**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE CHEROKEE NATION, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RAYMOND NASH, et al. | ) | Case No. 1:13-CV-1313 TFH |
| | ) | Judge Thomas F. Hogan |
| Defendants/Cross-Claimants/ | ) | |
| Counter-Claimants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MARILYN VANN, et al. | ) | |
| | ) | |
| Intervenor-Defendants/Cross-Claimants/ | ) | |
| Counter-Claimants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SALLY JEWELL, SECRETARY OF THE INTERIOR, | ) | |
| AND THE UNITED STATES DEPARTMENT OF | ) | |
| THE INTERIOR, | ) | |
| | ) | |
| Counter-Claimants/Cross-Defendants. | ) | |

**THE DEPARTMENT OF THE INTERIOR'S MOTION FOR
SUMMARY JUDGMENT, MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT THEREOF,
AND OPPOSITION TO THE CHEROKEE NATION AND
PRINCIPAL CHIEF BAKER'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

## MOTION FOR SUMMARY JUDGMENT

Sally Jewell, the Secretary of the Interior, and the United States Department of the Interior (collectively, "Interior") move for summary judgment, pursuant to Federal Rule of Civil Procedure 56, on Interior's counterclaim against the Cherokee Nation.  For the reasons more fully stated in the accompanying Memorandum of Points and Authorities, this Court should declare that the Treaty of 1866 between the Cherokee Nation and the United States guaranteed certain Cherokee Freedmen and their descendants "all the rights of native Cherokees," including the right to citizenship in the Cherokee Nation, and that this Treaty provision continues to guarantee descendants of eligible Freedmen with citizenship and all other rights of "native" Cherokees.  As a result, the Cherokee Nation's March 3, 2007 constitutional amendment making the descendants of Freedmen ineligible for citizenship is inconsistent with the Treaty.  The Cherokee Nation should be enjoined from denying tribal membership rights to descendants of those individuals listed on the "Freedmen" portion of the Cherokee Dawes Rolls.


Dated:  January 31, 2014

OF COUNSEL:
Jennifer Turner
Scott Keep
Office of the Solicitor
Department of the Interior
1849 C Street N.W.
Washington, D.C.  20240
Phone: (202) 208-6260

Respectfully Submitted,

ROBERT G. DREHER
Acting Assistant Attorney General

/s/ Amber Blaha
Amber Blaha (D.C. Bar No. 471008)
Frederick Turner
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
Law & Policy Section
P.O. Box 7415, Ben Franklin Station
Washington, D.C.  20044-7415
Phone: (202) 616-5515
Facsimile: (202) 514-4231
amber.blaha@usdoj.gov
frederick.turner@usdoj.gov

*Counsel for Department of the Interior*

i

## OBJECTION TO THE CHEROKEE NATION'S FACTUAL ASSERTIONS

**The Court Should Disregard Inadmissible Factual Assertions in the Cherokee Nation's Motion for Partial Summary Judgment.**

The Cherokee Nation's ("Cherokee Nation" or "Tribe") Memorandum in Support of its Motion for Partial Summary Judgment includes a section entitled "Historical Summary," as well as "an expanded version" of the historical summary and a chronological timeline attached as exhibits.  *See* Memorandum in Support of Cherokee Nation and Principal Chief Baker's Motion for Partial Summary Judgment (hereinafter, "CN Br.") at 3-7 and Ex. B, C.  Many statements in this section and these exhibits are entirely unsupported; other statements are supported by citations to unpublished dissertations which were not provided to the Court or the parties.  *See, e.g.,* CN Br. at 3 n. 5, 4 n. 13, 5 n. 17.  Several statements are clearly opinions or represent a biased view of history.  *See, e.g.,* CN Br. at 6-7; CN Br. at 12.[1]  For example, one of the principal sources for this historical summary, Robert J. Conley's *The Cherokee Nation: A History*, is a book commissioned by the Cherokee Nation and written with the input of former Chief Chad Smith and other Cherokee officials.[2]

Federal Rule of Civil Procedure 56(c) requires that the party moving for summary judgment support its factual positions with admissible record evidence.  Fed. R. Civ. P. 56(c).

---

[1] As but one example, the Cherokee Nation asserts that "[t]here can be no dispute that the provisions of the 1866 Treaty were extremely punitive towards the Nation, and were used as a furtherance of the United States' desire for a complete diminishment and dissolution of the Nation."  CN Br. at 12.  This sweeping statement is made without citation or support.  As described more fully in Interior's Memorandum at 6-9, Interior disputes this characterization of the facts.

[2] *See* Conley, *The Cherokee Nation: A History*, Acknowledgements at xiii (2005); *see also Interview with Cherokee Author Robert J. Conley*, HistoryNet.com (Jan. 30, 2009) http://www.historynet.com/interview-with-cherokee-author-robert-j-conley.htm (Robert Conley stating that "The Cherokee Nation: A History" "was written originally under a contract with the Cherokee Nation" and that in the process of finalizing the book "there were comments from the chief and a large committee.")

This Court's Local Rule 7(h) requires that summary judgment motions be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, including parts of the record relied upon to support the statement.  D.D.C. LCvR. 7(h).  The Cherokee Nation filed no statement of material facts.[3]

Given the Cherokee Nation's failure to comply with Federal Rule 56 or Local Rule 7(h), the Court should not rely on or accept the facts set forth in the Tribe's "Historical Summary" section, the portions of the brief that rely on unsupported facts, or Exhibits B or C.  *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Footbridge Ltd. v. Zhang*, 584 F. Supp. 2d 150, 154 (D.D.C. 2008) (requiring statement of material facts to contain citations to record evidence).  The Cherokee Nation has not identified which facts, if any, it believes are material to its motion, and has thus not provided the United States with an opportunity to contest these facts. This Court has the authority to require compliance with its rules, in order to protect the Court's resources and the nonmovant's opportunity to contest the motion.  For example, in *Gardels v. Central Intelligence Agency*, 637 F.2d 770, 773 (D.C. Cir. 1980), the court reversed summary judgment and remanded to the lower court so that the CIA could file a statement of material facts in conformity with the rule, noting that the purposes of the rule "clearly are not served when one party, particularly the moving party, fails in his statement to specify the material facts upon which he relies. . . ."  In this case, the Court should disregard all purported factual statements in the Cherokee Nation's filing.

---

[3] The parties jointly asked the Court to permit summary judgment briefing on the question of whether the Freedmen possess a right to equal citizenship in the Cherokee Nation under the Treaty of 1866.  *See* Joint Motion for Entry of Order Setting Briefing Schedule for Summary Judgment on Core Issue and Staying Case on All Other Matters, Docket No. 223.  However, the parties did not ask the Court to waive the requirement to file a statement of material facts, nor did the parties agree on a set of undisputed facts.  In fact, the parties expressly reserved their rights under Federal Rule of Civil Procedure 56(d), if it became clear during briefing that additional factual development would be appropriate prior to summary judgment.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ vi

INTRODUCTION ......................................................................................................... 1

HISTORICAL BACKGROUND .................................................................................... 3

    A.   Cherokee History Prior to the Civil War............................................................. 3

    B.   The Cherokees and the Civil War ..................................................................... 4

    C.   The Negotiation of the Treaty of 1866............................................................. 5

    D.   1866-1870: Implementation of the Treaty ....................................................... 9

    E.   1870-1890: Disputes Regarding Which Freedmen Were Entitled to Citizenship
       and Per Capita Payments ............................................................................... 10

    F.   1890-1905: Allotment ...................................................................................... 14

    G.   1906: The Five Tribes Act .............................................................................. 16

    H.   1907-1970: Oklahoma Statehood and the Indian Claims Commission ......................... 18

    I.   1970-Present: Modern Day Treatment of the Freedmen.................................. 19

ARGUMENT ............................................................................................................... 20

I.   SUMMARY JUDGMENT STANDARD ...................................................... 21

II.   THE TREATY OF 1866 GRANTED "ALL THE RIGHTS OF NATIVE
    CHEROKEES," INCLUDING POLITICAL, CIVIL, AND PROPERTY RIGHTS,
    TO ELIGIBLE FREEDMEN AND THEIR DESCENDANTS. ...................................... 21

    A.   The Treaty's Plain Language Grants Full Rights within the Cherokee Nation to
       the Freedmen. ................................................................................................. 23

    B.   The Historical Context and Negotiation History of the Treaty Indicates that
       Article 9 Granted Citizenship Rights to the Freedmen. .................................. 26

    C.   The Practical Construction of Article 9 by the Parties Demonstrates a Mutual
       Understanding that the Treaty Guaranteed Citizenship to the Freedmen. ..................... 33

    D.   Federal Courts and Tribunals Have Interpreted Article 9 as Providing the
       Freedmen with Equal Rights and Immunities. ............................................... 37

1.    The Opinions and Decrees in *Whitmire v. Cherokee Nation* Underscored the Expansive Rights of the Freedmen Under the Treaty............................................ 38

2.    The D.C. Circuit and This Court Have Interpreted Freedmen Provisions in Post-Civil War Treaties as Providing a Comprehensive Guarantee of Rights. .......... 43

3.    The Indian Claims Commission Cases Demonstrate That There Was No Dispute That the Treaty Guaranteed Citizenship to the Freedmen............................ 44

III.   ARTICLE 9 OF THE TREATY OF 1866 WAS NOT ABROGATED BY THE FIVE TRIBES ACT OF 1906. .......................................................................................... 47

A.   Congress Did Not Expressly Abrogate the Treaty of 1866............................................ 49

B.   Congressional Intent to Abrogate Cannot Be Implied from the Text of the FTA. ....... 50

C.   There Are No Other Indicia of Congressional Intent to Alter the Rights of Freedmen Descendants................................................................................................. 53

D.   No Federal Court Has Held that the FTA Abrogated Article 9. .................................... 55

IV.   THE CHEROKEE NATION DOES NOT HAVE A SOVEREIGN RIGHT TO DISREGARD FEDERAL TREATY OBLIGATIONS. ................................................ 57

CONCLUSION ................................................................................................................ 60

## TABLE OF AUTHORITIES

**Cases**

*Blackfeather v. United States*, 190 U.S. 368 (1903) ...................................................... 10

*Bollman Hat Co. v. Root*, 112 F.3d 113 (3d Cir. 1997) ................................................ 23

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ............................................................. 21

*Cherokee Freedmen v. United States*, 195 Ct. Cl. 39 (1971)........................................ 40

*Cherokee Nation of Oklahoma v. Norton*, 389 F.3d 1074 (10th Cir. 2004) ................................. 26

*Cherokee Nation v. Journeycake*, 155 U.S. 196 (1894).............................. 10, 26, 36, 39

*Cherokee Nation v. United States*, 180 Ct. Cl. 181 (1967)........................................... 40

*Cherokee Nation v. Whitmire*, 223 U.S. 108 (1912)................................. 18, 42, 52, 56

*Chickasaw Nation v. United States,* 534 U.S. 84 (2001) ............................................. 52

*\*Choctaw Nation v. United States,* 318 U.S. 423 (1943) ................................ 22, 27, 33

*Dred Scott v. Sandford*, 60 U.S. 393 (1856) ................................................................... 6

*El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155 (1999).......................... 27

*Elk v. Wilkins*, 112 U.S. 94 (1884)................................................................................. 6

*Garfield v. United States ex rel. Lowe*, 34 App. D.C. 70 (D.C. Cir. 1909) ........................... 55, 56

*Goat v. United States*, 224 U.S. 458 (1912)................................................................. 56

*Green v. Biddle*, 21 U.S. (1821)................................................................................... 22

*Gulf Power Co. v. F.C.C.*, 669 F.3d 320 (D.C. Cir. 2012) ..................................... 38, 39

*Harjo v. Kleppe*, 420 F. Supp. 1110 (D.D.C. 1976). ...................................... 14, 16, 52

*Haver v. C.I.R.*, 444 F.3d 656 (D.C. Cir. 2006).......................................................... 49

*Holcomb v. Powell,* 433 F.3d 889 (D.C. Cir. 2006) ..................................................... 21

*In the Matter of Enrollment of Persons Claiming Rights in the Cherokee Nation*,
      40 Ct. Cl. 411 (1905) ....................................................................................... 35, 41

*Journeycake v. Cherokee Nation*, 28 Ct. Cl. 281 (1893) ............................................. 39

*Leavenworth, L. & G. R. Co. v. United States*, 92 U.S. 733 (1876) ............................ 49

*Lewis v. Norton*, 424 F.3d 959 (9th Cir. 2005) ............................................................ 59

*Lone Wolf v. Hitchcock*, 187 U.S. 533 (1903) ............................................................ 22

*Mclean v. United States*, 226 U.S. 374 (1912)............................................................ 23

*Medellin v. Texas*, 552 U.S. 491 (2008) .................................................................... 22

*Menkes v. U.S. Dept. of Homeland Sec.*, 637 F.3d 319 (D.C. Cir. 2011) ...................................... 38

*Menominee Tribe of Indians v. United States*, 388 F.2d 998 (Ct. Cl. 1967) ............................... 49

*Menominee Tribe of Indians v. United States*, 391 U.S. 404 (1968) .......................................... 50

*Miller v. Clinton*, 687 F.3d 1332 (D.C. Cir. 2012) ....................................................... 51

*Mingo Logan Coal Co. v. U.S. E.P.A.*, 714 F.3d 608 (D.C. Cir. 2013)....................................... 51

*\*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) ....... 23, 27, 31, 49, 50

*Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439 (D.C. Cir. 1988) ......................................... 58

*Nat'l Steel & Shipbuilding Co. v. United States*, 419 F.2d 863 (Ct. Cl. 1969)............................. 23

*Nero v. Cherokee Nation*, 892 F.2d 1457 (10th Cir. 1989) .................................................. 59, 60

*Nobelman v. Am. Savings Bank,* 508 U.S. 324 (1993)........................................................ 52

*Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe,* 473 U.S. 753 (1985)................. 22, 24

*Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874 (2d Cir. 1996) ............................... 57

*Quair v. Sisco*, 359 F. Supp. 2d 948 (E.D. Cal. 2004).................................................... 59

*Red Bird v. United States (Cherokee Intermarriage Cases)*, 203 U.S. 76 (1906 ........................ 15

*Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140 (D.D.C. 2002).................................... 49

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978)........................................................ 57, 59

*Seminole Nation of Oklahoma v. Norton*, 2001 WL 36228153 (D.D.C. Sept. 27, 2001). 32, 44, 56

*Seminole Nation of Oklahoma v. Norton*, 206 F.R.D. 1 (D.D.C. 2001) ....................................... 44

*Seminole Nation of Oklahoma v. Norton*, 223 F. Supp. 2d 122 (D.D.C. 2002)............................... 44

*Seminole Nation v. United States*, 78 Ct. Cl. 455 (1933)................................................... 24, 41

*Seminole Nation v. United States*, 90 Ct. Cl. 151 (1940)................................................... 57

*Slaughter-House Cases*, 83 U.S. 36 (1872) .................................................................. 6

*Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243 (1984) ..................................... 49

*TRW, Inc. v. Andrews*, 534 U.S. 19 (2001) ................................................................. 51

*United Keetoowah Band of Cherokee Indians of Oklahoma v. United States*,
  67 Fed. Cl. 695 (Ct. Cl. 2005) ......................................................................... 58

*\*United States v. Dion*, 476 U.S. 734 (1986).................................................... 49, 50, 53

*United States v. Wheeler*, 435 U.S. 313 (1978) ........................................................... 57

*United States v. X-Citement Video, Inc.,* 513 U.S. 64 (1994) .............................................. 52

*Vann v. Kempthorne*, 534 F.3d 741 (D.C. Cir. 2008) .................................................. 57, 58

*Vann v. U.S. Dep't of Interior*, 701 F.3d 927 (D.C. Cir. 2012) ........................................... 43

*Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*,
  443 U.S. 658 (1979).......................................................................... 22, 49, 50

*Wheeler v. U.S. Dep't of Interior*, 811 F.2d 549 (10th Cir. 1987)......................................... 59

*\*Whitmire v. Cherokee Nation*, 30 Ct. Cl. 138 (1895) ................................................ 24, 39, 40

*\*Whitmire v. Cherokee Nation*, 30 Ct. Cl. 180 (1895) .............................................. 13, 39

*Whitmire v. Cherokee Nation*, 31 Ct. Cl. 140 (1896) ............................................... 43, 52, 56

*Whitmire v. Cherokee Nation*, 44 Ct. Cl. 453 (1909) ................................................. 18, 42

*Whitmire v. Cherokee Nation*, 46 Ct. Cl. 227 (1911) ................................................. 14, 42, 43

*\*Whitmire v. Cherokee Nation*, Ct. Cl. No. 17209 (Feb. 3, 1896)............................... 14, 37, 41, 54

*Williams v. Gover*, 490 F.3d 785 (9th Cir. 2007) ...................................................... 57

**Statutes**

14 Stat. 173 (July 16, 1866) ............................................................................. 33

14 Stat. 27 (Apr. 9, 1866) ............................................................................ 6, 33

22 Stat. 603 (Mar. 3, 1883) ............................................................................. 11

24 Stat. 388 (Feb. 8, 1887)............................................................................. 14

25 Stat. 608 (Oct. 19, 1888) ........................................................................ 13, 36

25 U.S.C. § 501 et seq........................................................................................ 18

25 U.S.C. § 503 ................................................................................................. 58

25 U.S.C. § 504 ................................................................................................. 18

25 U.S.C. § 70a et seq....................................................................................... 18

26 Stat. 636 (Oct. 1, 1890) ................................................................... 13, 36, 38

27 Stat. 612 (Mar. 3, 1893) ........................................................................ 13, 14

30 Stat. 495 (June 28, 1898) ....................................................................... 15, 17

30 Stat. 62 (June 7, 1897) ................................................................................. 14

34 Stat. 137 (Apr. 26, 1906) ................................................................. 16, 17, 48

34 Stat. 822 (Mar. 2, 1906) ............................................................................... 16

60 Stat. 1049 (Aug. 13, 1946) .................................................................... 18, 44

84 Stat. 1091 (Oct. 22, 1970) ........................................................................... 19

## Other Authorities

40 Cong. 1240-50 (1906) ....................................................................... 17, 53, 54

41 Fed. Reg. 1929-30 (Jan. 13, 1976) ............................................................. 46

Act of the Cherokee National Council, May 19, 1883 .................................... 12

Angie Debo, *And Still the Waters Run* (1972) ............................................... 17

*Annual Report of the Commissioner of Indian Affairs for the Year 1865* ............................... 5, 28

*Annual Report of the Commissioner of Indian Affairs for the Year 1866* .................................. 31

Cohen, *Handbook of Federal Indian Law* (2005) ......................................... 23

*Constitution and Laws of the Cherokee Nation* (1892)................................... 12

Daniel Littlefield, Jr., *The Cherokee Freedmen: From Emancipation to
    American Citizenship* (1978) ....................................... 4, 5, 10, 11, 12, 18

John Sanborn, Brevet Major General, Circular No. 1, Jan. 1, 1866 ............... 29

Kent Carter, *The Dawes Commission and the Allotment of the Five Civilized Tribes,
    1893-1914* (1999) ......................................................................... 15, 16

Letter from Harrison Loesch, Assistant Secretary, to Virgil N. Harrison, Area Director,
BIA Muskogee Area Office (Mar. 29, 1971). ...................................................................... 19

*Merriam-Webster Dictionary* (11th ed. 2004) ............................................................................ 23

Proclamation and Amendments to the Constitution (1870)...................................................... 9, 34

*Report of the Secretary of the Interior for the Fiscal Year Ended June 30, 1906* ........................ 55

Senate, *Letter of the Secretary of the Interior to the Chairman of the Committee on
Indian Affairs, Communicating Amendments to the Cherokee Treaty Concluded
July 9, 1868*, 41st Cong., 2d Sess., 1870 .............................................................................. 10

Solicitor's Opinion, Oct. 1, 1941, 1 Op. Sol. on Indian Affairs 1076-78 (U.S.D.I. 1979)........... 58

**Indian Claims Commission Documents**

*Cherokee Freedmen v. United States*, Docket 123, 10 Ind. Cl. Comm. 109 (Dec. 28, 1961) ...... 45

*Cherokee Freedmen v. United States*, Docket 123, 2 Ind. Cl. Comm. 231 (Sept. 9, 1952) ......... 45

*Cherokee Freedmen v. United States*, Docket 173-A, Response of the Cherokee Nation
to the Intervenors' Motion for Summary Judgment (June 9, 1969) ...................................... 46

*\*Cherokee Nation v. United States*, Docket 190,
12 Ind. Cl. Comm. 570 (Sept. 25, 1963).................... 4, 7, 8, 10, 19, 29, 37, 38, 40, 42, 46, 47

*Cherokee Nation v. United States*, Docket 190, Petition (August 2, 1951).................................. 47

**Treaties**

*\*Treaty with the Cherokees (July 19, 1866), 14 Stat. 799........................................... 8, 22, 25, 30

Treaty with the Choctaws and Chickasaws (Apr. 28, 1866), 14 Stat. 769 ................................... 32

Treaty with the Creeks (June 14, 1866), 14 Stat. 785.................................................................... 32

Treaty with the Seminoles (Mar. 21, 1866), 14 Stat. 755 ............................................................. 32

**Cherokee Tribal Cases**

*Cherokee Nation Registrar v. Nash*, S.C. 2011-02 (Cherokee Nation Supreme Court,
Aug. 22, 2011) ...................................................................................................................... 20

*Lucy Allen v. Cherokee Nation Tribal* Council, JAT 04-09 (Judicial Appeals Tribunal
of the Cherokee Nation, March 7, 2006) ............................................................................. 19

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

One hundred and fifty years ago, the Cherokee Nation signed a treaty of friendship with the Confederacy, thus severing its relationship with the Federal government.  At the close of the Civil War, the Federal government restored relations with the Tribe by negotiating and signing a new treaty – the Treaty of 1866 – between the United States and the Cherokee Nation.  In crafting this agreement, the Federal government was concerned about the rights and welfare of the Cherokee Nation's former slaves and other free blacks who were residing in what was then "Indian Territory" – not a state – and had homes, farms, and cultural and familial ties with the Cherokee Tribe.  Thus, an important provision of this Treaty was an agreement that the Cherokee Nation would grant certain of its former slaves and free blacks living in Cherokee territory, and their descendants, "***all the rights of native Cherokees***."

In interpreting treaties, courts must look to the plain language of the treaty itself, as well as the contemporaneous understanding of the parties.  The interpretation and implementation of a treaty in the years following its passage is also relevant.  Here, all of these factors point to a single conclusion – that the Treaty of 1866 granted eligible Freedmen and their descendants full citizenship rights in the Cherokee Nation, on the same basis as "native Cherokees."

Consistent with the expansive language of the Treaty itself, the historical record clearly demonstrates that the negotiators of the Treaty, subsequent Cherokee leadership, and federal officials all understood that the Treaty granted these Freedmen and their descendants full citizenship rights in the Tribe, including voting rights, civil rights, access to courts, and other benefits.  In the years following the signing of the Treaty, disputes arose about ***which*** Freedmen were entitled to rights under the Treaty.  But notably, until quite recently, the Cherokee Nation

1

did not dispute that at least some Freedmen were entitled to the same civil and political rights within the Nation as other Cherokee citizens.  Indeed, in the late nineteenth century, when the Cherokee Nation received payments for its lands and began the process of making per capita payments to its members, the Cherokee Nation disputed (unsuccessfully) the Freedmen's rights to proceeds from tribal lands but assumed without question that the Freedmen were entitled to civil and political rights as Cherokee citizens.  Thus, for at least a century after the Treaty was passed, the Cherokee Nation viewed the Treaty as granting to Freedmen all of the civil and political rights given to other Cherokee citizens.  Further, the Federal government and numerous court decisions have repeatedly concluded that the Freedmen's citizenship rights under the Treaty are broad, and include rights to tribal resources, such as per capita payments and allotments.  The Cherokee Nation's modern challenge to the Freedmen descendants' status as tribal citizens asks this Court to ignore this compelling history.

Contrary to the Cherokee Nation's assertion in its Motion for Summary Judgment, Congress has never abrogated the Treaty provision granting tribal citizenship rights to the Freedmen.  The Supreme Court has long held that Congress must clearly express its intent to revoke the provisions of a treaty; this is particularly true with respect to Indian treaties.  Here, there is no such clear expression of congressional intent.  The Treaty provision granting tribal citizenship rights continues in full force and effect today.

This is true notwithstanding the Cherokee Nation's sovereign authority over most internal affairs.  The United States acknowledges and supports tribal self-determination, and seeks to minimize federal interference in intratribal matters.  However, where federal law clearly addresses an issue – as the Treaty of 1866 does here – it must govern.  In this case, the Cherokee Nation's tribal courts have had the opportunity to address this dispute, but determined that it was

2

outside of their jurisdiction.  Thus, it is appropriate for this Court to determine that the Treaty of

1866 granted and continues to grant eligible Freedmen descendants "all the rights of native

Cherokees," including the right to be citizens of the Cherokee Nation, the right to vote in tribal

elections, and any other benefits, privileges, and obligations, on the same basis as other Cherokee

individuals.

## HISTORICAL BACKGROUND[4]

### A.  Cherokee History Prior to the Civil War

The Cherokee people originally occupied portions of present-day Georgia, North

Carolina, and Tennessee.  *See* Ex. 3, Expert Report of Dr. Emily Greenwald, "Article 9 of the

1866 Cherokee Treaty" (hereinafter "Greenwald Rep.") at 3.[5]  During the eighteenth century and

early nineteenth century, some Cherokees took on some of the economic and social

characteristics of the European colonists (later Americans) in the region, including the practice of

using slaves to support plantation agriculture.  *Id.*  The Cherokees, along with the Creeks,

Seminoles, Choctaws, and Chickasaws, became known to Americans as the "Five Civilized

Tribes" because they developed constitutional governments, economies, and other characteristics

that matched Euroamerican ideas of civilization.  *Id.*

In 1830, Congress passed the Indian Removal Act, which authorized the President of the

United States to enter treaties with tribes to remove them to Indian Territory, a large area west of

the Mississippi River.  *Id.* at 4.  The Cherokees (along with other southeastern tribes) were

forced to relocate to territory in what is now the State of Oklahoma.  *Id.* at 4-5.  Many Cherokee

---

[4] A statement of material facts as to which there is no genuine issue is attached at Exhibit 1.  *See* D.D.C. LCvR. 7(h).

[5] A more detailed discussion of the historical background is contained in the Expert Report of Emily Greenwald, Ph.D., attached at Exhibit 3.  If it would be useful to the Court, counsel can provide a DVD containing the report with hyperlinks to all cited source documents.

slaveholders brought their slaves with them to the Indian Territory.  *Id.*  After removal to Indian Territory, the Cherokee Nation adopted a new constitution in 1839 that established rights for citizens and effectively prohibited most persons of African descent from being citizens of the Cherokee Nation.  *Id.* at 6-7.  The Cherokee Nation also passed a series of harsh slave codes between 1840 and 1855 that, among other things, forbade anyone from teaching blacks to read or write, and barred public school teachers favoring abolition from the Cherokee Nation.  *See, e.g.,* Daniel Littlefield, Jr., *The Cherokee Freedmen: From Emancipation to American Citizenship* (1978), at 9.[6]  The Cherokees held a larger number of slaves than any of the other tribes in the Indian Territory; when the Civil War started in 1860 they had 2,511.  *Id.* at 8-9.

**B.  The Cherokees and the Civil War**

At the outset of the Civil War, there were internal divisions within the Cherokee Nation regarding whether to align the Tribe with the Union or the Confederacy.  Ex. 3, Greenwald Rep. at 8; *see also* Ex. 4, *Cherokee Nation v. United States*, Docket 190, 12 Ind. Cl. Comm. 570, 592-98 (Sept. 25, 1963).  The Cherokee Nation entered into a treaty of friendship and alliance with the Confederate States on October 7, 1861.  Ex. 3, Greenwald Rep. at 8; Ex. 4, 12 Ind. Cl. Comm. at 630-31 (finding that "[e]ntering into this treaty was an act of the duly constituted Cherokee government.")  By signing this treaty with the Confederate States, the Indian Claims Commission later found that "[t]he Cherokee Nation absolutely and unilaterally annulled all pre-existing treaties between that Nation and the United States."  Ex. 4, 12 Ind. Cl. Comm. at 632.

As the Civil War progressed, there continued to be divisions within the Cherokee Nation regarding the alliance with the Confederacy.  Although Principal Chief John Ross signed the treaty with the Confederacy, he later repudiated this alliance and was exiled in Union territory.

---

[6] Excerpts of cited books can be provided by counsel upon request.

Ex. 3, Greenwald Rep. at 9.  Pro-Confederate Cherokees remained in Indian Territory, and

elected Stand Watie as principal chief.  *Id.*  Thus, during the Civil War, the Cherokee Nation was

split into two factions – the pro-Confederate majority that remained in Indian Territory and was

led principally by Stand Watie; and a pro-Union government-in-exile led primarily by John Ross.

*Id.*  The pro-Union government-in-exile abolished slavery within the Cherokee Nation on

February 18, 1863, shortly after President Lincoln issued the Emancipation Proclamation, and

enacted legislation granting liberated slaves the same rights as other non-citizens of the Cherokee

Nation.  *Id.*

As a practical matter, many slaves and free blacks left Cherokee territory during the Civil

War.  Some slaves were taken by their masters to the southern part of Indian Territory or to

Texas, while others escaped to Kansas or other Union states, where many lived in refugee camps

or joined black units of the Union Army.  Littlefield, at 29; Ex. 3, Greenwald Rep. at 22.

### C.  The Negotiation of the Treaty of 1866

As the Civil War drew to a close in 1865, the United States sought to restore political

relations with those tribes that had aligned with the Confederacy.  Ex. 3, Greenwald Rep. at 10.

To this end, the U.S. treaty commissioners met with the Cherokees and other Five Civilized

Tribes at Fort Smith, Arkansas in September 1865 to negotiate new treaties.  *Id.*  The U.S.

commissioners presented a list of provisions that the "treaties must contain."  These provisions

included a requirement that the institution of slavery be abolished and that measures be taken for

the "incorporation [of the emancipated slaves] into the tribes on an equal footing with the

original members, or suitably provided for."  *Id.*; Ex. 5, *Annual Report of the Commissioner of*

*Indian Affairs for the Year 1865* (2004), at 318.

Two separate Cherokee delegations attended the 1865 Fort Smith treaty negotiations – the Southern Cherokees, who had aligned with the Confederacy throughout the war, and the Northern Cherokees, who had broken ties with the Confederacy and aligned with the Union. Ex. 3, Greenwald Rep. at 11. At Fort Smith, both delegations signed a basic agreement of peace with the United States. *Id.*

The treaty negotiations should be viewed in the context of other federal actions of the same period. At the time of the treaty negotiations, the United States was in the process of ratifying the Thirteenth Amendment to the Constitution, which banned slavery (passed by Congress in January 1865, and ratified in December 1865). In the spring of 1866, Congress passed the Civil Rights Act, guaranteeing citizenship without regard to race, color, or previous condition of slavery, and guaranteeing equal benefits and access to law. Ex. 6, Act. of Apr. 9, 1866, ch. 31, 14 Stat. 27 (1866). In 1865 and 1866, Congress was also in the process of negotiating what would become the Fourteenth Amendment to the Constitution, which granted citizenship to all persons born or naturalized in the United States, including former slaves.[7] Prior to the Fourteenth Amendment, there was no constitutional right to United States citizenship for African Americans, *see Dred Scott v. Sandford*, 60 U.S. 393 (1856), or for those born in the Territories. *See Slaughter-House Cases*, 83 U.S. 36, 72-73 (1872). At the time of the treaty negotiations, there would have been uncertainty as to the citizenship status of freed slaves and other blacks who resided within the Cherokee Nation's territory (and not within any state), including whether these individuals would be encompassed by the contemplated Fourteenth

---

[7] The Fourteenth Amendment's self-executing citizenship provisions did not apply to Indians, *Elk v. Wilkins*, 112 U.S. 94, 102 (1884).

Amendment.  Thus, the Federal negotiators needed to make express provisions in the treaties for citizenship and other rights for Freedmen and free blacks,[8] as well as their descendants.

When treaty negotiations with the Cherokees and other tribes commenced anew in January 1866, the status of the Freedmen remained a principal point of discussion, and one of importance to the United States.  Ex. 3, Greenwald Rep. at 11-15; Ex. 4, 12 Ind. Cl. Comm. at 614.  The two Cherokee factions had competing proposals for treaty provisions, with the Southern Cherokees seeking separate territories and governments for the two factions, and the Northern Cherokees seeking a single tribe and territory.  Ex. 3, Greenwald Rep. at 16.

Despite the differences between the factions, both the Northern and Southern Cherokees appeared willing to grant substantial rights and privileges to the Freedmen.  For example, on May 12, 1866, the Northern delegation stated, "as we have repeatedly proposed to you and the Secretary of the Interior to make most liberal provision for our freedmen in lands and school funds, we have no doubt that any arrangement the Government would ask for their benefit would be freely conceded by us."  Ex. 4, 12 Ind. Cl. Comm. at 617.   And on June 13, 1866, the Southern Cherokees reached an agreement with the U.S. Commissioners on a treaty that would provide a separate territory for the Southern faction and provide that "the negro or colored population now or hereafter lawfully residing within the said limits shall be entitled to all the rights, privileges, and immunities belonging to any members of the Cherokee Nation parties hereto."  Ex. 7, Articles of Agreement with the Southern Cherokees, June 13, 1866, at Article 7; Ex. 3, Greenwald Rep. at 16.  This treaty was signed but never ratified.  Ex. 3, Greenwald Rep. at 17.

---

[8] In 1865, the newly freed slaves were generally referred to as "Freedmen" and those individuals who were not enslaved were referred to as "free blacks."  In this brief, the term "Freedmen" may be used to refer to both groups.

In July 1866, the United States recognized John Ross as principal chief of the entire

Cherokee Nation and on July 19, 1866, the U.S. Commissioners reached an agreement with Ross

and other Cherokee representatives.  Article 9 of that treaty provided:

> The Cherokee Nation having, voluntarily, in February, eighteen hundred and
> sixty-three, by an act of the national council, forever abolished slavery, hereby
> covenant and agree that never hereafter shall either slavery or involuntary
> servitude exist in their nation otherwise than in the punishment of crime, whereof
> the party shall have been duly convicted, in accordance with laws applicable to all
> the members of said tribe alike. They further agree that all freedmen who have
> been liberated by voluntary act of their former owners or by law, as well as all
> free colored persons who were in the country at the commencement of the
> rebellion, and are now residents therein, or who may return within six months,
> and their descendants, shall have all the rights of native Cherokees: *Provided*,
> That owners of slaves so emancipated in the Cherokee Nation shall never receive
> any compensation or pay for the slaves so emancipated.

Ex. 8, Treaty with the Cherokees, 14 Stat. 799 (1866).  Article 4 of the Treaty partially addressed

the Southern faction's desire for a separate territory by granting the Cherokees, along with freed

slaves and other free black persons who resided in the Cherokee Nation prior to the Civil War,

the right to settle in and occupy the "Canadian district" in the southern portion of Cherokee

territory.  *Id.*  Articles 5 and 6 granted those living in the Canadian district the right to elect local

officers and judges, and participate in any general council.  *Id.*

The U.S. treaty negotiators also aimed to provide for the settlement of several tribes that

were residing in Kansas.  Article 15 of the Treaty included a provision allowing "friendly"

Indians that settled among the Cherokees and paid a certain sum into the Cherokee national fund,

to "be incorporated into and ever after remain a part of the Cherokee nation, on equal terms, in

every respect with native citizens."  *Id.*; Ex. 3, Greenwald Rep. at 17-18.  The Treaty did not

include many of the provisions that had been objected to by the Cherokee Nation, such as large

railroad rights of way, the imposition of a territorial government, uncompensated cession of land,

or division of the Cherokee Nation.  *See, e.g.,* Ex. 4, 12 Ind. Cl. Comm. at 618.

When negotiations first began in September 1865, the United States had aimed to incorporate Freedmen on an equal footing.  Just under a year later, the Treaty of 1866 accomplished this goal by providing the Cherokee Freedmen with "all the rights of native Cherokees."  The Treaty was ratified by the Senate on July 27, 1866 and promulgated by the President on August 11, 1866.

**D. 1866-1870: Implementation of the Treaty**

After the Cherokee Treaty was ratified, both parties began taking steps to implement its terms, including Article 9.  On October 19, 1866, Principal Chief William P. Ross delivered a message to the Cherokee Council regarding the implementation of the Treaty, noting that there was a need for a census of the Cherokee people to include "the names, ages, and residence of all whites who are legal citizens by adoption, and of all blacks admitted to the full rights of Cherokee citizenship by the 9th Article of the Treaty…."  Ex. 9, "Message of Hon. Wm. P. Ross to the Cherokee Council," Oct. 19, 1866; Ex. 3, Greenwald Rep. at 20.  Just over a month later, on November 28, 1866, the Cherokee Nation amended its constitution to add the following language:

> All Native Born Cherokees, all Indians and Whites Legally Members of the Nation by Adoption, and all Freedmen who have been Liberated by Voluntary Act of their Former Owners or by Law, as well as Free Colored Persons who were in the Country at the Commencement of the Rebellion, and are now Residents therein, or who may return within Six Months from the 19th day of July, 1866, and their Descendants, who Reside within the Limits of the Cherokee Nation, shall be taken, and deemed to be Citizens of the Cherokee Nation.

Ex. 10, Proclamation and Amendments to the Constitution (1870), at 19; Ex. 3, Greenwald Rep. at 20.  The Principal Chief's Proclamation of the constitutional amendments referred to the Treaty of 1866, noting that "certain things were agreed to between the parties to said treaty, involving changes in the Constitution of the Cherokee Nation. . . ."  *Id.* at 17.; *see also* Ex. 4, 12

Ind. Cl. Comm. at 619 (recounting Chief Ross' statement that the amendments to the constitution "seem to be required, in part, by that treaty"). There were estimated to be 2,000-2,500 freedmen in the Cherokee Nation at this time. Littlefield, at 28.

Subsequently, the United States and the Cherokee Nation sought to negotiate a supplemental treaty agreement to clarify some aspects of the Treaty. Article 9 does not appear to have been in dispute; in fact, the parties' negotiations indicate that there was agreement at the time that Article 9 granted citizenship rights to qualified freedmen. Ex. 3, Greenwald Rep. at 19-21-22; Ex. 12, S. Comm. on Indian Affairs, *Letter of the Secretary of the Interior to the Chairman of the Committee on Indian Affairs, Communicating Amendments to the Cherokee Treaty Concluded July 9, 1868*, Mis. Doc. No. 148, 41st Cong. (2d Sess. 1870). Other aspects of the 1866 Treaty were also implemented in these years: for example, the Cherokee and the Delaware Indians entered into an agreement on April 8, 1867 to settle the Delawares on certain Cherokee lands as provided in Article 15 of the Treaty. *See Cherokee Nation v. Journeycake*, 155 U.S. 196, 200 (1894). An agreement was made with the Shawnee pursuant to Article 15 on June 7, 1869. *See Blackfeather v. United States*, 190 U.S. 368, 372 (1903).

### E. 1870-1890: Disputes Regarding Which Freedmen Were Entitled to Citizenship and Per Capita Payments

The Treaty's restrictions as to which Freedmen were entitled to Cherokee citizenship proved to be problematic to apply in practice. U.S. officials noted that some former slaves had been unable to return to Cherokee territory within six months. Ex. 3, Greenwald Rep. at 22-23; Littlefield, at 29. Some slave children had been sold and separated from their families, and were unable to get back to the Cherokee territory at the end of the war. *Id.* Thus, the six-month deadline had the effect of splitting up families that could not return together. Other former slaves did not know about the Treaty provisions, or were forcibly prevented from returning to the

Nation. *Id.* In 1872, U.S. Agent John Jones noted that "[f]or two consecutive years the principal chief, Lewis Downing, has recommended in his annual message to the national council, that these freedmen [who failed to return within six months] be adopted as citizens, but the measure failed to pass at both sessions of the national council." Ex. 3, Greenwald Rep. at 23.

By 1878, the Cherokee National Council had created a Cherokee Commission on Citizenship to hear claims for citizenship on a case-by-case basis, but the Cherokee Nation's determinations of Freedmen citizenship did not entirely resolve the issue. Ex. 3, Greenwald Rep. at 22. In 1883, U.S. Indian Agents investigated the disputed citizenship claims, and concluded that many "colored people residing in the Cherokee nation" "would be excluded from the rights of citizenship by a strict construction and severe application of the six months limitation clause in Article nine of the treaty of 1866. By the spirit and equities of the treaty they are entitled to citizen[']s rights. By its letter they would be excluded." *Id.* at 24. These disputes were not about whether *any* Freedmen should be granted citizenship rights within the Tribe, but rather whether the qualifications for citizenship should be loosened in practice, as a matter of equity. Those freedmen who were recognized as citizens "had access to the political system of the Cherokee Nation and voted in local and national elections," whereas those who were not faced potential ejectment from Cherokee lands. Littlefield at 63.

Against the backdrop of these issues, economic factors began to influence the Cherokee Nation's actions towards the Freedmen. In the 1880s and 1890s, the Cherokee Nation sold or leased portions of what was known as the Cherokee Outlet, generating substantial monies for the Tribe. Ex. 3, Greenwald Rep. at 25. For example, in 1883, Congress appropriated $300,000 to be paid to the Cherokee Nation for certain western lands on which the United States had settled other tribes. *Id.*; Ex. 13, Act of March 3, 1883, ch. 143, 22 Stat. 603, 624. The Cherokee

11

National Council passed legislation to distribute the proceeds from this sale per capita "to the citizens of the Cherokee Nation by Cherokee blood," thus excluding Freedmen as well as other classes of Cherokee citizens.  Ex. 14, Act of the Cherokee National Council (May 19, 1883); Ex. 3, Greenwald Rep. at 25.  Principal Chief Dennis Wolf Bushyhead protested that this legislation violated Article 9 of the Treaty of the 1866 and vetoed it, but it was passed over his veto in 1883.  Littlefield at 119.

A group of Freedmen petitioned the President of the United States for their share of the payment, on the grounds that the Council's act violated Article 9 of the Treaty.  Ex. 3, Greenwald Rep. at 27.  The Commissioner of Indian Affairs and the Secretary of the Interior agreed that the Cherokee statute violated the Treaty, which gave qualified Freedmen "all the rights of native Cherokees."  Ex. 3, Greenwald Rep. at 26.  The House Committee on Indian Affairs' report on legislation to address the issue concluded that the Cherokee Council's 1883 act was "in conflict with the treaties existing between said nation and the United States."  Ex. 3, Greenwald Rep. at 28; *see also* Ex. 40 (House Report).  That same year, the Cherokee Nation Council took an additional step to limit payments only to Cherokees by blood – but acknowledged that the Treaty at least granted non-property rights within the Tribe – when it passed legislation construing Article 9 of the Treaty as providing only the "civil, political, and personal" rights granted to white adopted citizens of the Nation, and not "any right or title to the Cherokee Domain, or to the proceeds thereof…."  Ex. 15, *Constitution and Laws of the Cherokee Nation*, at 371-72 (1892); Ex. 3, Greenwald Rep. at 27.

To remedy the situation, in 1888, Congress passed legislation to appropriate $75,000 to make a per capita distribution equal to that made to Cherokees by blood "among such freedmen and their descendants as are mentioned in the ninth article of the treaty of July 19, 1866…."  ;

12

Ex. 16, Ch. 1211, 25 Stat. 608 (Oct. 19, 1888); Ex. 3, Greenwald Rep. at 28.  In order to determine who was entitled to a share in the $75,000, Congress authorized the Secretary of the Interior to investigate this and "what other sums of money, if any, have been appropriated by the Cherokee Nation in violation of their treaty obligation in reference to freedmen in said nation…."  Ex. 3, Greenwald Rep. at 28.  The Secretary of the Interior appointed a Special Commissioner, John W. Wallace, who created an 1890 census of the Freedmen who qualified for citizenship, known as the "Wallace Roll."  Ex. 3, Greenwald Rep. at 28-29.

        In 1890, Congress determined that many Freedmen were still not receiving payments.  In response, Congress passed a statute allowing the Freedmen of the Cherokee Nation, as well as the Shawnee and Delaware Indians, to file suit in the U.S. Court of Claims against the Cherokee Nation and the United States for monies from sale, leasing, or rent of the Cherokee Outlet that were due pursuant to the provisions of the Treaty of 1866.  Ex. 3, Greenwald Rep. at 29; Ex. 17, Act of Oct. 1, 1890, ch. 1249, 26 Stat. 636 (1890).  A year later, the Cherokee Nation agreed to cede the Cherokee Outlet to the United States.  Again, consistent with the view that the freedmen were entitled to the same share of the proceeds as other Cherokee citizens, the authorizing federal legislation provided that "a sufficient amount" of the funds would be "retained in the Treasury to pay the freedmen who are citizens of the Cherokee Nations or their legal heirs and representatives…."  Ex. 3, Greenwald Rep. at 29; Ex. 18, Act of Mar. 3, 1893, ch. 209, 27 Stat. 612, 640-41 (1893).

        In 1895, the Court of Claims ruled in *Whitmire v. Cherokee Nation*, 30 Ct. Cl. 180, 190-93 (1895), that the acts of the Cherokee National Council that restricted the distribution of funds only to Cherokees "by blood" were in violation of Article 9 of the Treaty of 1866.  In light of disputes about the accuracy of the 1890 Wallace Roll, on February 3, 1896 the Court of Claims

ordered that the Secretary of the Interior prepare a new roll on which payments to Freedmen

would be based.  Ex. 3, Greenwald Rep. at 31.  This decree stated that the Freedmen and their

descendants had "equal rights and immunities . . . in the same manner and to the same extent as

Cherokee citizens of Cherokee blood."  Ex. 19, *Whitmire v. Cherokee Nation*, Ct. Cl. No. 17209

(Feb. 3, 1896), printed in *Report of the Commission to the Five Civilized Tribes* (1903).  A

commission prepared this roll, which became known as the Kern-Clifton Roll, and the Secretary

of the Interior approved it in 1897.  Ex. 3, Greenwald Rep. at 31; *Whitmire v. Cherokee Nation*,

46 Ct. Cl. 227, 237 (1911).

## F.   1890-1905: Allotment

The sale of the Cherokee lands, and subsequent opening of these lands to non-Indian

settlement, was part of a larger Federal policy shift that was intended to diminish the communal

land holdings of Indian tribes throughout the United States.  The General Allotment Act of 1887,

also known as the Dawes Act, was intended to convert the communally-held lands of tribes to

individually-owned parcels by allotting land to individual Indians and opening the remaining

lands to homesteading.  Ex. 20, Act. of Feb. 8, 1887, ch. 119, 24 Stat. 388 (1887).  The Cherokee

and the other Five Tribes were initially exempt from the Dawes Act, but were included by

legislation in 1893 when Congress created a commission to negotiate with the Five Tribes for

extinguishment of communal lands and creation of a new state (Oklahoma).  Ex. 18, 27 Stat. at

645.  In 1897, Congress made federal law applicable to all persons in the Indian territory,

including Indians, thus diminishing the authority of the tribes.  Act of June 7, 1897, ch. 3, 30

Stat. 62, 83 (1897); *Harjo v. Kleppe*, 420 F. Supp. 1110, 1121 (D.D.C. 1976).

The Five Tribes continued to resist allotment, and to expedite the process, Congress

passed the Curtis Act in 1898.  The Curtis Act transferred the authority to determine tribal

14

membership to the Dawes Commission, and authorized that commission to prepare tribal rolls

(including freedmen) as a basis for forced allotment of tribal lands.  Ex. 21, The Curtis Act, ch.

517, 30 Stat. 495, 502-04 (1898).  From 1899 to 1905, the Dawes Commission compiled the

"final rolls" of the Cherokee Nation, comprising of Cherokees by blood, Cherokee Freedmen,

citizens by marriage, and Delawares.  Ex. 22, Excerpts of Final Rolls of the Citizens and

Freedmen of the Five Civilized Tribes in Indian Territory, available at

www.archives.gov/research/native-americans/dawes/intro.html.  By Congressional decree, the

Dawes Rolls (and not the Cherokee Nation's determinations) essentially became the authoritative

source for tribal membership and entitlement to allotments.  The Curtis Act also abolished tribal

courts and tribal governments of the Five Civilized Tribes effective March 6, 1906, and made

tribal law unenforceable in the federal courts.  Ex. 21, 30 Stat. at 512.

        The compilation of the Dawes Rolls was fraught with controversy.  Many Cherokee

objected to the rolls, believing that the federal government was improperly usurping tribal

authority.  There were disputes over the rights of persons claiming citizenship by intermarriage.

*E.g., Red Bird v. United States (Cherokee Intermarriage Cases)*, 203 U.S. 76 (1906).  There

were also continued disputes over the eligibility requirements for Freedmen.  For example, on

January 13, 1904, the Assistant Attorney General for the Department of the Interior issued an

opinion that clarified the deadline for the return of Freedmen specified in the Treaty of 1866,

ruling that the six months had not started until the treaty was ratified, making the deadline

February 11, 1867.  Kent Carter, *The Dawes Commission and the Allotment of the Five Civilized

Tribes*, 1893-1914, at 119 (1999).  This prompted the reconsideration of hundreds of cases.  *Id.*

There also continued to be disputes over whether both Freedmen (newly freed slaves) and free

blacks were equally subject to the requirement to return to the Cherokee Nation within six

15

months.  Some Freedmen were included on the Wallace or Kern-Clifton rolls, but were

determined to be ineligible by the Dawes Commission, generating protests.  There were also

numerous evidentiary disputes, since eligibility for listing on the rolls turned on events that

occurred almost 40 years prior.  However, in the midst of these disputes, the Cherokee Nation

did not assert that Freedmen, as a class, should be excluded from the Rolls.  When the Dawes

Commission finally completed its work, it approved the enrollment of 41,798 individuals,

including 4,924 freedmen, though these numbers changed somewhat after 1907 because of court

rulings and investigations.  *Id.* at 122.

### G. 1906: The Five Tribes Act

As the Federal government continued to prepare the Indian Territory for statehood in

1906, there were outstanding issues surrounding allotment of land, the finalization of the Dawes

Rolls, and the planned dissolution of the tribes.  In order to finally address these issues, Congress

debated and eventually enacted "An act to provide for the final disposition of the affairs of the

Five Civilized Tribes in the Indian Territory" ("Five Tribes Act" or "FTA").  Ex. 23, Five Tribes

Act, ch. 1876, 34 Stat. 137 (1906), *see also Harjo v. Kleppe*, 420 F. Supp. at 1126.[9]

The debate over the FTA included discussion about a variety of enrollment provisions,

including those affecting Freedmen.  Freedmen representatives argued that anyone listed on the

Wallace or Kern-Clifton rolls was entitled to inclusion on the Dawes Roll.  Carter, at 122 (citing

S. Rep. No. 5013, at 152 (1907)).  Some members of Congress felt that the Treaty provisions

regarding return of the Freedmen to Cherokee territory should be interpreted more liberally, on

---

[9] Congress realized that it would not have this bill enacted prior to March 4, 1906, the statutory
date for dissolution of the tribes, so on March 2, 1906, Congress passed a joint resolution, 34
Stat. 822, extending the life of the tribal governments until the allotment and property
distribution process had been completed, or until otherwise provided by Congress.  *See* Ex. 24,
34 Stat. 822 (Mar. 2, 1906); *Harjo v. Kleppe*, 420 F. Supp. at 1128-29.

equitable grounds.  Ex. 26, 40 Cong. Rec. 1248 (1906) (statement of Congressmen Philip

Campbell of Kansas).  In the end, Congress decided not to adopt a more liberal standard, but set

the deadline for returning to the nation as February 11, 1867 (the date set by the Department of

the Interior), Carter at 122, and clarified that the deadline applied equally to both newly freed

slaves and free blacks.  Ex. 23, 34 Stat. 137, 138.

The Curtis Act had contemplated the dissolution of the Cherokee government in 1906.

Ex. 21, 30 Stat. 495.  Congress determined, however, that the Cherokee government was

necessary to complete an orderly allotment process and the issuance of deeds, among other

things.  When the FTA was finally enacted on April 26, 1906, it contained a provision (section

28) that continued "the tribal existence and present tribal governments" of the Five Tribes, in

order to avoid the problems created by dissolution.  Ex. 23, 34 Stat. 137, 148.  Nonetheless, the

FTA stripped the Cherokee Nation and the other tribes of most of their governmental functions.

Tribal legislatures or councils were restricted in their meetings, the Nation's public buildings

were transferred to the Department of the Interior for sale, the President was empowered to

appoint the Principal Chief, and Presidential approval was required for all of the Nation's

legislation and contracts.  *Id.*; *see generally* Angie Debo, *And Still the Waters Run* (1973).

The FTA did not resolve the disagreements about the meaning of the six-month deadline,

or about whether the FTA granted allotments to the 1,720 Freedmen who were listed on the

Kern-Clifton Roll but not included on the Dawes Roll.  In 1906, a group of Freedmen who were

on the Kern-Clifton Roll but excluded from the Dawes Roll filed a supplemental petition in

*Whitmire v. United States*.  The U.S. Court of Claims ruled in favor of the Freedmen, but the

Supreme Court reversed in 1912.  44 Ct. Cl. 453 (1909); *Cherokee Nation v. Whitmire*, 223 U.S.

108 (1912).

**H. 1907-1970: Oklahoma Statehood and the Indian Claims Commission**

Oklahoma became a state in 1907.  The allotment process was essentially completed by this time, with 4,208 Freedmen receiving allotments.  Littlefield, at 238.  From 1907 until the 1940s, the Cherokee governmental structure was significantly diminished as a result of the Five Tribes Act, allotment, non-Indian settlement, and the growth of Oklahoma.  However, in 1936, as part of a shift in Federal policy towards tribal self-government, Congress passed the Oklahoma Indian Welfare Act.  25 U.S.C. § 501 et seq.  This statute permitted the Secretary of the Interior to acquire lands in trust for Oklahoma Indian tribes; authorized the Oklahoma tribes to reorganize and adopt a constitution and by-laws, under such rules and regulations as the Secretary of the Interior prescribed; and authorized the Secretary of the Interior to issue a charter of incorporation to the tribe.  25 U.S.C. § 504.  The Cherokee Nation has not reorganized under the provisions of the Oklahoma Indian Welfare Act, nor has the Secretary of the Interior issued a charter of incorporation to the Tribe.

At the end of World War II, Congress passed the Indian Claims Commission Act, which authorized tribes or identifiable groups of Indians to file certain types of monetary claims against the United States to address claims of historic wrongs.  60 Stat. 1049, 25 U.S.C. § 70a et seq. (1946).  Over the next two decades, the Indian Claims Commission (ICC) handled four cases related to the distribution of the proceeds from the sale of Cherokee lands.  In one of these cases, the Cherokee Nation claimed that the Treaty of 1866 was a product of duress and sought recovery of funds paid to the Freedmen from land cessions.  Ex. 4, 12 Ind. Cl. Comm. 570 .  The ICC determined that the Cherokee Nation had failed to prove the Treaty or its negotiations were attended by duress and dismissed the claim.  In doing so, the ICC found that the Treaty made Freedmen "newly-accepted citizens, with their exactly equal rights. . . ."  Ex. 4, *Id.* at 642, 643a.

### I.   1970-Present: Modern Day Treatment of the Freedmen

In 1970, Congress passed the Principal Chiefs Act, which reauthorized the Five Civilized Tribes to popularly elect their principal chiefs in accordance with procedures established by each tribe and subject to the approval of the Secretary of the Interior.  Act of Oct. 22, 1970, Pub. L. 91-495, 84 Stat. 1091 (1970).  In 1971, the Assistant Secretary of Interior advised that voter qualifications for these elections must be "broad enough to include the enrolled freedmen citizens of the respective nations, together with the descendants of such enrollees."  Ex. 28, Letter from Harrison Loesch, Assistant Secretary, to Virgil N. Harrison, Area Director, BIA Muskogee Area Office (Mar. 29, 1971).  In 1976, the Cherokee Nation adopted a new constitution that provided "[a]ll members of the Cherokee nation must be citizens as proven by reference to the Dawes Commission Rolls."  At the time, Freedmen and descendants of Freedmen listed on the Dawes Rolls were permitted to vote in Principal Chief elections as well as the constitutional referendum.

The current dispute stems from more recent efforts by the Cherokee Nation to exclude the Freedmen from citizenship in the Tribe.  In 2006, the Cherokee Nation's highest court ruled that a Cherokee statute limiting membership to those with Indian blood violated the Cherokee Constitution.  *Lucy Allen v. Cherokee Nation Tribal* Council, Case No. JAT 04-09 (Judicial Appeals Tribunal of the Cherokee Nation, March 7, 2006).  In response, the Tribe passed a constitutional amendment in 2007 limiting membership to those on the "by blood" and "Delaware" portions of the Dawes Rolls, and began disenrolling Freedmen.  On August 22, 2011, the Cherokee Nation's Judicial Appeals Tribunal (the Nation's highest court) determined that it did not have jurisdiction to decide a challenge asserting that the Cherokee Nation's

Constitution conflicted with the Treaty of 1866.  *Cherokee Nation Registrar v. Nash*, Case No. S.C. 2011-02 (Sup. Ct. of the Cherokee Nation, Aug. 22, 2011).

## ARGUMENT

In the Treaty of 1866 between the United States and the Cherokee Nation, the Cherokee Nation agreed that former slaves and other resident free blacks who chose to remain in or return to Cherokee territory, as well as the descendants of these individuals, would have "all the rights of native Cherokees."  The plain language of the Treaty indicates that it is a broad guarantee of rights – that eligible Freedmen and their descendants[10] must be accorded the same rights, privileges, and benefits, on the same basis, as native Cherokees.  This understanding is also supported strongly by the negotiation history of the Treaty, evidence of the contemporaneous understanding of its terms by both the Cherokees and the United States, and subsequent interpretations by federal courts and tribunals.

The Cherokee Nation's summary judgment motion argues that all treaty-protected rights of the descendants of the Freedmen were abrogated by statute in 1906.  But Congress must clearly evince its intent to abrogate a treaty, and there is no clear evidence that Congress considered the rights of Freedmen descendants and clearly determined to diminish those rights through passage of the 1906 Five Tribes Act.  The Cherokee Nation also argues that, regardless of Article 9 of the 1866 Treaty, it retains sovereign authority over the composition of its membership.  Tribal authority, however, may be limited by treaty or statute, and here, the Cherokee Nation's authority to determine its membership and to distribute other rights and benefits to its citizens is expressly constrained by Article 9 of the Treaty of 1866.  The Cherokee Nation is required by Federal law – which the Nation agreed to adopt in the wake of its former

---

[10] In this brief, unless indicated otherwise, the term "Freedmen" includes the descendants of the freed slaves or free blacks who qualified under Article 9 of the Treaty.

slaveholding practices and alliance with the Confederacy – to give Freedmen descendants "all the rights of native Cherokees," including citizenship within the Nation.

## I.       SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the initial burden of showing that there exist no genuine issues of material fact, after which the non-moving party must in opposition "set forth specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  As described by the D.C. Circuit:

> The mere existence of *some* alleged factual dispute between the parties will not defeat summary judgment; the requirement is that there be no *genuine* issue of *material* fact.  A fact is "material" if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are "irrelevant or unnecessary" do not affect the summary judgment determination.  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  If there are no genuine issues of material fact, the moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Holcomb v. Powell,* 433 F.3d 889, 895 (D.C. Cir. 2006) (internal citations omitted).

## II.      THE TREATY OF 1866 GRANTED "ALL THE RIGHTS OF NATIVE CHEROKEES," INCLUDING POLITICAL, CIVIL, AND PROPERTY RIGHTS, TO ELIGIBLE FREEDMEN AND THEIR DESCENDANTS.

The central issue in this case turns on the present meaning of Article 9 of the Treaty of 1866 in which the Cherokee Nation agrees:

> that all freedmen who have been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months, and their descendants, shall have all the rights of native Cherokees.

Ex. 8, Treaty of 1866, Article 9.  This Treaty, like other treaties with Indian tribes, has the full

force of federal law, and "is essentially a contract between two sovereign nations."  *Washington*

*v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675 (1979)

(citing *Lone Wolf v. Hitchcock*, 187 U.S. 533 (1903)).

The interpretation of a treaty, including a treaty with an Indian tribe, must begin with the

treaty's plain language.  *See, e.g., Medellin v. Texas*, 552 U.S. 491, 506 (2008); *Oregon Dep't of*

*Fish & Wildlife v. Klamath Indian Tribe,* 473 U.S. 753, 774 (1985).  Thus, "where the words of a

law, treaty, or contract, have a plain and obvious meaning, all construction, in hostility with such

meaning, is excluded."  *Green v. Biddle*, 21 U.S. 1, 89-90 (1823); *see also Choctaw Nation v.*

*United States,* 318 U.S. 423, 432 (1943) ("[E]ven Indian treaties cannot be re-written or

expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted

understanding of the parties.").

The express terms of the Treaty establish that eligible Freedmen and their descendants

were granted ***all the rights*** of native Cherokees.  By its plain language, this provision assures the

Freedmen rights within the Cherokee Nation on the same basis as Cherokees "by blood."  As

discussed *infra* at 37-46, every court to interpret this provision has done so expansively, finding

that it guaranteed Freedmen precisely the same set of rights as other Cherokee citizens.  Courts

interpreting a treaty also "look beyond the written words to the history of the treaty, the

negotiations, and the practical construction adopted by the parties."  *Choctaw*, 318 U.S. at 432.

As explained by the Supreme Court, "an examination of the historical record provides insight

into how the parties to the Treaty understood the terms of the agreement."  *Minnesota v. Mille*

*Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999).  *See also* Cohen, *Handbook of*

*Federal Indian Law*, at 119-20 (2005).  Here, all three of these factors – the history, negotiations,

and practical construction of the 1866 Treaty – strongly support the conclusion that Article 9 represented a broad guarantee of rights, including citizenship, to the Freedmen.

**A. The Treaty's Plain Language Grants Full Rights within the Cherokee Nation to the Freedmen.**

By its express terms, Article 9 grants the Freedmen and other free blacks then residing in Cherokee territory "***all*** the rights of native Cherokees."  Ex. 8 (emphasis added).  "All" is an expansive word that means "the whole amount, quantity, or extent of."  *Merriam-Webster Dictionary*, at 31 (11th ed. 2004); *see, e.g., Mclean v. United States*, 226 U.S. 374, 383 (1912) ("'All' excludes the idea of limitation. . . ."); *Bollman Hat Co. v. Root*, 112 F.3d 113, 116-17 (3d Cir. 1997) ("'[A]ny' and 'all' both mean 'the whole of' or 'every.'" (citing *Black's Law Dictionary*)); *Nat'l Steel & Shipbuilding Co. v. United States*, 419 F.2d 863, 875 (Ct. Cl. 1969) ("'All' means the whole of that which it defines – not less than the entirety.").  Additionally, the Treaty explicitly provides that these rights were secured not only to the Freedmen who were present in or returned to the Cherokee territory in 1866 and early 1867, but also to "their descendants."

The plain meaning of this Treaty language is that it guarantees eligible Freedmen and their descendants ***all*** the rights and privileges enjoyed by "native Cherokees."  Thus, if a native Cherokee is permitted to vote in a tribal election, a similarly-situated Freedman would enjoy the exact same right.  If a native Cherokee is entitled by tribal law to a benefit or service, a similarly-situated Freedman is entitled to exactly the same benefit or service.  If the Cherokee Nation makes per capita payments to tribal members based on the sale of tribal assets, Freedmen are entitled to these payments on the same basis as other Cherokee.  *See, e.g., Whitmire v. Cherokee Nation*, 30 Ct. Cl. 138, 158-59 (1895) (finding that Freedmen were entitled to per capita payments from the sale of Cherokee lands).

23

In its summary judgment motion, the Cherokee Nation ignores the plain language and attempts to insert an unwritten limitation into the Treaty.  Specifically, the Cherokee Nation argues that although the Treaty "afforded the Freedmen equal rights as citizens residing in the Nation's portion of Indian Territory, it did not confer upon them a right of tribal citizenship in the body-politic of the Nation."  CN Br. at 8.  To the extent that this interpretation presents a meaningful distinction, the Cherokee Nation cannot point to any language in the Treaty that afforded a lesser set of rights to the Freedmen.  *See, e.g., Oregon Dep't of Fish & Wildlife,* 473 U.S. at 774 ("[C]ourts cannot ignore plain language that, viewed in historical context and given a 'fair appraisal,' … clearly runs counter to a tribe's later claim.").  As discussed *infra* at 33-37, the Cherokee Nation's argument today directly contradicts not only the plain language of the Treaty, but also the decades of history in which the Tribe has agreed that the Treaty guaranteed Freedmen civil and political rights.  The Nation's cramped reading of the Treaty has also been rejected by numerous courts and tribunals, including *Whitmire v. Cherokee Nation*, 30 Ct. Cl. 138 (holding that Freedmen were entitled to share in the property of the Tribe) and *Seminole Nation v. United States*, 78 Ct. Cl. 455 (1933) (rejecting Seminole Nation's argument that identical provisions in the Seminole Treaty granted only civil rights within the Tribe).

The Cherokee Nation also strains to assign significance to language used in Articles 4, 5, 6, 12, and 15, in comparison to Article 9, and suggests that these distinctions support the Cherokee Nation's argument that the Treaty granted something less than "all the rights of native Cherokee" to the Freedmen.  CN Br. at 9-12.  However, nothing in these sections of the Treaty supports this argument or overcomes the plain language of Article 9 and its consistent interpretation by the Federal courts.  Each of these articles is consistent with the expansive grant of "all the rights of native Cherokees" in Article 9.  Articles 4, 5, and 6 begin, respectively:

- All the Cherokees and freed persons who were formerly slaves to any Cherokee, and all free negroes not having been such slaves, who resided in the Cherokee Nation prior to June first, eighteen hundred and sixty-one, who may within two years elect not to reside northeast of the Arkansas River and southeast of Grand River, shall have the right to settle in and occupy the Canadian district. . . .

- The inhabitants electing to reside in the district described in the preceding article shall. . . .

- The inhabitants of the said district hereinbefore described shall. . . .

Ex. 8, Treaty of 1866.  These Treaty provisions were intended to address the desires of the "Southern Cherokees" (those who had affiliated with the Confederacy) to have their own separate territory.  *See supra* at 8-9.   Article 4 simply permits Freedmen to live in this separate territory, as well.  By listing out "[a]ll the Cherokees and freed persons who were formerly slaves to any Cherokee, and all free negroes" in Article 4 and then referring to these groups as "the inhabitants" in Articles 5 and 6, the Treaty ensured that both the Freedmen and any Cherokees who decided to live in the Canadian district would have the same rights.[11]

The Cherokee Nation also contends that the different language of Article 9 ("all the rights of native Cherokees") versus Article 15 (incorporating other tribes and bands of Indians into the Cherokee Nation on "equal terms in every respect with native citizens") supports their argument that the Treaty granted the Freedmen some lesser set of rights.  CN Br. at 11-12.  Article 15 was designed to allow the United States to settle other tribes or bands of Indians into the Cherokee

---

[11] The Cherokee Nation suggests that the language in Articles 4, 5, and 6 addressing the settlement of the "Canadian district" is an indication that the Freedmen were "a distinct class of individuals."  CN Br. at 8-9.  It is beyond dispute that the Freedmen were considered a "distinct class of individuals."  The welfare of this group was a significant focus of the treaty negotiations, and it is not surprising that the United States ensured that the Treaty specifically spelled out the rights of the Freedmen vis à vis the Cherokee, many of whom were former slave owners.  For similar reasons, Federal officials or Congress sometimes explicitly stated that "Freedmen," along with other Cherokee citizens, were entitled to particular rights or benefits.  *See* CN Br. at 20, n. 35.

Nation, and as a result, the Treaty provision as a whole is quite different than Article 9.  Article

15 thus speaks in terms of "incorporating" these political entities into the Cherokee Nation, and

this design results in slightly different language providing for the integration of these individuals

into the Tribe.  This design does not mean, however, that there is any significance to the fact that

slightly different words were used.  Though they may use slightly different language, both

Article 9 and 15 clearly evince an intent to provide their subjects – Freedmen and other Indians –

with the same rights as native Cherokee citizens.

This interpretation was confirmed in 1867 when the Cherokees signed an agreement with

the Delawares, who were incorporated into the Cherokee Nation under Article 15.  This

agreement made the Delawares "members of the Cherokee Nation, with the same rights and

immunities, and the same participation (and no other) in the national funds as native Cherokees,

save as hereinbefore provided," and thus used similar language to Article 9 of the Treaty.  *See*

*Cherokee Nation v. Journeycake*, 155 U.S. 196, 206 (1894) (finding that the Delawares "were

not only to become members of the Cherokee Nation, but also to stand equal with the native

Cherokees in all the rights springing out of citizenship in the Cherokee Nation."); *Cherokee*

*Nation of Oklahoma v. Norton*, 389 F.3d 1074, 1084 (10th Cir. 2004).  The use of the terms

"rights and immunities" of "native Cherokees" in this agreement echoes Article 9 – not Article

15 – and indicates the interchangeability of the terms used in these articles.  The Cherokee

Nation's strained reading of the Treaty cannot overcome Article 9's plain language granting the

Freedmen the same rights, including the right to citizenship, held by "native Cherokees."

## B. The Historical Context and Negotiation History of the Treaty Indicates that Article 9 Granted Citizenship Rights to the Freedmen.

Although the Court need look no further than the plain language of the Treaty in this

instance, courts "may look beyond the written words to the history of the treaty, the negotiations,

and the practical construction adopted by the parties." *Choctaw*, 318 U.S. at 432. *See also Mille Lacs*, 526 U.S. at 197 (negotiation history as shedding light on treaty interpretation); *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 172-74 (1999) (same). Here, an evaluation of the historical context of the Treaty and the negotiation history all support the understanding that Article 9 guarantees citizenship rights to the Freedmen. *See* Ex. 3, Greenwald Rep. at 19 and 37-38 (concluding that the historical record demonstrates that the United States had a "goal of placing former slaves and free blacks among the Cherokee on an equal footing with other members of the Cherokee Nation" and that the Cherokee Nation's representatives understood this goal). *First*, the historical context of the Treaty reveals the United States' focus on ensuring an "equal footing" for the Freedmen. *Second*, the parties' negotiations establish that both parties understood and intended to "permanently" secure the "full rights" of the Freedmen. *Third*, the terms of the separate treaties ultimately signed with the Creeks, the Seminoles, and the Chickasaws and Choctaws, as well as the laws and policy related to Freedmen in the rest of the United States, indicate that Article 9 guaranteed the Cherokee Freedmen the full rights of citizenship.

The post-Civil War treaties were negotiated in unique circumstances. These were treaties of amnesty, designed principally to restore relations with the tribes in light of their affiliation with the Confederacy. At the same time, the Federal government was commencing the "reconstruction" of the South, and was concerned about the rights and welfare of the newly-freed slaves and free blacks. Against this backdrop, the United States began treaty negotiations with the Five Civilized Tribes in 1865.

When the United States treaty commissioners convened with the Cherokees as well as the Creek, Seminole, Choctaw, and Chickasaw Tribes in September 1865 to negotiate new treaties,

the treaty commissioners emphasized that one of the requirements for the agreements would be that "[t]he institution of slavery, which has existed among several of the tribes, must be forthwith abolished, and measures taken for the unconditional emancipation of all persons held in bondage, and for their incorporation into the tribes on an equal footing with the original members, or suitably provided for."  Ex. 3, Greenwald Rep. at 10; Ex. 5, *Annual Report of the Commissioner of Indian Affairs for the Year 1865*, at 318.  In 1865, the Cherokee Nation was located in the Indian Territory – not a state – and the United States recognized the Nation's sovereign authority over its territory and members.  The status of the former slaves within the Indian Territory – including the degree to which their status would be governed by generally applicable federal legislation – was uncertain; thus, the Federal officials wanted specific provisions regarding Freedmen rights and welfare in the Treaty.

The stipulation that the Freedmen would be on an "equal footing" echoed throughout late 1865 and early 1866, especially in correspondence related to the work of Major General John Sanborn, who was dispatched to head a commission regulating relations between the Freedmen and the Indians.  On November 20, 1865, Secretary of the Interior James Harlan instructed Sanborn:

> You will impress upon the Indians the justice of admitting the Freedmen to the enjoyment of all the rights of persons and property without reference to their former condition, and to equal enjoyment of the bounty that may hereafter be bestowed by the National Government, and that it would be especially gratifying to the Government if these Freedmen should be admitted to an equal enjoyment of civil rights.

Ex. 3, Greenwald Rep. at 12.  With this instruction in hand, Sanborn traveled to Fort Gibson, and issued a circular to Indian agents on January 1, 1866.  That circular in turn directed the agents to "use every means in their power to impress upon the minds of each individual of the tribes and

28

nations . . . that these former slaves are now vested with all the rights of Freedmen." Ex. 29,

John Sanborn, Brevet Major General, Circular No. 1, 1866; Ex. 3, Greenwald Rep. at 13.

The collective negotiations between the United States and the Five Civilized Tribes that

began and ended in 1865 were followed by negotiations between the United States and

individual tribes that began in early 1866.  As explained above at pp. 7-8, the United States treaty

commissioners negotiated with the Southern Cherokee and Northern Cherokee separately for

most of the period leading to the signing of the Treaty.  The drafts exchanged in both sets of

negotiations as well as the notes of the United States commissioners demonstrate an

understanding by both parties that the Treaty would provide Cherokee Freedmen with a broad set

of rights within the Tribe.  Ex. 3, Greenwald Rep. at 14-19.

During negotiations with the tribes, the United States was focused on "[f]our principal

points," including "[t]he proper relations which the freedmen should hereafter hold towards the

remainder of the people."  Ex. 3, Greenwald Rep. at 14.  The Cherokee Nation expressed an

unconditioned willingness to agree to such terms, stating, "as we have repeatedly proposed to

you and the Secretary of the Interior to make most liberal provision for our freedmen in lands

and school funds, we have no doubt that any arrangement the Government would ask for their

benefit would be freely conceded by us."  Ex. 4, 12 Ind. Cl. Comm. at 617.  On March 15, 1866,

the Northern Cherokee proposal provided that the Freedmen and all their descendants

> shall be allowed to occupy, improve, and cultivate such tracts now unoccupied by
> Cherokees. . . .  And in case of a future sale by the Cherokee Nation, of lands so
> held by freedmen or their descendants they shall be entitled to receive, out of the
> proceeds, the full value of their improvements, and such freedmen and their
> descendants shall have the same right to remain in the Cherokee Country, to
> acquire and hold personal property, and to sue and testify, and the same liability,
> to be sued in [all] Courts held therein as belong to the citizens of the Nation.
> [T]he Cherokee Nation will at all times apply funds out of the proceeds of such
> sale [of certain Cherokee lands] for the education of such persons so as to give
> them equal advantages. . . .

Ex. 3, Greenwald Rep. at 15.[12]  This list of rights contains some of the civil rights included in the Civil Rights Act that Congress passed a month later.  While this list was not exhaustive, it demonstrates an early understanding that the Freedmen would receive rights like to those of native Cherokees.

As negotiations with the Cherokee factions proceeded, treaty drafts included increasingly expansive language related to the rights of the Freedmen.  One late treaty draft exchanged with the Southern faction "further stipulated and agreed that the negro or colored population within the said limits [of the area set aside for the Southern Cherokees] shall be entitled to all the rights, privileges and immunities of citizens."  Ex. 3, Greenwald Rep. at 16.  The treaty ultimately agreed to by the Southern Cherokees and the United States on June 13, 1866, although not ratified, included a very similar provision stating that the Freedmen "shall be entitled to all the rights, privileges, and immunities belonging to any members of the Cherokee Nation parties hereto."  Ex. 7; Ex. 3, Greenwald Rep. at 16-17.

The United States ultimately signed and ratified a treaty with the Cherokees (signed by representatives of the northern faction) just over a month after the un-ratified treaty with the Southern Cherokees.  The language of Article 9 granting the Freedmen and their descendants "all the rights of native Cherokees" echoed that of the un-ratified treaty with the Southern Cherokees.  Ex. 8, Treaty of 1866 .  Thus, throughout the course of negotiations, the United States was focused on ensuring that the Freedmen would have the full measure of tribal rights if they chose to reside in Cherokee territory, and the Cherokee understood and agreed to this approach.  This is the conclusion of the United States' expert historian, who found that the historical record

---

[12] The Northern Cherokee submitted a proposed treaty with very similar language on May 3, 1866.  Ex. 3, Greenwald Rep. at 15.

demonstrates that the Cherokee representatives understood this goal and acceded to it.  Ex. 3,

Greenwald Rep. at 37-38.

This conclusion is reinforced by the contemporaneous report on the Treaty from the

Commissioner of Indian Affairs.  *See Mille Lacs*, 526 U.S. at 198 (relying on the

Commissioner's memorandum accompanying the Treaty submitted to the Senate).

Commissioner D.N. Cooley wrote that as a result of the Treaty with the Cherokees "[s]lavery is

abolished, and the full rights of the freedmen are acknowledged,"  Ex. 30, *Annual Report of the*

*Commissioner of Indian Affairs for the Year 1866* (October 22, 1866) at 12.  *See also id.* at 56

("the rights of [the Freedmen] have been *permanently* secured by the treaties heretofore referred

to."  (emphasis added)).  This contemporaneous account emphasized not only the expansive

grant of rights to the Freedmen, but also the understanding that these rights could not be easily

eroded or eliminated.

Treaties were signed with the Seminoles, the Choctaws and Chickasaws, and the Creeks

in the months leading up to the 1866 Treaty with the Cherokees, and each of these included

similar provisions with respect to Freedmen.  *See Mille Lacs*, 526 U.S. at 199 (comparing the

treatment of different tribes, and noting "[t]he State proposes no explanation – compelling or

otherwise – for why the United States would have wanted to abrogate the Mille Lacs Band's

hunting and fishing rights, while leaving intact the other Bands' rights to hunt and fish on the

same territory.").  Specifically, in March 1866, the Treaty with the Seminoles guaranteed the

Seminole Freedmen and their descendants "all the rights of native citizens"; in April 1866, the

Treaty with the Choctaws and Chickasaws guaranteed the Choctaw and Chickasaw Freedmen

and their descendants "all the rights, privileges, and immunities, including the right of suffrage,

of said citizens" if and when they were incorporated into the tribes; and in June 1866, the Treaty

31

with the Creeks guaranteed the Freedmen and their descendants "all the rights and privileges of

native citizens."  Ex. 31, Treaty with the Seminoles (Mar. 21, 1866), 14 Stat. 755; Ex. 32, Treaty

with the Choctaws and Chickasaws (Apr. 28, 1866), 14 Stat. 769; Ex. 11, Treaty with the Creeks

(June 14, 1866), 14 Stat. 785; *see also Seminole Nation of Oklahoma v. Norton*, 2001 WL

36228153, at *15 (D.D.C. Sept. 27, 2001) (noting that in *Goat v. United States*, 224 U.S. 458

(1912), the United States Supreme Court "accepted and recited the explanation of the Dawes

Commission in 1898, that the Seminole Freedmen were, pursuant to treaty, 'on equal footing

with the citizens by blood.'").  Building upon the concept of "equal footing" first introduced in

the 1865 negotiations, each of these treaties used the identical language of "all the rights" when

describing the rights of Freedmen.  And although the latter two of the treaties included additional

details on the nature of the rights, their scope was identical.

Contemporaneous federal laws with respect to the Freedmen in the rest of the United

States also provide context that supports the conclusion that the Treaty granted full and complete

citizenship rights within the Tribe to the Freedmen.  During the first half of 1866 – the same

period in which the U.S. treaty commissioners were negotiating treaties with the tribes that

ultimately would be sent to Congress for ratification – Congress amended and passed a number

of laws related to the Freedmen and citizenship.  First, in April 1866, Congress passed a revised

Civil Rights Act, which stated:

> That all persons born in the United States, and not subject to any foreign Power,
> excluding Indians not taxed, are hereby declared to be citizens of the United
> States; and such citizens, of every race and color, without regard to any previous
> condition of slavery or involuntary servitude . . . shall have the same right, in
> every State and Territory in the United States, to make and enforce contracts, to
> sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and
> convey real and personal property, and to full and equal benefit of all laws and
> proceedings for the security of person and property.

Ex. 6, 14 Stat. 27.  Two months later, Congress passed the Fourteenth Amendment, which would

be ratified two years later.  That amendment, which was intended to bolster the citizenship clause

in the Civil Rights Act, granted citizenship to all persons born or naturalized into the United

States, including freed slaves (though excluding Indians).  And in July 1866, the same month the

Treaty with the Cherokees was signed, Congress strengthened the Freedmen's Bureau Act,

adding that civil rights, including the right to make and enforce contracts, to inherit, purchase,

lease, sell, hold, and convey real and personal property would be enjoyed by all citizens

regardless of race, color, or previous condition of slavery in those states where the judicial

proceedings had been interrupted by the Civil War.  Ex. 33, Act of July 16, 1866, ch. 200, 14

Stat. 173 (1866).  The same Senate that ratified the Treaty with the Cherokees also voted on

these laws that granted citizenship and equal protection to the Freedmen living elsewhere in the

United States.  The Treaty negotiators understandably wanted to ensure that similar civil rights

were provided to those Freedmen living in the Indian Territory.

### C.  The Practical Construction of Article 9 by the Parties Demonstrates a Mutual Understanding that the Treaty Guaranteed Citizenship to the Freedmen.

In interpreting treaty language, courts may also look to the practical construction of the

treaty by the parties in the years immediately following its adoption.  *Choctaw Nation*, 318 U.S.

at 432.  Here, the practical construction adopted by the parties in the years following the Treaty

establishes that both the United States and the Cherokee Nation interpreted the Treaty as

guaranteeing the Freedmen all rights within the Tribe, including citizenship.  *See* Ex. 3,

Greenwald Rep. at 24, 37-38.  Legislative action – both federal and tribal – as well as statements

by the Cherokee Nation and the United States in the years following the Treaty show that the

parties viewed Article 9 as providing the Freedmen with Cherokee citizenship and all of its

accompanying rights.

33

Within months of signing the Treaty of 1866, the Cherokee Nation amended its Constitution to include Freedmen as tribal citizens.  In November 1866, the Cherokee Nation added the following amendment to its Constitution:

> All native born Cherokees, all Indians, and whites legally members of the Nation by adoption, and *all freedmen who have been liberated by voluntary act of their former owners or by law, as well as free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months from the 19th day of July, 1866, and their descendants,* who reside within the limits of the Cherokee Nation, shall be taken, and deemed to be, citizens of the Cherokee Nation.

Ex. 10, Proclamation and Amendments to the Constitution (1870), at 19; Ex. 3, Greenwald Rep. at 20. (emphasis added).  The speed with which this change was made and the use of the same language as Article 9 of the Treaty strongly suggest that the Tribe made this change in response to the Treaty, and that the Tribe interpreted Article 9 broadly.

This interpretation is also supported by evidence of how Cherokee leadership viewed the Treaty and the corresponding changes to the tribal constitution.  For example, on October 19, 1866, the Cherokee Nation's Principal Chief told the Cherokee National Council about the need for a census of people to include "the names, ages, and residence of all whites who are legal citizens by adoption, and of all blacks admitted to the *full rights of Citizenship* by the 9th Article of the Treaty. . . " (emphasis added). Ex. 9; Ex. 3, Greenwald Rep. at 20.  Thus, a month before the constitutional amendment, the Principal Chief indicated his understanding that Article 9 itself granted the Freedmen "full rights of citizenship."  *See also* Ex. 10, at 17 (Principal Chief's proclamation of amendments referring to Treaty).  In its motion for summary judgment, the Cherokee Nation asserts that it was this constitutional amendment and not the Treaty that gave the Freedmen citizenship. CN Br. at 12-17.  But this unsupported assertion is contradicted by

34

evidence that Cherokee officials at the time viewed the constitutional amendment as necessary to implement Article 9 of the Treaty.[13]  Ex. 3, Greenwald Rep. at 20.

The Cherokee and the United States continued to negotiate supplemental treaties in the years following 1866, and these negotiations also evince a mutual understanding that the Treaty guaranteed the Freedmen citizenship rights.  These negotiations resulted in an 1868 agreement, but provisions relating to the Freedmen were not disputed by the Tribe.  Ex. 12; Ex. 3, Greenwald Rep. at 21-22.  Amendments agreed to by both parties in 1870 included definitions "as to who are and who are not Cherokee Indians as contemplated by the thirteenth article of the Cherokee treaty of 1866," which addressed jurisdiction of the federal courts in Indian Territory.  One of those definitions applied to the Freedmen:  "That all colored people who, by the fourth and ninth articles of the said treaty of 1866, have been invested with 'all the rights of native-born Cherokees,' shall be held to be Cherokee citizens, and within the contemplation of the said thirteenth article of the said treaty of 1866."  Ex. 3, Greenwald Rep. at 22.  Unlike two other definitions that mentioned the Cherokee Constitution or the National Council, the Freedmen provision referred only to the Treaty, indicating the parties' understanding that Freedmen rights emanated from this document.

Taken together, the actions and comments of the parties in the first two decades following the Treaty support the conclusion that the amendment to the Cherokee Constitution on Freedmen citizenship was "simply declaratory of the new order of things."  *In the Matter of Enrollment of Persons Claiming Rights in the Cherokee Nation*, 40 Ct. Cl. 411, 442 (1905), *aff'd Red Bird v. United States*, 203 U.S. 76 (1906).

---

[13] In addition, the Cherokee Nation's reliance on the *Whitmire v. Cherokee Nation* case as suggestive that a federal court has interpreted the Cherokee Constitution as the source of Freedmen citizenship is misplaced.  *See infra* at 39-40.

Legislative activity in the 1880s and 1890s surrounding the distribution of money from the sale of Cherokee lands to the United States provides additional support for the conclusion that the parties interpreted the Treaty as guaranteeing citizenship to the Freedmen.  Following Congress's appropriation of $300,000 for land in 1883, the Cherokee National Council passed legislation giving per capita payments from these funds to Cherokees by blood only.[14]  Ex. 14, Act to Pay Balance Due of Lands West.

In an 1883 letter sent to the United States Senate, the Commissioner of Indian Affairs concluded that the Cherokee law violated the Treaty because under Article 9 the Freedmen had "*acquired all the rights of native Cherokees. . . .*"  Ex. 3, Greenwald Rep. at 26. (emphasis in original).  The House Committee on Indian Affairs echoed this interpretation of the 1883 law. Ex. 3, Greenwald Rep. at 28 (The act was "in conflict with the treaties existing between said nation and the United States.")  Congress responded by passing two acts to ensure that the Freedmen received an equal share of the proceeds from the sale, demonstrating the United States' understanding of the Treaty.  First, Congress passed an 1888 act appropriating money for the Freedmen that was to be deducted from future payments to the Cherokee Nation.  Ex. 16, 25 Stat. 608.  That Act noted that under the Cherokee law, "freedmen . . . have been deprived of their legal and just dues guaranteed them by treaty stipulations." *Id.* at 608.  Second, in 1890, Congress passed a jurisdictional act for the Court of Claims to hear claims from Freedmen regarding disputes over payments.  Ex. 17, 26 Stat. 636; *see infra* at 38-43.

---

[14] Notably, the Principal Chief of the Cherokee Nation believed that the exclusion of the Freedmen from the per capita payments violated the Treaty.  He vetoed the bill, stating that the Treaty "vested [the Freedmen] with all the rights of 'native Cherokees' upon specified conditions" and that "[t]hese conditions have been fulfilled for the acknowledged colored citizens of this nation." *Cherokee Nation v. Journeycake*, 155 U.S. 196, 217 (1894) (quoting Principal Chief D. W. Bushyhead's veto message).  In his objection, the Principal Chief added that "all citizens have an equal right to the use of [common property and] . . . an equal right to the proceeds of their joint property." *Id.*  The Cherokee Council passed the bill over his veto.

Importantly, the Cherokee National Council only resisted providing Freedmen with rights to communally-held lands, or the proceeds thereof.  The Tribe never disputed – and in fact, explicitly recognized – the entitlement of Freedmen to "civil, political, and personal" rights within the Tribe.  Ex. 3, Greenwald Rep. at 25-27; Ex. 4, 12 Ind. Cl. Comm. at 583 ("When … the Cherokees had occasion to mention the freedmen, it was the consensus of its leaders that the freedmen were in fact Cherokee citizens, with all the rights of native Cherokees, and that they acquired such rights by virtue of Article 9 of the treaty of 1866."); Ex. 15, at 371-72 (1883 Cherokee legislation recognizing that Treaty provided "civil, political, and personal" rights to Freedmen).  The Tribe's view that the Treaty granted these non-property rights within the Cherokee Nation continued well into the 20th Century, as demonstrated by the Nation's position in cases before the Indian Claims Commission, *see infra* at 44-46.  The Cherokee Nation's argument in this case that the Treaty did not grant these civil and political rights (CN Br. at 8) is a modern-day revision that stands in stark contrast to the Cherokee Nation's understanding of the Treaty at the time of its passage.  The Cherokee Nation's contemporaneous interpretation of Article 9's meaning is determinative here.

### D. Federal Courts and Tribunals Have Interpreted Article 9 as Guaranteeing the Freedmen with Equal Rights and Immunities.

Every federal court and tribunal that has addressed the language of Article 9 has found that the Treaty provided the Freedmen with the full set of rights guaranteed to other Cherokees, including tribal citizenship.  The Court of Claims was the first federal court to analyze the terms of the Treaty when it issued a series of opinions and decrees in *Whitmire v. Cherokee Nation* finding, among other things, that under Article 9, the Freedmen were "admitted into and became a part of the Cherokee Nation and entitled to equal rights and immunities."  Ex. 19, *Whitmire v. Cherokee Nation*, Ct. Cl. No. 17209, Feb. 3, 1896.  These cases, which the Cherokee Nation was

37

a party to, preclude the re-litigation of the issue of the scope of the Freedmen's rights under the Treaty. *See Gulf Power Co. v. F.C.C.*, 669 F.3d 320, 323 (D.C. Cir. 2012) ("doctrine of issue preclusion generally bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment.'" (citing *New Hampshire v. Maine*, 532 U.S. 742 (2001)); *Menkes v. U.S. Dept. of Homeland Sec.*, 637 F.3d 319, 334 (D.C. Cir. 2011). Other federal courts, including this one, have interpreted the Freedmen provisions in the post-Civil War treaties expansively. And in the mid-twentieth century, the Indian Claims Commission issued a number of opinions finding that as a result of the Treaty, the Freedmen became "newly-accepted citizens, with their exactly equal rights." *E.g.,* Ex. 4, 12 Ind. Cl. Comm. 570, 642 (Sept. 25, 1963).

1. **The Opinions and Decrees in *Whitmire v. Cherokee Nation* Underscored the Expansive Rights of the Freedmen Under the Treaty.**

The *Whitmire* case emerged as a result of a jurisdictional act passed by Congress in 1890, which was enacted to help settle disputes about whether the Freedmen were entitled to the proceeds derived from the sale of Cherokee lands. Ex. 17, 26 Stat. 636 (granting jurisdiction to the Court of Claims to hear claims for the recovery of "all moneys due either in law or equity or unpaid to the said Shawnees, Delawares, or freedmen."). In the 1895 and 1896 decisions in *Whitmire*, the Court of Claims determined that the Treaty granted the Freedmen a full set of rights within the Tribe, including the right to share in the proceeds that resulted from the sale of Cherokee lands.

The Cherokee Nation places great weight on the Court of Claims' March 4, 1895 opinion in *Whitmire*, but the rest of that decision as well as the court's later, related opinion and decree demonstrate that the court interpreted the Treaty not only as a broad grant of rights to the Freedmen, but also as the fundamental source of those rights. In the March 4, 1895 opinion, the

Court of Claims held that the Freedmen were entitled to a share of the proceeds under the Treaty

and the Cherokee Constitution.  *Whitmire*, 30 Ct. Cl. 138, 157-58 (1895).  Two weeks later, on

March 18, 1895, the court issued a second opinion setting the recovery for the Freedmen at

$905,365 and establishing a plan for determining who qualified for a share of this money.

*Whitmire*, 30 Ct. Cl. 180, 186-89 (1895).  The Court of Claims then entered a decree on May 8,

1895, which demonstrated its understanding that Article 9 provided the Freedmen with

expansive rights within the Tribe.  The court stated:

> [I]t appearing to the court that under the provisions of article 9 of the treaty of
> July 19, 1866, made by and between the Cherokee Nation and the United States,
> the said freedmen, who had been liberated by voluntary act of their former owners
> or by law, and all free colored persons who resided in the Cherokee country at the
> commencement of the rebellion and were residents therein at the date of said
> treaty, or who had returned thereto within six months of said last-mentioned date,
> and their descendants, were admitted into and became a part of the Cherokee
> Nation and entitled to equal rights and immunities, and to participate in the
> Cherokee national funds and common property in the same manner and to the
> same extent as Cherokee citizens of Cherokee blood.

*Whitmire*, 30 Ct. Cl. at 190-91.  This expansive view of the Freedmen's rights – underscored by

the language "equal rights and immunities" – was central to the court's decision that the

Freedmen were entitled to share in the proceeds from the sale of the Cherokee Outlet.[15]  And the

similarity between this statement and Article 9 underscored the fact that the Treaty was the

source of the rights.  This decision precludes the Tribe from re-litigating the same issue here.

*Gulf Power Co.*, 669 F.3d at 323.

---

[15] The Court of Claims used the same language in deciding that under Article 15 of the Treaty
and the 1867 Delaware-Cherokee Agreement, the Delawares were "entitled to equal rights and
immunities . . . to the same extent as Cherokee citizens of Cherokee blood" and therefore entitled
to participate in the distribution of the proceeds of the land.  *Journeycake v. Cherokee Nation*, 28
Ct. Cl. 281, 319 (1893).  The United States Supreme Court affirmed, adding that "the grant of
equal rights as members of the Cherokee Nation naturally carried with it the grant of all rights
springing from citizenship."  *Cherokee Nation v. Journeycake*, 155 U.S. 196, 212 (1894).

The Cherokee Nation argues that two passages from the March 4, 1895 opinion support its argument that the amendment to the Constitution, and not the Treaty, provided the Freedmen with citizenship.  In context, however, these passages do not bear the weight that the Cherokee Nation places on them.  First, the Cherokee Nation emphasizes the court's statement that the Cherokee Constitution "fixed the status of the freedmen and raised him to the same rank of citizenship." (CN Br. at 14).  But immediately before this passage, the court stated that the Freedmen's "foothold was acquired exclusively through the interposition of the United States, and *exclusively by virtue of the treaty of 1866*," adding that although some facts worked against the equity of the Freedmen's case, these facts did "not take their legal rights out of the safeguard of the constitution, or the obligations of the treaty."[16] *Whitmire*, 30 Ct. Cl. at 155 (emphasis added).  Second, the Cherokee Nation highlights the court's statement that the Cherokee Constitution "came into the case and defined what citizenship was" (CN Br. at 14), but this statement suggests that citizenship already existed even if it was not fully described.  Indeed, in the text quoted by the Cherokee Nation, the court made clear that the Treaty had stipulated that the Freedmen should become ***citizens***.

The Cherokee Nation's argument about the foundational nature of the constitutional amendment is also directly contradicted by decisions in two related Court of Claims cases.  In

---

[16] The Cherokee Nation's reliance on the language in *Cherokee Freedmen v. United States*, 195 Ct. Cl. 39, (1971), stating that Freedmen were "'taken and deemed to be citizens of the Cherokee Nation' by the Nation's constitution" is also misplaced.  While that opinion does quote the constitutional amendment, immediately before this it quoted Article 9 of the Treaty, thus recognizing that the Treaty was the source of this right.  195 Ct. Cl. at 41.  Further, the Court of Claims citation for this quotation is another decision, *Cherokee Nation v. United States*, 180 Ct. Cl. 181 (1967), *affirming* 12 Ind. Cl. Comm. 570 (1963), which does not contain that quote and makes no mention of the amendment.  In fact, the ICC decision that it affirmed indicates that the amendment was *not* the source of citizenship:  "The Cherokee Nation then ratified such amendments to its constitution as were necessitated by the treaty."  *Cherokee Nation v. United States*, *Cherokee Nation*, 12 Ind. Cl. Comm. at 640.

reaching a decision on the property rights of intermarried whites in the Cherokee Nation, the court determined that the amendments to the Cherokee Constitution resulted from the United States "dictating that the slaves or freed persons of color in the Cherokee country should not only be admitted to the rights of citizenship, but to an equal participation in the communal or common property of the Cherokees. . . . The constitutional amendment quoted was simply declaratory of the new order of things." *In the Matter of Enrollment of Persons Claiming Rights in the Cherokee Nation*, 40 Ct. Cl. 411, 442 (1905), *aff'd Red Bird v. United States*, 203 U.S. 76 (1906). And in *Seminole Nation v. United States*, 78 Ct. Cl. 455, 464 (1933), the Seminole Nation made exactly the same argument that the Cherokee Nation makes here – that "the freedmen did not acquire their rights under the treaty but under the constitution of the tribe." The court disagreed, finding that "it is apparent from an analysis [of *Whitmire*] that the fundamental property rights of the freedmen originated in the grant conferred by article 9 of the treaty, and reference to the constitution of the tribe was made to disclose the meaning which the Indians themselves ascribed to the previous grant in the effect to be given thereto." *Id.*

On motions from both the Freedmen and the Cherokee Nation, the Court of Claims reopened the *Whitmire* case, and on February 3, 1896 the parties agreed to a modified decree. Ex. 19, Ct. Cl. No. 17209, Feb. 3, 1896. This consent decree reaffirmed the Court of Claims' decision by including the same language about "equal rights and immunities" and providing that the Freedmen and their descendants "are entitled to participate hereafter in the common property of the Cherokee Nation in the same manner and to the same extent as Cherokee citizens of Cherokee blood or parentage may be entitled." *Id.* Thus, in a court-entered consent decree, the Cherokee Nation agreed that Freedmen and their descendants were entitled to the same rights and benefits as other Cherokee citizens. The Indian Claims Commission later found that while

this consent decree may not support a defense of res judicata to the Cherokee Nation's later claims for refund of payments to Freedmen, it is "material evidence of the [Cherokee Nation's] then position vis-à-vis freedmen." Ex. 4, 12 Ind. Cl. Comm. at 591.

The February 3, 1896 decree, which gave an expansive reading to the rights guaranteed by Article 9, also mandated the creation of an updated Freedmen roll. This roll, known as the Kern-Clifton Roll, became the subject of the final phase of the *Whitmire* litigation when some of the Freedmen named on that Roll were not included in the final Freedmen Roll created by the Dawes Commission in 1906. *Whitmire v. Cherokee Nation*, 44 Ct. Cl. 453 (1909). The court determined that the Freedmen listed on the Kern-Clifton Roll but not the Dawes Rolls had the right to an equal share of the distribution of property because the Dawes Commission did not have the authority to ignore the roll produced pursuant to the Court's February 3, 1896 decree. *Whitmire v. Cherokee Nation*, 46 Ct. Cl. 227, 254 (1911). The Supreme Court reversed, finding that Congress had the power to change the way it determined who would be on the Freedmen roll. *Cherokee Nation v. Whitmire*, 223 U.S. 108, 116-17 (1912).

The Cherokee Nation contends that language from the Court of Claims' 1911 decision in *Whitmire* endorsed the view that "the Treaty provisions only applied to former slaves, descendants of those slaves and 'free colored persons' who resided in the Cherokee Nation as of February 11, 1867" and therefore that "[u]pon the death of the last Freedmen, the provisions of Article IX of the 1866 Treaty ceased to apply to any individual." CN Br. at 14-16; *see also* discussion *infra* at 47-56. The Cherokee Nation's gloss on this language – "freedmen and the descendants of freedmen who did not return within six months" – misconstrues its meaning. At best, it is ambiguous whether the words "who did not return within six months" were intended to qualify "freedmen" or "descendants." Further, this language, which the court recited from the

42

Court's February 18, 1896 letter to the Commissioner of Indian Affairs, was simply intended to

clarify whether the six-month limitation applied to both the newly freed slaves and free blacks[17];

it did not address the issue of "descendants," and should not be read as an interpretation of that

term.  Indeed, the court described the purpose of the February 18, 1896 letter in the very same

opinion without reference to descendants:  "The Court construed this [February 3, 1896] decree

so as to make the limitation with regard to residence or return within six months apply to

freedmen as well as free colored persons."  *Whitmire*, 46 Ct. Cl. at 242.

### 2. The D.C. Circuit and This Court Have Interpreted Freedmen Provisions in Post-Civil War Treaties as Providing a Comprehensive Guarantee of Rights.

Recent decisions by other federal courts, including this one, have interpreted the

Freedmen provisions in post-Civil War treaties, including Article 9, as the source of a full set of

rights, including tribal citizenship.  In *Vann v. U.S. Dep't of Interior*, which primarily concerned

the application of the *Ex parte Young* doctrine to tribal officials, the D.C. Circuit's recitation of

the facts stated that the phrase "all the rights of native Cherokees" in Article 9 included "the right

to tribal membership and the right to vote in tribal elections."  701 F.3d 927, 928 (D.C. Cir.

2012).

---

[17] In response to a request from the Commissioner of Indian Affairs for instructions on
how to proceed under the decree in determining which Freedmen were entitled to a share
in the distribution of the funds, the Court sent a letter on February 18, 1896 stating that
the "words '*And are now residents therein, or who may return within six months, and
their descendants*' were intended, for the protection of the Cherokee Nation, as a
limitation upon the number of persons who might avail themselves of the provisions of
the treaty; and consequently that they refer to both the freedmen and the free colored
persons previously named in the article."  *Whitmire v. Cherokee Nation*, 31 Ct. Cl. 140,
148 (1896).  The Court added:  "That is to say, freedmen and the descendants of
freedmen who did not return within six months are excluded from the benefits of the
treaty and of the decree."  *Id.*

The treaty between the Seminoles and the United States contained a nearly identical

provision granting Seminole Freedmen and their descendants "all the rights of native citizens."

Ex. 31, 14 Stat. at 756.  In *Seminole Nation of Oklahoma v. Norton*, this Court determined that

the Department of the Interior (DOI) properly disapproved three amendments that attempted to

deny the Freedmen membership in the Seminole Nation because "the DOI clearly expresses the

basis for its objection to these amendments, pointing out that the Freedmen have been members

of the Seminole Nation since 1866 and that their removal would violate both statue and treaty."

2001 WL 36228153, at *12 (D.D.C. September 27, 2001).[18]  These cases demonstrate that the

Freedmen provisions in the 1866 treaties, including Article 9, continue to be read expansively by

federal courts.

### 3. The Indian Claims Commission Cases Demonstrate That There Was No Dispute That the Treaty Guaranteed Citizenship to the Freedmen.

In 1946, Congress passed the Indian Claims Commission Act (ICCA), which authorized

tribes or identifiable groups of Indians to file certain types of monetary claims against the United

States.  Act of Aug. 13, 1946, ch. 959, 60 Stat. 1049 (1946).  The Indian Claims Commission

(ICC) subsequently resolved four cases – Dockets 123, 173, 173-A, and 190 – involving claims

by the Freedmen and the Cherokee Nation for monies from the sale of Cherokee lands in the late

nineteenth and early twentieth century.  The briefs, findings of fact, and opinions in these ICC

cases all provide express and affirmative recognition – including statements by the Cherokee

Nation – of the Freedmen's right to citizenship based on Article 9 of the Treaty.

---

[18] Judge Kollar-Kotelly issued two decisions on September 27, 2001 – this cited, unpublished opinion and a published opinion, *Seminole Nation of Oklahoma v. Norton*, 206 F.R.D. 1 (D.D.C. 2001).  A year later, in *Seminole Nation of Oklahoma v. Norton*, 223 F. Supp. 2d 122, 126 (D.D.C. 2002), Judge Walton cited the published opinion when referring to Judge Kollar-Kotelly's ruling on the cross motions for summary judgment, but that ruling was made in the unpublished decision from the same day.

Docket 123 involved claims by a group of Freedmen who were listed only on the Kern-Clifton or Wallace Rolls, but not included on the final Dawes Roll. These Freedmen filed claims against the United States "for the value of properties and money of the Cherokee Nation wrongfully withheld from the Cherokee Freedmen," alleging that "they and their descendants" had equal rights to Cherokee property as those who were Cherokees by blood. Ex. 34, *Cherokee Freedmen v. United States*, Docket 123, 2 Ind. Cl. Comm. 231, 232 (Sept. 9, 1952). The ICC ultimately determined that the Freedmen's claims against the United States were individual rather than tribal in nature and thus outside the ICC's jurisdiction, but in its written opinion the ICC made two affirmative points about the status of the Freedmen. Ex. 35, *Cherokee Freedmen v. United States*, Docket 123, 10 Ind. Cl. Comm. 109 (Dec. 28, 1961). First, the ICC stated that under the Treaty, the Freedmen and free blacks "acquired new rights and status *as citizens of the said [Cherokee] Nation*." *Id.* at 128 (emphasis added). Second, the ICC described the dispute as one that presumed the citizenship status of the Freedmen – the Cherokee Nation contended that the Freedmen were entitled only to civil and political rights as citizens, while the Freedmen argued that they were entitled to equal rights of citizenship *and* division of property. *Id.* at 128-29. Indeed, the ICC stated that other than determining whether the Freedmen had a right to citizenship *and* property, "the most important problem presented was that of determining **who** among the Cherokee Freedmen were entitled to be members of the tribe within the meaning of Article 9 of the Treaty." *Id.* at 129. (emphasis added). Thus, it was well understood by both parties and the ICC that the Treaty provided, at a minimum, the civil and political rights of citizenship.

The ICC held that the 1912 *Whitmire* decision precluded the relitigation of the Kern-Clifton Freedmen's claims, but remanded in part to see whether the Freedmen might intervene in

the remaining aspects of the Cherokee Nation's claim in Dockets 173 and 173-A, in which the

Cherokee Nation sought additional compensation for the Cherokee Outlet.  In this case, the

Cherokee Nation again argued that while the Freedmen had civil and political rights, they lacked

the right to share in the proceeds from land sales.  In response to the Freedmen's summary

judgment motion, the Cherokee Nation stated:  "At most, the sole and only status it has ever been

possible for any freedmen to attain in relation to the affairs, and other properties of the Cherokee

Nation, was that of citizenship."  Ex. 36, *Cherokee Nation v. United States*, Docket 173-A,

Response of the Cherokee Nation to the Intervenors' Motion for Summary Judgment, at 7a (June

9, 1969).  This statement demonstrates that 103 years after the Treaty of 1866, the Cherokee

Nation still interpreted the Treaty as guaranteeing the right to citizenship to the Freedmen.

Although the ICC determined that it lacked jurisdiction to determine which individuals

should benefit from a Commission award, it entered final judgment in Docket 173-A, awarding

$3,887,557.57 in additional compensation to the Cherokee Nation.  The per capita payments

made under this award were paid to living enrollees listed on the final Dawes Rolls, including

Cherokee Freedmen (including descendants). 41 Fed. Reg. 1929-30 (Jan. 13, 1976).

The ICC's most direct analysis of Article 9 of the Treaty appeared in Docket 190.  In

1951, the Cherokee Nation filed a claim seeking recovery of funds paid to the Freedmen from

land cessions.  The Cherokee Nation alleged that the Treaty of 1866 was the product of duress

and that Article 9 was intended "to secure to said Freedmen in the Cherokee Nation only civil

and political rights as then evidenced by the Fourteenth Amendment of the Constitution of the

United States," not any rights or interests in Cherokee lands.[19]  Ex. 25, *Cherokee Nation v.*

---

[19] According to the ICC, "The Cherokee Nation did not at any time contend that all freedmen qua
freedmen should be excluded from the final Cherokee rolls."  Ex. 4, 12 Ind. Cl. Comm. 570, 629
(Sept. 25, 1963).

*United States*, Docket 190, Petition, at 8 (August 2, 1951).  The Cherokee Nation sought return of the funds that Congress ordered to be paid to the Freedmen and asked that the Treaty of 1866 be "treated or considered as revised so as to provide that Article 9 of the Treaty of 1866 grant to Cherokee Freedmen only civil or political rights."  *Id.* at 10.  Again, the Cherokee Nation itself acknowledged that the Treaty provided civil and political rights, which are central aspects of citizenship.

In dismissing the Cherokee Nation's claim, the ICC found that the Cherokee Nation failed to prove "that the 1866 treaty or its antecedent 1865 or 1866 negotiations were attended by duress, fraud, intimidation, falsehood, or mistake."  Ex. 4, 12 Ind. Cl. Comm. 570, 643 (Sept. 25, 1963).  The ICC concluded that the Treaty made the Freedmen "newly-accepted citizens, with their exactly equal rights, [who] had no greater interests than any blood Cherokees to the common property of The Cherokee Nation.  Nor did they have any lesser interests.  The interest of each Cherokee citizen was equal and, as to lands and funds, wholly intangible."  *Id.* at 642.  The ICC's decision in Docket 190 that the Freedmen had "exactly equal rights" that were neither greater nor lesser than those of Cherokee citizens echoed that of the Court of Claims' statements in *Whitmire* that the Freedmen were entitled to "equal rights and immunities . . . in the same manner and to the same extent as Cherokee citizens."

## III.     ARTICLE 9 OF THE TREATY OF 1866 WAS NOT ABROGATED BY THE FIVE TRIBES ACT OF 1906.

The Cherokee Nation asserts that Article 9 of the Treaty of 1866 no longer applies because it was abrogated by the Five Tribes Act of 1906 ("FTA").  CN Br. at 17-20.  This statute, also known as "An Act to provide for the final disposition of the affairs of the Five Civilized Tribes in the Indian Territory, and for other purposes," was one of the many Congressional acts of this era designed to wind down the affairs of the Indian tribes.  Ex. 23, 34

Stat. 137; *supra* at 14-18).  It provided for the finalization of a roll of citizens of the Cherokee

Nation, which would be used for allotting tribal land.  Section 3 of the FTA reads:

> The roll of Cherokee freedmen shall include only such persons of African
> descent, either free colored or the slaves of Cherokee citizens and their
> descendants, who were actual personal bona fide residents of the Cherokee Nation
> August eleventh, eighteen hundred and sixty-six, or who actually returned and
> established such residence in the Cherokee Nation on or before February eleventh,
> eighteen hundred and sixty-seven; but this provision shall not prevent the
> enrollment of any person who has heretofore made application to the Commission
> to the Five Civilized Tribes or its successor and has been adjudged entitled to
> enrollment by the Secretary of the Interior.  Ex. 23, 34 Stat. 137.

The Cherokee Nation argues that Congress, by placing the three words "and their

descendants" ***before*** the words establishing the residential and temporal limitations in the Five

Tribes Act, abrogated the Treaty of 1866.  CN Br. at 19.  In the Treaty, the phrase "and their

descendants" came after the words establishing the residential and temporal parameters for the

free African Americans and slaves emancipated during the Civil War – "are now residents

therein, or who may return within six months."  The Cherokee Nation argues that Congress

intentionally moved the term "and their descendants" before the residency term so that "the

descendants to be included on the Freedmen Roll were also expressly required to be *bona fide*

residents of the Nation by February 11, 1867."  CN Br. at 19.  In other words, in the Cherokee

Nation's view, only those persons of African descent who were alive and residents of the

Cherokee Territory on February 11, 1867 should be listed as Freedmen on the Dawes Roll, and

have the rights that flowed therefrom.

The Supreme Court is "extremely reluctant" to find that a federal statute abrogates a

treaty, and has held that although Congress can abrogate treaty rights, "it must clearly express its

intent to do so."[20]  *Washington v. Washington Commercial Passenger Fishing Vessel Assn.*, 443

U.S. 658, 690 (1979); *see also Mille Lacs*, 526 U.S. at 202 (1999); *United States v. Dion*, 476

U.S. 734, 738 (1986) ("We have required that Congress' intention to abrogate Indian treaty

rights be clear and plain.").  More specifically, the Supreme Court has held there must be "clear

evidence that Congress actually considered the conflict between its intended action on the one

hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the

treaty."  *Dion*, 476 U.S. at 739-40.  This is consistent with "the settled rule that repeals by

implication are not favored and will not hold to have taken place if there is a reasonable

construction, by which both the treaty and the statute can coexist consistently with the intention

of Congress."  *Menominee Tribe of Indians v. United States*, 388 F.2d 998, 1003 (Ct. Cl. 1967);

*see also Haver v. C.I.R.*, 444 F.3d 656, 658 (D.C. Cir. 2006) ("When [a statute and treaty] relate

to the same subject, the courts will always endeavor to construe them so as to give effect to both,

if that can be done without violating the language of either. . . ."  (quotations and citations

omitted)).

### A.  Congress Did Not Expressly Abrogate the Treaty of 1866.

The best evidence of abrogation is an explicit declaration by Congress in statutory text

that it intended to alter treaty rights.  *See Dion*, 476 U.S. at 739; *Leavenworth, L. & G. R. Co. v.

United States*, 92 U.S. 733, 741-42 (1875).  An "[e]xplicit statement by Congress is preferable

for the purpose of ensuring legislative accountability for the abrogation of treaty rights."  *Dion*,

476 U.S. at 739.  The provision of the FTA addressing the Freedmen contains no such explicit

statement of abrogation.  Section 3 of the FTA does not expressly refer to the Treaty of 1866,

---

[20] This principle applies to international treaties as well.  *See, e.g., Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243 (1984) ("There is . . . a firm an obviously sound canon of construction against finding implicit repeal of a treaty in ambiguous congressional action."); *see also Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 175 (D.D.C. 2002).

much less state that it is intended to abrogate or alter the rights granted by Article 9 of that

Treaty. To the contrary, Section 3 demonstrates congressional recognition that certain Freedmen

had rights under the Treaty, because the FTA expressly provided that the Freedmen who were

listed on the Dawes Rolls would receive allotments of tribal land on the same basis as other

Cherokee citizens.

The Supreme Court has found the lack of express abrogation language to be significant.

*Washington Commercial Passenger Fishing Vessel Assn.*, 443 U.S. at 690; *Mille Lacs*, 526 U.S.

at 203. In *Mille Lacs*, the Supreme Court addressed whether tribal treaty rights were abrogated

by an executive order, a subsequent treaty, or a statute enabling the admission of Minnesota as a

state. The Court found that the statute did not abrogate the Tribe's treaty rights in part because

the act "makes no mention of Indian treaty rights; it provides no clue that Congress considered

the reserved rights of the Chippewa and decided to abrogate those rights when it passed the Act."

*Id.* at 203; *see also Menominee Tribe of Indians v. United States*, 391 U.S. 404, 412 (1968)

("declin[ing] to construe the Termination Act as a backhanded way [of] abrogating the hunting

and fishing rights of these Indians" because a reference to "statutes" and not the treaty was

"potent evidence that no treaty was in mind."). The lack of express abrogation language weighs

heavily in favor of finding that the FTA did not abrogate Article 9 of the Treaty.

**B. Congressional Intent to Abrogate Cannot Be Implied from the Text of the FTA.**

Congress may impliedly abrogate treaty rights, but a court should reach this conclusion

only if the treaty rights and a statute are in direct and irreconcilable conflict with each other. *See,*

*e.g., Mille Lacs*, 526 U.S. at 204; *Menominee Tribe*, 391 U.S. at 411; *Dion*, 476 U.S. at 740.

Here, this standard is not met. Article 9 of the Treaty and the FTA can co-exist because they

serve different, non-conflicting purposes. Article 9 of the Treaty of 1866 was designed to ensure

that freed slaves and their descendants were given all the rights of native Cherokees in the wake

of the Civil War, as part of a larger peace and reconstruction treaty between the Cherokee Nation

and the United States.  The purpose of the FTA was not to alter the rights created by the Treaty;

rather, it was intended to finalize the criteria for enrollment on the Dawes Rolls and the

distribution of land allotments.

The Cherokee Nation argues that the FTA required that "the descendants to be included

on the Freedmen Roll were also expressly required to be *bona fide* residents of the Nation by

February 11, 1867."  CN Br. at 19.  The Cherokee Nation's reading makes the provision in

Section 3 of the FTA addressing "their descendants" superfluous.  The FTA already directs the

roll to include "persons of African descent, either free colored or the slaves of Cherokee citizens"

who were residents of the Cherokee territory by February 11, 1867.  If, as the Cherokee Nation

argues, "descendants" must also meet this residency requirement, then there was no need for the

term "descendants" at all, since any "descendant" would also independently meet the other

specified criteria as a "free colored" person.  "It is a cardinal principle of statutory construction

that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause,

sentence, or word shall be superfluous, void, or insignificant."  *TRW, Inc. v. Andrews*, 534 U.S.

19, 31 (2001) (internal quotation marks omitted); *see also Mingo Logan Coal Co. v. U.S. E.P.A.*,

714 F.3d 608, 613-14 (D.C. Cir. 2013) (court must avoid reading of statute that would render

language in statute superfluous); *Miller v. Clinton*, 687 F.3d 1332, 1347 (D.C. Cir. 2012) (same).

The better explanation is that the moving of the phrase "and their descendants" in Section

3 was an inadvertent shift in language that occurred while Congress was crafting language to

clarify criteria for Freedmen eligibility.  The Supreme Court has repeatedly instructed that

misplaced modifiers and similar grammatical errors should not necessarily govern statutory

51

interpretation, warning that an interpretation can be "literally permit[ted]" by a statute's grammar, "quite sensible as a matter of grammar," and even "the most natural grammatical reading" of the statute, without being the *only* reasonable interpretation, or even the reading most consistent with Congress's manifest intent. *See Chickasaw Nation v. United States,* 534 U.S. 84, 90 (2001); *United States v. X-Citement Video, Inc.,* 513 U.S. 64, 68-69 (1994); *Nobelman v. Am. Savings Bank,* 508 U.S. 324, 330-331 (1993).  Accordingly, when confronted with a statute that is ambiguous due to a misplaced modifier, courts must consider the surrounding context and structure.[21]  *See, e.g., X-Citement Video, Inc.*, 513 U.S. at 68; *Nobelman*, 508 U.S. at 331.

In this case, as discussed *supra* at 11-14, the decades following the enactment of the Treaty were filled with disputes as to **which** Freedmen were entitled to citizenship, based on factors such as the date of return or whether they were slaves or free blacks prior to the Civil War.  *Whitmire*, 223 U.S. 108; *Whitmire*, 31 Ct. Cl. 140.  These disputes were still ongoing in 1905 as the Dawes Rolls were being finalized; for example, the Secretary of the Interior had just clarified that Freedmen must have returned by February 11, 1867 (six months from the Treaty's proclamation) in order to be eligible for the Dawes Rolls.  Section 3 of the FTA adds this newly-established date.  The reordering of the language also clarifies that the requirement for return by February 11, 1867 applies to both Freedmen (newly freed slaves) and free blacks.  Thus, viewed in historical context, the better explanation for the slight alterations to the Treaty language in the FTA is that they were made to address these disputed eligibility criteria.  Moving the phrase "and their descendants" was incidental to this clarification process and should not be read to have changed the meaning of Article 9.

---

[21] This Court has also recognized that by "declin[ing] to terminate the tribal existence or dissolve the tribal governments, despite all of its earlier intentions to do so," Congress "rendered some of the other provisions of the Five Tribes Act ineffective."  *Harjo v. Kleppe*, 420 F. Supp. at 1129.

**C. There Are No Other Indicia of Congressional Intent to Alter the Rights of Freedmen Descendants.**

In the absence of an express congressional statement of abrogation, courts may look to a statute's legislative history, surrounding circumstances, and other factors to ascertain whether Congress intended to abrogate a treaty.  Even when looking to these other sources of congressional intent, "what is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *Dion*, 476 U.S. at 739-40.  When determining whether "surrounding circumstances and legislative history" indicate an intent to abrogate, courts look for "clear and reliable evidence in the legislative history of a statute." *Id.* at 739 (quoting Cohen, *Handbook*).

Here, the surrounding circumstances and legislative history of the FTA provide no such "clear and reliable evidence" that Congress intended to abrogate Section 9 of the Treaty by altering the tribal citizenship rights of the Freedmen and their descendants.  To the contrary, the legislative history indicates that in passing the FTA, Congress intended to maintain the same general standards and rules as had been used in previous years with respect to Freedmen and their descendants.  Under these practices, Freedmen and descendants of Freedmen who were born after 1867 were listed on Cherokee rolls and considered by Congress to be "citizens" of the Tribe.  For example, during the initial consideration of the bill that would become the Five Tribes Act (H.R. 5976), in response to questions regarding whether certain classes of Freedmen and their children were being enrolled under fair terms, Representative Curtis indicated that the Secretary of the Interior was making enrollment decisions with respect to the Freedmen, and that "it will carry out the same policy in regard to enrolling freedmen in the future that it has in the past."  Ex. 26, 40 Cong. Rec. 1241 (1906).  Rep. Curtis continued, "In the original act, known as

53

the 'Curtis Act,' the Cherokee freedmen were to be enrolled in accordance with the decision of the Court of Claims rendered in 1896, and I believe the [Interior] Department has been following that decision." *Id.*; *see* Ex. 19, *Whitmire v. Cherokee Nation*, Ct. Cl. No. 17209, Feb. 3, 1896.

There was debate about whether and how to give those Freedmen who had not returned to the Cherokee Nation by early 1867 additional opportunities to file for enrollment, , but nowhere in this debate did any of the members of Congress mention curtailing the rights of descendants of such Freedmen.  Ex. 26, 40 Cong. Rec. at 1248-49.  To the contrary, even though there was disagreement about whether the time to apply for enrollment should be further extended, the members all agreed that the enrollment decisions of the Secretary of the Interior and the Dawes Commission – which included many Freedmen descendants were not alive in 1867 – would continue to stand.

Further, the Cherokee Nation's interpretation of the FTA is flatly contradicted by the contemporaneous interpretation of the statute.  Under the Tribe's interpretation, the Dawes Freedmen Roll, which was finalized in 1906, should have included only those individuals who actually resided in the Cherokee Nation in February 1867.  In fact, ***most*** of the names on the Freedmen Roll are individuals who were under the age of 40 who could not have met this requirement because there were not alive in 1867.  Ex. 22, Excerpts of Cherokee Freedmen Dawes Rolls.  This is compelling evidence that, at the time, the FTA was not read to exclude descendants born after 1867 from enrollment.  The Commissioner for the Five Civilized Tribes also reported on the implementation of the 1906 statute, and one of the principal topics with respect to the Cherokee Freedmen concerned the applications for enrollment of children pursuant to the FTA.  The Commissioner reported that by June 30, 1906, 583 applications for enrollment had been received from children of Freedmen.  Ex. 37, *Report of the Secretary of the Interior for*

*the Fiscal Year Ended June 30, 1906*, at 290.  This accounting would, of course, have been

unnecessary if, as the Cherokee Nation argues, Section 3 was intended to require descendants to

meet the same criteria for return to Cherokee territory.

### D.  No Federal Court Has Held that the FTA Abrogated Article 9.

The Cherokee Nation argues that *Garfield v. United States ex rel. Lowe*, 34 App. D.C. 70

(D.C. Cir. 1909) supports their argument that the Five Tribes Act limited enrollment to

"descendants" who were residents of the Cherokee Nation by February 11, 1867.  The Cherokee

Nation misreads this opinion, and fails to place it in proper historical context.  In *Garfield*, the

relators – Freedmen descendants – were placed on the Freedmen roll in 1904 by the Secretary

based on the conclusion that one of the descendants' ancestors (Mary Robbins) was a former

slave of a Cherokee citizen who had returned to the Cherokee Nation within the time specified

by the *Whitmire* court.  However, in 1905, the Commission to the Five Civilized Tribes

determined that Mary Robbins had not, in fact, returned to the Cherokee Nation within the time

specified by the *Whitmire* court.  After a rehearing, the Secretary of the Interior affirmed this

decision and Mary Robbins and, by extension, her descendants were struck from the list.  The

Freedmen relators argued that the Treaty's requirement of return to the Cherokee Nation within

six months applied only to free blacks, and not to former slaves.  *See, e.g.,* Ex. 38, Brief for

Plaintiffs in Error, *United States ex rel. Lowe v. Fisher*, 223 U.S. 95 (1912), at 52.

The D.C. Circuit's decision thus considered whether the six-month-return requirement

applied to both freedmen *and* "free colored persons."  The decision refers to this longstanding

dispute, and notes that "[i]f any doubt theretofore existed . . . that doubt was dissipated by the

language of section 3 [of the FTA], for that language constitutes a legislative interpretation of,

and supersedes *pro tanto*, the prior treaty."  *Garfield*, 34 App. D.C. at 76; *cf. Whitmire*, 31 Ct. Cl.

at 148 (holding that the language of Article 9 was a "limitation upon the number of persons who might avail themselves of the provisions of the treaty" and that the six-month limitation applied to both "the freedmen and the free colored persons").  There was no "doubt" – or even debate – as to whether the "descendants" themselves must have returned within six months of the Treaty.[22]  The Cherokee Nation's suggestion that the *Garfield* case addressed this question is entirely misplaced.

Moreover, a number of federal courts have considered the rights of the Freedmen of the Five Civilized Tribes since 1906, and not a single court has found that the Freedmen provisions of the post-Civil War treaties have been abrogated.  In *Seminole Nation of Oklahoma v. Norton*, 2001 WL 36228153 (D.D.C. Sept. 27, 2001), Judge Kollar-Kotelly addressed the Seminole Nation's claims that the Freedmen provisions of the Seminole Treaty of 1866 were abrogated by the Curtis Act.  Judge Kollar-Kotelly rejected this argument, stating, "[b]ecause the Treaty of 1866 has not been abrogated by subsequent agreement or statute, there can be no other conclusion but that it remains in force."  *Seminole*, 2001 WL 36228153, at *17.  The *Seminole* decision relied in part on *Goat v. United States*, 224 U.S. 458, 468 (1912), in which the Supreme Court "implicitly acknowledged the continued vitality of the Treaty of 1866 following the passage of the Curtis Act."  *Seminole*, 2001 WL 36228153, at *14.   Several other decisions have considered issues related to the Freedmen of the Five Civilized Tribes, and none has found that the Treaty provisions were abrogated.  *See, e.g., Cherokee Nation v. Whitmire*, 223 U.S. 108; *Chickasaw Nation v. United States*, 95 Ct. Cl. 192 (Ct. Cl. 1941); *Seminole Nation v. United*

---

[22] Further, *Garfield* affirms the authority of the Secretary of the Interior to make and finalize the Dawes Rolls, which as discussed *infra*, contained the names of many "descendants" who could were not alive in 1867.  *Garfield*, 34 App. D.C. at 77-78.

*States*, 90 Ct. Cl. 151 (Ct. Cl. 1940).  The Cherokee Nation's assertion that Article 9 of the

Treaty has been abrogated should be rejected.

## IV.     THE CHEROKEE NATION DOES NOT HAVE A SOVEREIGN RIGHT TO DISREGARD FEDERAL TREATY OBLIGATIONS.

The Cherokee Nation argues that it has the sovereign right to determine its own

membership, and that this entitles the Nation to exclude the Freedmen.  CN Br. at 22-25.  Interior

agrees that the Cherokee Nation is a sovereign entity that retains powers of self-government.

*See, e.g., Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55-56 (1978).  These retained powers

include, as a general matter, the power to define its own membership.  *Id.* at 72; *Williams v.

Gover*, 490 F.3d 785, 789 (9th Cir. 2007).  However, tribal authority, including the right to

define tribal membership, can be constrained by treaties or other federal laws.  *See United States

v. Wheeler*, 435 U.S. 313, 323 (1978) ("Indian tribes still possess those aspects of sovereignty

not withdrawn by treaty or statute…."); *Vann v. Kempthorne*, 534 F.3d 741, 746 (D.C. Cir. 2008)

("Congress may whittle away tribal sovereignty as it sees fit." (citations omitted); *see also

Williams*, 490 F.3d at 789 ("An Indian tribe has the power to define membership as it chooses,

subject to the plenary power of Congress."); *Poodry v. Tonawanda Band of Seneca Indians*, 85

F.3d 874, 880 (2d Cir. 1996) (tribes have right "absent limitation by treaty or federal statute . . .

to determine questions of membership.").  In this case, through Article 9 of the Treaty of 1866,

Congress has constrained (with the Cherokee Nation's agreement) the Nation's authority to

determine tribal membership.

In a slightly different context, the D.C. Circuit has already rejected the Cherokee Nation's

argument that the Tribe's interest in defining tribal membership to exclude the Freedmen is a

"core sovereign interest" of the tribe.  *Vann v. Kempthorne*, 534 F.3d at 755 (D.C. Cir. 2008).

The *Vann* Court was considering the Cherokee Nation's argument that the Freedmen could not

pursue their claims relating to membership against individual Cherokee officers under an *Ex parte Young* theory because "the requested relief 'implicates special sovereignty interests.'" 534 F.3d at 755 (citations omitted).  The Court rejected this argument, stating "[t]he Cherokee Nation has no interest in protecting a sovereignty concern that has been taken away by the United States." *Id.*  The Court held that "the Thirteenth Amendment and the 1866 Treaty whittled away the tribe's sovereignty with regard to slavery and left it powerless to discriminate against the Freedmen on the basis of their status as former slaves." *Id.* at 756.

The Cherokee Nation also discusses, at some length, the passage of the Oklahoma Indian Welfare Act of 1936 (OIWA)[23], and a 1941 Department of the Interior Solicitor's memorandum that concludes that the "Freedmen were adopted as full members into the Cherokee, the Choctaw, the Seminole, and the Creek Tribes pursuant to the treaties of July 19, 1866 (14 Stat. 799) (Cherokee). . ." and that the Freedmen had "all rights of citizenship in the Nations, including the right of suffrage." *See* CN Br. at 22-23; Ex. 39, Solicitor's Opinion, Oct. 1, 1941, 1 Op. Sol. on Indian Affairs 1076-78 (U.S.D.I. 1979).  That memorandum also stated that the Oklahoma Indian Welfare Act provided the consent of Congress for tribes to reorganize, as provided for by that Act, and modify their membership requirements if desired.

Even assuming *arguendo* that OIWA reflects a clear congressional intent to provide a path for the abrogation of rights and obligations guaranteed by earlier treaties, it does not apply here.  The Cherokee Nation has never reorganized under OIWA**.**  *See, e.g., United Keetoowah Band of Cherokee Indians of Oklahoma v. United States*, 67 Fed. Cl. 695 (Ct. Cl. 2005) (noting that the Cherokee Nation has never been organized under OIWA) (reversed on other grounds,

---

[23] Section 3 of OIWA grants Oklahoma tribes the right to organize and act through a governmental entity organized under a constitution and a corporate entity organized under a corporate charter.  25 U.S.C. § 503; *see also Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1442 (D.C. Cir. 1988).

480 F.3d 1318 (Fed. Cir. 2007)).  The Cherokee Nation cannot avail itself of any argument that

in passing OIWA, Congress authorized the abrogation of the Treaty of 1866 because even if this

argument is meritorious, the Cherokee Nation did not follow the procedures set forth by

Congress in OIWA to reorganize.  And while Interior agrees that the Cherokee Nation "still

possesses an inherent right to self-government" notwithstanding its failure to reorganize under

OIWA, *see Wheeler v. U.S. Dep't of Interior*, 811 F.2d 549 (10th Cir. 1987), CN Br. at 23, this

general right to self-governance does not supercede the rights and obligations that are expressly

defined by treaty.  As discussed *infra* at 47-54, treaty rights and obligations are not abrogated

absent clear and plain congressional intent to do so, and the Cherokee Nation has pointed to

nothing in OIWA that meets this standard with respect to the Treaty provision guaranteeing

Freedmen citizenship.

The Cherokee Nation also cites a series of cases in which federal courts have been

reluctant to intervene in intra-tribal membership disputes.  *See* CN Br. at 23-25; *Lewis v. Norton*,

424 F.3d 959 (9th Cir. 2005); *Santa Clara Pueblo*, 436 U.S. 49; *Quair v. Sisco*, 359 F. Supp. 2d

948 (E.D. Cal. 2004).  None of these cases involved the question whether membership rights

were specifically guaranteed by a treaty between the Tribe and the United States, and thus are

readily distinguishable.  Here, the issue before the Court is whether a specific treaty provision

guarantees a particular group of individuals certain rights within the Cherokee Nation.  The

parties are not asking the Court to delve into any other matters of tribal government or

membership.

The Cherokee Nation also cites *Nero v. Cherokee Nation*, 892 F.2d 1457 (10th Cir. 1989)

in support of its argument that membership is a sovereign matter.  But the question before the

*Nero* court was whether the Tribe and the federal officials enjoyed sovereign immunity in a suit

brought by a group of Freedmen, and the Tenth Circuit concluded that there was no waiver of immunity that permitted the suit.  Sovereign immunity is not the issue before this Court, since in this case, the Cherokee Nation sought a declaratory judgment on the issue of the meaning of the Treaty, thus waiving its immunity.  And, Interior brought a counter-claim against the Cherokee Nation on the same issue, and the Cherokee Nation does not enjoy immunity from suit by the United States.

The *Nero* Court also considered whether the Freedmen could state a claim against tribal officials under 42 U.S.C. §§ 1981 and 2000d, and concluded (in the language at CN Brief at 25) that general federal race discrimination law does not apply to the Tribe's membership determinations, and thus that the plaintiffs could not state a claim on this basis.  892 F.2d at 1463.  Again, that is not the issue before this Court.  The *Nero* Court was not considering the issue of the rights of the Freedmen under the Treaty of 1866, and the cited statements in that opinion are thus not relevant to this case.  Although the Cherokee Nation retains substantial sovereign powers, it must nonetheless comply with the terms of Article 9 of the Treaty of 1866.

## CONCLUSION

After the Civil War and the Cherokee alignment with the Confederacy, the United States and the Cherokee Nation entered into the Treaty of 1866, which expressly guaranteed a group of former Cherokee slaves and free blacks broad rights within the Cherokee Nation on the same basis as "native Cherokees."  This means that these individuals are entitled to citizenship, voting in tribal elections, other civil rights, and tribal benefits on the same basis as other Cherokees. This Treaty provision has never been abrogated by Congress, and continues with full vitality today.  Summary judgment should be granted to Interior.

Dated:  January 31, 2014

Respectfully Submitted,

ROBERT G. DREHER
Acting Assistant Attorney General

 /s/ Amber Blaha

OF COUNSEL:
Jennifer Turner
Scott Keep
Office of the Solicitor
Department of the Interior
1849 C Street N.W.
Washington, D.C.  20240
Phone: (202) 208-6260

Amber Blaha (D.C. Bar No. 471008)
Frederick Turner
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
Law & Policy Section
P.O. Box 7415, Ben Franklin Station
Washington, D.C.  20044-7415
Phone: (202) 616-5515
Facsimile: (202) 514-4231
amber.blaha@usdoj.gov
frederick.turner@usdoj.gov

*Counsel for Department of the Interior*