# Exhibit 3

**Cherokee Nation v. Nash**
Case No.: 1:13-CV-1313 TFH

In support of the Department of the Interior's
Memorandum of Points and Authorities in
Support of Motion for Summary Judgment
and Opposition to the Cherokee Nation
and Principal Chief Baker's Motion for Partial Summary Judgment

# Article 9 of the 1866 Cherokee Treaty

Submitted to:
U.S. Department of Justice



Submitted by:
Historical Research Associates, Inc.
Emily Greenwald Ph.D.

Missoula, Montana
January 28, 2014



# Table of Contents

INTRODUCTION    1

SLAVERY AND CITIZENSHIP BEFORE 1861    3

SLAVERY IN CHEROKEE SOCIETY    3
CHEROKEE REMOVAL    4
THE 1839 CHEROKEE CONSTITUTION    6

THE CIVIL WAR, RECONSTRUCTION, AND THE 1866 TREATY    8

THE CIVIL WAR    8
THE 1865 TREATY NEGOTIATIONS    9
THE STATUS OF FREEDMEN    11
THE 1866 TREATY    14
CONCLUSION    19

IMPLEMENTING ARTICLE 9    20

CHEROKEE GOVERNANCE    20
SUPPLEMENTAL TREATY NEGOTIATIONS    21
CITIZENSHIP CLAIMS    22
CONCLUSION    24

CLAIMS TO PROCEEDS FROM CHEROKEE LANDS    25

ACTS OF THE CHEROKEE NATIONAL COUNCIL    25
CONGRESSIONAL REMEDIES    27
SALE OF THE CHEROKEE OUTLET    29
COURT OF CLAIMS RULINGS    29
CONCLUSION    33

INDIAN CLAIMS COMMISSION DOCKETS    34

DOCKET 123    34
DOCKETS 173 AND 173-A    35
DOCKET 190    35

FINDINGS    37

## List of Figures

Figure 1. Cherokee Land Cessions, 1785-1835.    4
Figure 2. Emigration and Removal of Southeastern Tribes to Indian Territory.    5
Figure 3. Indian Territory after Removal.    26

# Introduction

During the American Civil War, the Cherokee Nation entered into a treaty with the Confederate States of America, which the United States government regarded as having abrogated the tribe's prior treaties with the United States. After the war, the federal government sought to restore political relations with the tribe through a new treaty. It also sought, among other things, to ensure that the tribe, which had permitted slavery prior to the war, would provide for its former slaves' well-being. The Treaty of July 19, 1866, between the Cherokee Nation and the United States accomplished those goals. Article 9 of the treaty contained the following language:

> that all freedmen who have been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months, and their descendants, shall have all the rights of native Cherokees[.][1]

The United States Department of Justice asked me to investigate the history of Article 9 and to determine its meaning. Based on the historical record, it is my opinion that the United States government intended—and the Cherokee Nation understood—that Article 9 required citizenship in the Cherokee Nation for the freedmen and their descendants. The report that follows presents the historical evidence underlying this opinion.

Briefly, the history is as follows: U.S. representatives made clear in September 1865 negotiations at Fort Smith that post-Civil War treaties with the Cherokees and other tribes must include provisions to incorporate former slaves into the tribes on a footing equal to other tribal members. Cherokee delegates to the 1865 negotiations, although they opposed this idea, understood what the U.S. representatives meant.[2]

During subsequent negotiations in Washington, D.C., U.S. representatives again indicated that a provision for equitable treatment of former slaves must be included in treaties with the Cherokees and other tribes. Prior to reaching an agreement with the Cherokees in July 1866, the United States concluded treaties with the Seminoles, Creeks, Choctaws, and Chickasaws, all of which included language granting rights to former slaves among those tribes. The Cherokee delegates acknowledged that they must provide for equitable treatment of freedmen, and a provision to that end appeared in some of their proposed treaty drafts.

---

[1] Treaty of July 19, 1866, 14 Stat. 799 at 801.

[2] The Cherokee delegates to the 1865 and 1866 negotiations were literate in English, and they exchanged documents and treaty drafts written in English with the U.S. representatives.

The Cherokee Nation lacked secure title to its lands in Indian Territory because the federal government regarded its prior treaties with the Cherokees to have been voided by the tribe's treaty with the Confederacy. This state of affairs gave the United States an advantage during the 1866 negotiations. It was in a position to prevail on provisions it was strongly committed to, such as tribal citizenship for former slaves. The Cherokee Nation, by contrast, was in a position of needing to make concessions in order to normalize its diplomatic relations with the United States. Thus, the United States succeeded in obtaining a treaty provision that granted freedmen and their descendants "all the rights of native Cherokees." This is not to say that the United States simply dictated the treaty terms, and the protracted negotiation process confirms that it did not.

In November 1866, following the conclusion of the treaty, the Cherokees enacted a constitutional amendment that paralleled the terms of Article 9, further illustrating the Cherokees' understanding of the provision's meaning. The amendment was not necessary to make Article 9 operational, however. The ratification and proclamation of the treaty were all that was necessary to put Article 9 into effect.

In the 1880s, the Cherokee National Council explicitly acknowledged that Article 9 conferred civil, political, and personal citizenship rights upon the freedmen. However, the council disputed the freedmen's right to an ownership stake in Cherokee lands acquired prior to 1866. The Department of the Interior, Congress, and the federal courts repeatedly found that Article 9 made the freedmen equal citizens to "Cherokees by blood" in all respects, including ownership of lands and the proceeds derived therefrom.

As the historical documents underlying these events demonstrate, both the United States and the Cherokee Nation understood that Article 9 of the 1866 treaty conferred Cherokee citizenship rights upon the freedmen and their descendants. Congress and the courts have consistently determined that the treaty took precedence over subsequent acts of the Cherokee National Council. And the Cherokee Nation asserted as recently as 1951 that Article 9 conferred civil rights upon the freedmen.

# Slavery and Citizenship Before 1861

The Cherokee Nation originally occupied a large territory in the American Southeast, including portions of present-day Georgia, North Carolina, and Tennessee. The Cherokees, along with the Creeks, Seminoles, Choctaws, and Chickasaws, became known to Americans as the "Five Civilized Tribes" because they developed constitutional governments and economies that accorded with Euroamerican ideas of civilization. Nevertheless, Americans generally wanted Indians out of the path of their own expansion, and most members of the five tribes were removed from the region in the 1830s and 1840s. They rebuilt their governments and economies in Indian Territory, present-day eastern Oklahoma.

## Slavery in Cherokee Society

Early Europeans in the American Southeast observed slavery among the Cherokees, and historian Theda Perdue has traced its origins and evolution.[3] Initially, the Cherokees enslaved some war captives from other tribes, who were taken in retaliation for kinsmen who had been killed. Europeans capitalized on that practice by offering desired trade goods for Indian slaves, and they also encouraged intertribal conflict to increase the number of slaves and to serve their own colonial goals. By the mid-1700s, the British had secured the region east of the Appalachians and sought to stabilize relations with and among Indian tribes. They found it more advantageous to use enslaved Africans for labor than to promote intertribal raids and conflict.[4]

Over time, the Cherokees took on some of the economic and social characteristics of the British (later Americans) in the region. The elite among them adopted the practice of using African slave labor for plantation agriculture.[5] Similar to white planter society, only a minority of Cherokees owned slaves. In 1809, less than five percent of Cherokee families owned slaves. By 1835, that figure had risen to eight percent, with a total population of 16,395 Cherokees and 1,592 slaves.[6]

---

[3] Theda Perdue, *Slavery and the Evolution of Cherokee Society, 1540-1866* (Knoxville: University of Tennessee Press, 1979).

[4] Perdue, *Slavery and the Evolution of Cherokee Society*, 4–5, 19, 30, 35, 38, 46, 50.

[5] Perdue, *Slavery and the Evolution of Cherokee Society*, 50–60.

[6] Duane H. King, "Cherokee in the West: History Since 1776," in *Handbook of North American Indians*, vol. 14: Southeast, general ed. William C. Sturtevant, volume ed. Raymond D. Fogelson (Washington: Smithsonian Institution, 2004), 363.

## Cherokee Removal

By the 1820s, pressure from encroaching Euroamericans had reduced Cherokee territory considerably, and the State of Georgia sought to oust the tribe altogether. U.S. Indian policy at the time aligned with Georgia's goals in seeking to move Indians out of the path of American settlement. Congress responded with the 1830 Indian Removal Act, which authorized the president to enter treaties with tribes to remove them to Indian Territory, a vast area west of the Mississippi that Americans, at the time, thought they would never want.[7]



Figure 1. Cherokee Land Cessions, 1785-1835.
Source: Francis Paul Prucha, *Atlas of American Indian Affairs* (Lincoln: University of Nebraska Press, 1990), 31.

A minority of Cherokees, many of whom were slaveholders, agreed to a removal treaty, which the U.S. government regarded as applying to the whole tribe. Historian Theda Perdue explained, "In order to escape the seizure of more of their possessions by invading Georgians, many slaveholders departed for their new homes in the West" in 1836. In 1838–39, the U.S. military forcibly removed

---

[7] Theda Perdue and Michael D. Green, eds., *The Cherokee Removal: A Brief History with Documents* (Boston: Bedford Books, 1995), 14–20; Prucha, *The Great Father*, 64–77.

most the Cherokees who had remained in Georgia, along with their slaves. Perdue found that slaves performed labor during the removal that "[made] their masters' migration more comfortable," and they also gave their masters "a distinct advantage over the nonslaveholders in re-establishing themselves in the West."[8] The two groups—the pro-treaty and anti-treaty factions—reunited as a single entity in Indian Territory, although factional conflicts remained a problem.[9]

The U.S. government removed the other "Civilized Tribes" to Indian Territory, using varying degrees of force, between 1832 and 1842.[10] Figure 2 shows the various removal routes from the tribes' home territories to their new lands in Indian Territory.



Figure 2. Emigration and Removal of Southeastern Tribes to Indian Territory.
Source: Francis Paul Prucha, *Atlas of American Indian Affairs* (Lincoln: University of Nebraska Press, 1990), 117.

---

[8] Perdue, *Slavery and the Evolution of Cherokee Society*, 70–71.

[9] Perdue, *Slavery and the Evolution of Cherokee Society*, 72–76; Francis Paul Prucha, *The Great Father: The United States Government and the American Indians*, abridged edition (Lincoln: University of Nebraska Press, 1986), 95–97

[10] Prucha, *The Great Father*, 78–85.

## The 1839 Cherokee Constitution

The Cherokee Nation had adopted its first constitution in 1827. In 1839, shortly after removal to Indian Territory, the reunified nation enacted a new constitution that established the following rights for Cherokee citizens (article and section follow in parentheses):

- Ownership in common of the lands of the Cherokee Nation. (I.2)

- The exclusive and indefeasible right to their improvements (but without right to dispose of them to the United States, to the individual states, or to individual citizens thereof). (I.2)

- Free male citizens of 25 years of age or older could be elected to the National Council. (III.5)

- Free male citizens 18 and older were entitled to vote at all public elections. (III.7)

- Natural-born citizens age 35 or older could be elected to the office of Principal Chief. (IV.2)[11]

The constitution spelled out various other rights but did not specify whether they were limited to citizens. Such rights included freedom from unreasonable search and seizure, free exercise of religion, protection from double jeopardy, protection from takings without just compensation, and the right to trial by jury.[12]

Article III, Section 5, of the constitution provided that people in the following categories were entitled to "all the rights and privileges of this Nation":

- "descendants of Cherokee men by all free women, except the African Race, whose parents may have been living together as man and wife," and

- "the posterity of Cherokee women by all free men."[13]

---

[11] *The Act of Union Between the Eastern and Western Cherokees, the Constitution and Amendments, and the Laws of the Cherokee Nation, Passed During the Session of 1868 and Subsequent Sessions* (Tahlequah: National Press, 1870), 1–2, 7, 10.

[12] *The Act of Union Between the Eastern and Western Cherokees, the Constitution and Amendments, and the Laws of the Cherokee Nation, Passed During the Session of 1868 and Subsequent Sessions*, 14–15.

[13] *The Act of Union Between the Eastern and Western Cherokees, the Constitution and Amendments, and the Laws of the Cherokee Nation, Passed During the Session of 1868 and Subsequent Sessions*, 7.

Although it did not say so explicitly, the constitution effectively prohibited people of African descent from being citizens. And it did explicitly prohibit anyone of negro or mulatto parentage from holding office in the national government.[14]

Section 20 of Article III provided that "All Acknowledged Treaties shall be the Supreme Law of the Land, and the National Council shall have the sole power of deciding on the construction of all Treaty Stipulations."[15] The Cherokee National Council would later rely on that section in articulating its interpretation of the 1866 treaty.

---

[14] *The Act of Union Between the Eastern and Western Cherokees, the Constitution and Amendments, and the Laws of the Cherokee Nation, Passed During the Session of 1868 and Subsequent Sessions*, 7.

[15] *The Act of Union Between the Eastern and Western Cherokees, the Constitution and Amendments, and the Laws of the Cherokee Nation, Passed During the Session of 1868 and Subsequent Sessions*, 9.

# The Civil War, Reconstruction, and the 1866 Treaty

In 1861, the American Civil War began. Tribes in Indian Territory were in a difficult position. They abutted both Confederate and Union states, and some of them, like the Cherokees, practiced slavery. The Cherokees, Choctaws, Chickasaws, Creeks, and Seminoles all decided to enter into treaties with the Confederacy, although some of their members were pro-Union. After the war ended in 1865, the United States sought to restore relations with tribes that had aligned with the Confederacy. U.S. representatives met with numerous tribes at Fort Smith, Arkansas, between September 8 and 21, 1865, but little progress resulted. Therefore, during 1866, the United States pursued a strategy of negotiating with the tribes individually, and it succeeded in signing new treaties with each of them.

## The Civil War

At the outset of the Civil War, tribes in Indian Territory dealt with stresses similar to those of the borderlands states, and they debated whether to align with the Union or the Confederacy. At this point in time, about nine percent of Cherokee families owned slaves, with the total number of Cherokees around 21,000 and the number of slaves between 3,500 and 4,000.[16] Divisions within the Cherokee Nation over slavery and secession overlapped with older rifts between the treaty and anti-treaty parties. Stand Watie led the pro-slavery, pro-Southern contingent, while Chief John Ross received most of his support from those who did not own slaves.[17] Ross tried to maintain neutrality, but he soon determined that the tribe's best option was to enter into a treaty with the Confederacy, whose agents were exerting pressure on the tribe at the same time the Unionists were leaving Indian Territory.[18]

The Cherokee Nation entered a treaty of friendship and alliance with the Confederate States on October 7, 1861. The Confederacy agreed to protect the tribe, and the tribe "acknowledge[d] itself to be under the protection of the Confederate States of America, and of no other power or

---

[16] King, "Cherokees in the West," 363.

[17] Gary E. Moulton, *John Ross, Cherokee Chief* (Athens: The University of Georgia Press, 1978), 166.

[18] Moulton, *John Ross, Cherokee Chief*, 167–72.

sovereign whatever . . . ."[19] Less than a year later, John Ross and his followers realigned with the Union and left Indian Territory for Kansas. Ross soon traveled east to try to repair relations with the United States government, and he spent much of the war in Philadelphia.[20] Cherokees under the leadership of Stand Watie and others remained in Indian Territory and continued to fight for the Confederacy. Thus the Cherokee Nation was divided by the war.

President Abraham Lincoln issued the Emancipation Proclamation on January 1, 1863.[21] John Ross's Cherokee government-in-exile followed suit by abolishing slavery on February 18, 1863.[22] But it also enacted legislation providing

> [t]hat liberated slaves not having rights and privileges as the citizens of the Cherokee Nation shall be viewed and treated as other persons, members of other Nations or communities possessing no right of citizenship in the Cherokee Nation. But if such persons desire to become laborers within the Cherokee Nation, They shall be admitted upon the same terms as others, who are not citizens.[23]

In other words, former slaves were not entitled to Cherokee citizenship, although they could be admitted into Cherokee society as laborers.

## The 1865 Treaty Negotiations

The Civil War officially ended on April 9, 1865. The process of reconstructing the nation then began. An important component of federal reconstruction was addressing the political and economic status of former slaves and free blacks. In 1865, Congress passed (and the requisite number of states approved) the Thirteenth Amendment, which abolished slavery using the following language:

> Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.[24]

Congress passed the Fourteenth Amendment in April 1866, making "[a]ll persons born or naturalized in the United States . . . citizens of the United States and of the State wherein they

---

[19] Vine Deloria, Jr., and Raymond J. DeMallie, *Documents of American Indian Diplomacy: Treaties, Agreements, and Conventions, 1775-1979, vol. I* (Norman: University of Oklahoma Press, 1999), 667.

[20] Moulton, *John Ross, Cherokee Chief*, 175.

[21] James L. Roark, et al., *The American Promise: A History of the United States*, compact edition (Boston: Bedford/St. Martin's, 2000), 395.

[22] "Laws of the Cherokee Nation 1863," February 18, 1863, in *Laws of 1863, to 1868, Inc.*, 3, Roll CHN 8, Cherokee National Records, Oklahoma Historical Society, Oklahoma City, Oklahoma.

[23] "Laws of the Cherokee Nation 1863," November 14, 1863, in *Laws of 1863, to 1868, Inc.*, 24, Roll CHN 8, Cherokee National Records.

[24] U.S. Const. amend. XIII, § 1; Roark, *The American Promise*, A-14.

reside." Ratification took two years.[25] The ideas underlying the Thirteenth and Fourteenth Amendments shaped the United States' objectives in reconstructing the Cherokee Nation after the war.

The U.S. government deemed any tribe that had entered into a treaty with the Confederacy to have abrogated its prior treaties with the United States. Therefore, it sought to negotiate new treaties with those tribes in order to restore political relations. The federal government also sought to end slavery among the tribes in Indian Territory and to ensure the economic well-being of the former slaves, much as it was doing at the national level.[26]

U.S. treaty commissioners gathered the Cherokees and other tribes at Fort Smith, Arkansas, in September 1865 to negotiate new treaties. On September 9, the commissioners outlined the provisions that "must be" included in the treaties. One of them was as follows: "The institution of slavery which has existed among several of the tribes must be forthwith abolished, and measures taken for the unconditional emancipation of all persons held in bondage, and for their incorporation into the tribes on an equal footing with the original members, or suitably provided for."[27] Another provision stated, "No white person, except officers, agents, and employés of the government . . . will be permitted to reside in the [Indian] territory, unless formally incorporated with some tribe, according to the usages of the band."[28] Taken together, these two provisions suggest that the United States wanted every non-government resident in Indian Territory to be a member of one of the tribes.

Commissioner of Indian Affairs D. N. Cooley, who served as a U.S. treaty commissioner at Fort Smith, advised the Cherokees during the negotiations that until they repudiated their treaty with the Confederacy and entered into a new treaty, "you, as a nation, are legally, morally, and of right ought to be, as you are, subject to the will and pleasure of the President of the United States touching your interests under any former treaty or treaties with the United States affecting annuities or titles to land in the Indian territory."[29] In other words, the federal government did not consider itself obliged to uphold the provisions of earlier treaties.

---

[25] U.S. Const. amend. XIV, § 1; Roark, *The American Promise*, 423–24, A-14.

[26] Secretary of the Interior James Harlan outlined the federal government's goals in instructions to the U.S. treaty commissioners appointed to negotiate with southern Indians at Fort Smith. James Harlan to Gentlemen, August 16, 1865, reprinted in Annie Heloise Abel, *The American Indian and the End of the Confederacy, 1863-1866* (Lincoln: University of Nebraska Press, 1993 [1925]), 291–26. See also Francis Paul Prucha, *American Indian Treaties: The History of a Political Anomaly* (Berkeley: University of California Press, 1994), 265–66.

[27] *Annual Report of the Commissioner of Indian Affairs for the Year 1865* (Washington: Government Printing Office, 1865), 318. [This series cited hereafter as *ARCIA [YEAR].*]

[28] *ARCIA 1865*, 319.

[29] *ARCIA 1865*, 327.

Two groups of Cherokees attended the Fort Smith treaty negotiations. The Southern Cherokees—who had remained aligned with the Confederacy throughout the war—were represented by E. C. Boudinot, William P. Adair, Stand Watie, and others. The Northern Cherokees—the group that had broken ties to the Confederacy and realigned with the Union—were represented by John Ross, Lewis Downing, Smith Christie, and others. The groups appear to have acted independently of one another during the negotiations.

The record of negotiations on September 16 captured the Southern Cherokees' stance on incorporation of former slaves into the tribe. According to a written statement submitted by E. C. Boudinot, the Southern Cherokees accepted the abolition of slavery,

> But we respectfully submit that it would neither be for the benefit of the emancipated negro nor for the Indian to "incorporate" the former into the several tribes "on an equal footing with the original members." That the emancipated negro must be "suitably provided for" is a natural sequence of his emancipation; but so serious and delicate a question should not be so hastily considered and acted upon, and we therefore ask further time before deciding upon it, pledging ourselves to acquiesce in good faith in any plan which may be considered reasonable and just.[30]

The negotiations at Fort Smith did not result in the comprehensive treaty the federal government sought. Instead, the parties entered into brief articles of agreement, which stated that the treaties with the Confederacy had made the tribes "liable to a forfeiture of all rights of every kind, character, and description which had been promised and guaranteed to them by the United States . . . ." The tribes agreed to revoke those treaties, and the United States promised to "re-establish peace and friendship with all the nations and tribes of Indians within the limits of the so-called Indian country . . . ." The agreement left the door open to further treaty negotiations.[31] Discussions resumed in January 1866 between the Five Civilized Tribes and the United States in Washington, D.C. (as explained below).

## The Status of Freedmen

Meanwhile, the United States government became increasingly concerned about the status of former slaves in Indian Territory. Correspondence among federal Indian agents, Commissioner of Indian Affairs D. N. Cooley, and Secretary of the Interior James Harlan reveal some of the circumstances and thinking underlying the citizenship provision in the 1866 Cherokee treaty.

---

[30] _ARCIA 1865_, 339.

[31] Charles J. Kappler, _Indian Affairs: Laws and Treaties, vol. II_ (Treaties) (Washington: Government Printing Office, 1904), 1050–51. Kappler included the Fort Smith agreement in an appendix to his 1904 compilation of treaties with the comment that it was unratified. He noted, "This document is claimed by the Indian Office not to be a treaty, but simply an agreement which formed the bases for the treaty with the Seminole of May 21, 1866, and of the treaty with the Creeks of June 14, 1866." Kappler II: 1051 (parenthetical references removed).

Freedmen in Indian Territory faced difficult conditions in late 1865. Elijah Sells, Superintendent of Indian Affairs for the Southern Superintendency, reported to Commissioner Cooley that some of the freedmen in Indian Territory were destitute. In such cases, he "instructed the agents to issue rations to them, the same as to the Indians." He said that he did not know what policy the Office of Indian Affairs (later called the Bureau of Indian Affairs) intended to pursue, but he commented, "If they are to be recognized as Indians, then, I recommend that some provision be made to aid them to return to their former homes."[32] Sells had been a commissioner at the 1865 Fort Smith negotiations, and his use of the phrase "recognized as Indians" aligned with the goal the United States had put forward at Fort Smith of incorporating former slaves "into the tribes on an equal footing with the original members."

Cooley apparently relayed Sells' letter to Secretary of the Interior James Harlan. Harlan agreed with the suggestion of returning former Cherokee slaves to their homes among the Cherokee. He told Cooley, "you will direct the Supt. of Indian Affairs [Sells] to see that no distinction is made between members of the Cherokee tribe who were held in bondage and those who were free. That, in all cases they should receive the same annuities, lands and educational advantages."[33] Thus, before any formal treaty was in place, the Department of the Interior took steps to ensure that Cherokee freedmen were treated as being fully equal to other Cherokees.

Within a few days of his letter to Cooley, Harlan dispatched John Sanborn to Indian Territory to assess the condition of the freedmen. Harlan instructed Sanborn,

> In cases where the feeling existing between the parties is amicable and the relations satisfactory to both, and the rights of the Freedmen are fully acknowledged, you will not interfere or disturb those relations, but in all cases where the rights of the Freedmen, as such, are denied by the Indians or where abuses exist or wrongs are perpetrated upon the Freedmen you will at once interfere and afford such relief as may be within your power.[34]

He referred to Sanborn as "the protector of the rights of the Freedmen."[35] Harlan continued,

> You will impress upon the Indians the justice of admitting the Freedmen to the enjoyment of all the rights of persons and property without reference to their former condition, and to an equal enjoyment of the bounty that may hereafter be bestowed by the National Government, and that it would be especially gratifying to the Government if these Freedmen should be admitted to an equal enjoyment of civil rights. With this in view you will explain to them that in this manner the Indians will rapidly augment their numbers and power—that they would thus be only following the example of the white people of the U.S. who have, from the beginning, admitted to the rights of citizenship white people of

---

[32] Elijah Sells, Superintendent of Indian Affairs, to D. N. Cooley, November 15, 1865, Roll 100, Letters Received by the Office of Indian Affairs, 1824-81, National Archives Microfilm Publication No. M234 [hereafter M234].

[33] James Harlan, Secretary of the Interior, to D. N. Cooley, Commissioner of Indian Affairs, November 17, 1865, Roll 100, M234.

[34] John Sanborn, Brevet Major General, Circular No. 1, January 1, 1866, 357, Roll 837, M234.

[35] John Sanborn, Brevet Major General, Circular No. 1, January 1, 1866, 357, Roll 837, M234.

> all countries of the world, when there has appeared to exist no natural antagonism; that as a result of this policy the whites have grown so numerous and strong as to render it difficult for the President to prevent them from crushing out the Indian race and that many of the States, including the richest and wisest, make no distinction in this respect on account of color.[36]

In this passage, Harlan equated "an equal enjoyment of civil rights" with citizenship. He expected Sanborn to persuade the tribes of the benefits of citizenship for the freedmen.

Sanborn assumed his post as head of the "commission for regulating relations between freedmen in the Indian Territory and their former masters," establishing himself at Fort Gibson. He issued a circular on January 1, 1866, directing federal Indian agents to "use every means in their power to impress upon the minds of each individual of the tribes and nations a clear and correct idea of the new relation existing between them and their former slaves . . . ."[37] After surveying the condition of the freedmen among the various tribes, Sanborn wrote,

> The Cherokees are divided in sentiment. A fraction, and not a very small fraction, think the government should move the Negroes from their country, as it has freed them. While a portion, including the Principal Chief Downing, are in favor of having them retained in the Nation, and located upon some tract of land set apart for their exclusive use; and, Col Downing says that this policy will obtain in the Nation; and that Civil rights will be accorded to the Freedmen before a great while.[38]

Subsequently, Sanborn issued circulars authorizing the freedmen to occupy and cultivate land within tribal territories.[39]

Major Pinkney Lugenbeel reported a few months later that the status of freedmen among the Cherokee remained problematic. He wrote,

> Several years since, slavery was abolished in the Cherokee Nation, but the negro was not admitted to citizenship, and cannot therefore improve property. They report to me that the Cherokees are anxious for them [the freedmen] to leave the country and are unwilling for them even to cultivate leased land. The Cherokees have also passed confiscation laws and have proceeded to sell the property belonging to the Rebel Cherokees. Many of this latter class owned large farms and many slaves. The freedmen who were formerly slaves to rebel Cherokees, and who built and occupied cabins on these confiscated lands, are now notified to vacate by those persons who purchased these improvements at the confiscation sales.[40]

---

[36] John Sanborn, Brevet Major General, Circular No. 1, January 1, 1866, 359-59, Roll 837, M234.

[37] John Sanborn, Brevet Major General, Circular No. 1, January 1, 1866, 360, Roll 837, M234.

[38] John Sanborn, Brevet Major General and Commissioner, to James Harlan, Secretary of the Interior, January 5, 1866, 350, Roll 837, M234.

[39] Daniel F. Littlefield, Jr., *The Cherokee Freedmen: From Emancipation to American Citizenship* (Westport, Conn.: Greenwood Press, 1978), 22–23.

[40] Pinkney Lugenbeel, Major, to Jonathan Craig, Assistant Adjutant General, March 7, 1866, Roll 837, M234.

Lugenbeel directly tied to difficulties of freedmen to their lack of citizenship in the Cherokee Nation. He further commented, "It is clearly the duty of the Cherokee Nation to enact laws permitting their former slaves to buy, lease, and rent farms in the Nation, but they have not done so as yet."[41]

## The 1866 Treaty

Treaty negotiations with the Cherokees, Creeks, Seminoles, Choctaws, and Chickasaws began again in January 1866 and unfolded in the context of deteriorating conditions for freedmen in Indian Territory. During the negotiations, Commissioner Cooley reported, "Four principal points came up for settlement, to wit:"

> The proper and just method of adjusting affairs between the loyal and disloyal, this point applying especially to the Cherokees, where confiscation laws, passed by the national council, had taken effect upon the property of those who were disloyal.

> The proper relations which the freedmen should hereafter hold towards the remainder of the people.

> A fair compensation for losses of property occasioned to those who remained loyal by the disloyal party.

> Cession of lands by the several tribes to be used for the settlement thereon of Indians whom it is in contemplation to remove from Kansas.[42]

The Seminoles were the first to reach agreement (on March 21), while the Cherokees were the last, not signing a treaty until July 19, 1866.[43] All of the treaties contained provisions establishing rights for freedmen.[44]

A review of the historical record indicates that negotiation of the Cherokee treaty was complicated by the rift between Northern and Southern Cherokees. These two parties interacted separately with the U.S. treaty commissioners, despite the government's goal of uniting the factions

---

[41] Pinkney Lugenbeel, Major, to Jonathan Craig, Assistant Adjutant General, March 7, 1866, Roll 837, M234.

[42] *ARCIA 1866*, 8.

[43] *ARCIA 1866*, 8-11.

[44] Treaty with the Seminoles, March 21, 1866, 14 Stat. 755, Article 2; Treaty with the Choctaws and Chickasaws, April 28, 1866, 14 Stat. 769, Articles 3 and 4; Treaty with the Creeks, June 14, 1866, 14 Stat. 785, Article 2; Treaty with the Cherokees, July 19, 1866, 14 Stat. 799, Article 9. Article 3 of the Choctaw and Chickasaw treaty provided for a land cession to the United States and specified that the payment would be held in trust "until the legislatures of the Choctaw and Chickasaw nations respectively shall have made such laws, rules, and regulations as may be necessary to give all persons of African descent, resident in the said nations at the date of the treaty of Fort Smith, and their descendants, heretofore held in slavery among said nations, all the rights, privileges, and immunities, including the right of suffrage, of citizens of said nations, except in the annuities, moneys, and public domain claimed by, or belonging to, said nations respectively . . . ."

under a single treaty.[45] In addition, the United States refused to recognize John Ross as the tribe's principal chief until July 1866. In spite of these difficulties, the record demonstrates that the government's goal of equal rights for the freedmen remained consistent throughout the negotiations.

Early in the negotiation process, the Southern Cherokees began lobbying for a treaty that would separate their party from the Northern Cherokees. They submitted proposed treaty provisions on February 26, calling for the tribe's land and funds to be divided proportionally between the Northern and Southern Cherokees based on population. They did not mention the status of freedmen in their proposal.[46]

On March 15, the Northern Cherokees offered their own propositions, including the following provisions with regard to former slaves:

> The Cherokees having before any state after the outbreak of the rebellion emancipated all their Slaves, and feeling kindly towards them, guaranty that all who have been freed by Cherokees, and all their descendants, as long as the Nation holds lands in common, shall be allowed to occupy, improve, and cultivate such tracts now unoccupied by Cherokees as shall be designated for them by the authority of the National Council. And in case of a future sale by the Cherokee Nation of lands so held by freedmen or their descendants, they shall be entitled to receive out of the proceed[s], the full value of their improvements. And such freedmen and their descendants shall have the same right to remain in the Cherokee Country, to acquire and hold personal property and to sue and testify and the same liability to be sued in [word illegible—all?] Courts held therein, as belongs to the Citizens of the Nation. And in case of the adoption of the provisions hereinafter recited, as to the sale of the neutral lands, the Cherokee Nation will at all times apply funds out of the proceeds of such sale for the education of such persons so as to give them equal advantages of common school education with the children of their own people.[47]

Such language addressed problems Indian agents observed in early 1866, particularly the uncertainty about removal that prevented freedmen from planting crops. The Northern Cherokees submitted a proposed treaty with very similar language on May 3, 1866.[48]

A government-prepared draft treaty also appears to have been circulated around this time. Northern Cherokee representatives referred to it in a letter dated March 22, 1866, but research to date has not yielded a copy of it.[49]

---

[45] Littlefield, *The Cherokee Freedmen*, 24–25.

[46] E. C. Boudinot, et al., Cherokee Delegates, to D. N. Cooly [*sic*], Commissioner of Indian Affairs, February 26, 1866, reprinted in D. W. Voorhees and Perry Fuller, "In the matter of a Treaty or Treaties between the United States and the People of the Cherokee Nation," no date, Roll CHN 80, Cherokee National Records.

[47] Article 2, "Project of a Treaty," March 15, 1866, Special File 125, Roll 24, Special Files of the Office of Indian Affairs, 1807-1904, National Archives Microfilm Publication No. M574 [hereafter M574].

[48] Articles of Agreement and Convention, no date [a note on the first page says "Proposed treaty by Cherokees submitted May 3, 66"], Roll 7, Documents Relating to the Negotiation of Ratified and Unratified Treaties with Various Tribes of Indians, 1801-69, National Archives Microfilm Publication T494, [hereafter T494].

[49] John Ross, Principal Chief, et al., to James Harlan, Secretary of the Interior, March 22, 1866, Roll 100, M234.

The two Cherokee factions met jointly with U.S. representatives on March 30, May 3, and May 11, but they could not overcome their differences.[50] While the Southern Cherokees wanted separate territories and governments for the two factions, the Northern Cherokees sought a single tribe and territory.[51] The Southern Cherokees also wanted to escape confiscation laws that the Northern Cherokee government had enacted to punish those who had remained with the Confederacy during the Civil War. The southern faction benefited to some degree from United States' continuing refusal to recognize John Ross—who led the northern faction—as the principal chief of the entire Cherokee Nation. Because the factions would not unite voluntarily and the United States could not (at the time) justify allowing one group to stand for the whole, negotiations remained separate. However, the available records do not suggest that provisions for the freedmen were a point of difference between the factions.

The parties exchanged various treaty drafts with the United States over the next several months. Secretary Harlan submitted a set of propositions to the Southern Cherokees at one point. The document is undated but may be from early June 1866. Although many of Harlan's propositions were spelled out in detail, the one relating to freedmen stated simply, "Just and equitable provisions for Freedmen."[52] The Southern Cherokees responded that they agreed with "[t]he main portion of the propositions . . . ." On the subject of former slaves, they wrote, "That the Freedmen should be protected by just and equitable provisions we do not dispute and will cheerfully concur with the Government in any reasonable measures to that end."[53] A draft treaty that appears to have resulted from this exchange prohibited slavery and "further stipulated and agreed that the negro or colored population within the said limits [of the area set aside for the Southern Cherokees] shall be entitled to all the rights, privileges and immunities of citizens."[54]

The Southern Cherokees succeeded in concluding a treaty with the United States on June 13, 1866, which achieved their goal of obtaining a territory separate from the northern faction. Commissioner D. N. Cooley, Elijah Sells, and Ely S. Parker signed on behalf of the United States. Article 7 of the treaty provided that slavery would not exist except as punishment for a crime, "and it is further stipulated and agreed, that the negro or colored population now or hereafter lawfully

---

[50] Interview between the Chiefs and Headmen of the Cherokee Nation, March 30, 1866, Roll 7, T494; Conference between Loyal and disloyal wings of Cherokee Nation, May 3, 1866, Roll 9, T494; Partial transcript of meeting held May 11, 1866, Roll 7, T494.

[51] For example, on March 30, General Ewing, representing the Northern Cherokees, said, "The Commissioners and we do not want a separation. Put in any provision you please to prevent unequal laws of individual aggressions of the Nation or against the disloyal portion." Interview between the Chiefs and Headmen of the Cherokee Nation, March 30, 1866, Roll 9, T494.

[52] Suggestions of Provisions for Treaty with the Cherokees, no date, 9, Special File 125, Roll 24, M574.

[53] John Ridge, et al., to the Secretary of the Interior, no date, 4, Special File 125, Roll 24, M574.

[54] Article 13, draft treaty, no date, Special File 125, Roll 24, M574.

residing within the said limits shall be entitled to all the rights, privileges, and immunities belonging to any members of the Cherokee Nation parties hereto."[55] The treaty was never ratified, for reasons that remain unclear.[56] The language change between the undated draft and the June 13 treaty may indicate that the parties had some difficulty determining how to articulate the intended rights for freedmen.

By early July, the United States finally decided to recognize John Ross as principal chief.[57] Ross had been in Washington throughout the negotiations, despite the fact that he had become very ill. His recognition allowed the United States to treat the northern faction as representing the entire Cherokee Nation. The U.S. and northern representatives soon reached agreement and signed a treaty on July 19, 1866. Article 2 of the treaty declared amnesty for "all crimes and misdemeanors committed by one Cherokee on the person or property of another Cherokee, or of a citizen of the United States . . . ." Article 3 repealed the confiscation laws the Northern Cherokee government had enacted to punish those who had aligned with the Confederacy.[58]

Article 9 of the treaty provided as follows:

> The Cherokee nation having, voluntarily, in February, eighteen hundred and sixty-three, by an act of their national council, forever abolished slavery, hereby covenant and agree that never hereafter shall either slavery or involuntary servitude exist in their nation otherwise than in the punishment of crime, whereof the party shall have been duly convicted, in accordance with laws applicable to all the members of said tribe alike. They further agree that all freedmen who have been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months, and their descendants, shall have all the rights of native Cherokees: *Provided*, That owners of slaves so emancipated in the Cherokee nation shall never receive any compensation or pay for the slaves so emancipated.[59]

Article 15 included a similar provision allowing certain Indians—if they settled among the Cherokees, abandoned their tribal organizations, and paid a certain sum into the Cherokee national

---

[55] Articles of Agreement with Southern Cherokees, June 13, 1866, 8–9, Special File 125, Roll 24, M574.

[56] Daniel Littlefield explained the situation as follows: "The treaty never reached the Senate, and it was apparently just a maneuver to bring the Union faction to terms." Littlefield, *The Cherokee Freedmen*, 25. However, a letter transmitting the treaty to the Senate is among the official documents relating to the treaty. See, To the Senate of the United States, June 14, 1866, Roll 9, T494; W. T. Otto, Acting Secretary, to the President of the United States, June 14, 1866, Roll 9, T494.

[57] The date on which the United States recognized Ross is not clear from the records collected to date, but Secretary Harlan mentioned it in a letter dated July 10, 1866. James Harlan, Secretary of the Interior, to D. N. Cooley, Commissioner of Indian Affairs, July 10, 1866, Roll 100, M234.

[58] Treaty of July 19, 1866, 14 Stat. 799.

[59] Treaty of July 19, 1866, 14 Stat. 799 at 801.

fund—to "be incorporated into and ever after remain a part of the Cherokee nation, on equal terms, in every respect with native citizens."[60]

All of the Cherokee signatures on the treaty were from the northern party. Commissioner Cooley explained the situation to Secretary Harlan: "This office has not relaxed its efforts to obtain the signature of both parties to a treaty, but has failed to do so; and I have the honor to transmit herewith a treaty which has this day been made with the Northern Cherokees, for such action as your judgment may approve."[61]

In his 1866 annual report, Commissioner Cooley reflected on the negotiations with the Cherokee delegations. He described the treaty of July 19 as "not entirely satisfactory to any party, [but] was the best possible settlement of the matter attainable."[62] Saladin Watie, son of Stand Watie, felt differently. Soon after the treaty was signed, Saladin wrote his father that he had news to communicate that "will be very unwelcome to you, and a sad disappointment to our people." He explained that the president had approved a treaty with the Ross delegation and had sent it to the Senate. He believed that the Senate would ratify the treaty, which it did on July 27, with some minor amendments.[63] Although the southern representatives did not sign the 1866 treaty, their June 13 unratified treaty indicates that they would have supported the rights for freedmen in the July 19 treaty.

Nearly a century after the Cherokee treaty was concluded, the Indian Claims Commission conducted a thorough review of the negotiations and determined they were not characterized by "duress, fraud, intimidation, falsehood, or mistake."[64]

---

[60] Treaty of July 19, 1866, 14 Stat. 799 at 803. Article 15 stemmed from the federal government's goal of moving Indian tribes out of Kansas. The parties agreed that the United States "may settle any civilized Indians, friendly with the Cherokees and adjacent tribes" on Cherokee land east of 96 degrees. Such Indians would have the option either to maintain a separate tribal organization or become Cherokee citizens, under certain conditions. Ultimately, members of both the Shawnee and Delaware tribes entered into agreements with the Cherokee Nation to settle on Cherokee land. According to historian Brice Obermeyer, the Delaware Tribe agreed to remove to the Cherokee Reservation "so they would not become American citizens," which was the only option open to them if they remained in Kansas. Brice Obermeyer, *Delaware Tribe in a Cherokee Nation* (Lincoln: University of Nebraska Press, 2009), 54–58 (quotation on page 55).

[61] D. N. Cooley, Commissioner of Indian Affairs, to James Harlan, Secretary of the Interior, July 19, 1866, in *Message of the President of the United States, Transmitting Treaty Negotiated at the City of Washington, D.C., on the 19th of July, 1866, Between the United States and the Cherokee Nation of Indians*, 39th Cong., 1st sess., Confidential, Executive DD, July 20, 1866, 2, File: 190-Def. ex. 1-10, Box 1848, Docket 190, Closed Docketed Case Files, 1947-82, RG 279: Records of the Indian Claims Commission [hereafter RG 279], National Archives and Records Administration, Washington, D.C. [hereafter NARA I].

[62] *ARCIA 1866*, 12.

[63] Saladin Watie to Father, July 24, 1866, Folder 4246, Roll 39, Cherokee Nation Papers, Western History Collections, University of Oklahoma, Norman, Oklahoma [hereafter CNP]; Treaty of July 19, 1866, 14 Stat. 799 at 807.

[64] Final Order, Docket No. 190, September 25, 1963, 12 Ind. Cl. Comm. 570 at 643a.

# Conclusion

Between September 1865 and July 1866, U.S. representatives promoted the inclusion of freedmen in the Cherokee Nation as equal members. This began when Commissioner of Indian Affairs D. N. Cooley explained at the Fort Smith negotiations that former slaves must be "[incorporated] the tribes on an equal footing with the original members, or suitably provided for."[65] Similarly, Secretary of the Interior James Harlan instructed Indian Superintendent Elijah Sells (through Cooley) to assure that "no distinction is made between members of the Cherokee tribe who were held in bondage and those who were free. That, in all cases they would receive the same annuities, lands and educational advantages."[66]

Cherokee representatives understood what the U.S. representatives sought with respect to freedmen. At Fort Smith, the Southern Cherokees demonstrated their understanding when they stated their opposition to incorporating former slaves into the tribes "on an equal footing with the original members."[67] The various treaty drafts exchanged in 1866 confirmed that the Cherokees not only understood federal goals but also acquiesced to them. A March 15, 1866, draft treaty prepared by the Northern Cherokees provided various rights for freedmen and their descendants, the same "as belongs to the Citizens of the Nation."[68] An undated treaty draft prepared by or in consultation with the Southern Cherokees provided that freedmen "shall be entitled to all the rights, privileges and immunities of citizens."[69] And the unratified treaty with the Southern Cherokees of June 13, 1866, provided that freedmen "shall be entitled to all the rights, privileges, and immunities belonging to any member of the Cherokee Nation parties hereto."[70] Article 9 of the July 19, 1866, represented the culmination of these efforts to articulate a right of citizenship for the freedmen and their descendants.

---

[65] _ARCIA 1865_, 318.

[66] James Harlan, Secretary of the Interior, to D. N. Cooley, Commissioner of Indian Affairs, November 17, 1865, Roll 100, M234.

[67] _ARCIA 1865_, 339.

[68] Article 2, "Project of a Treaty," March 15, 1866, Special File 125, Roll 24, M574.

[69] Article 13, draft treaty, no date, Special File 125, Roll 24, M574.

[70] Articles of Agreement with Southern Cherokees, June 13, 1866, 7-8, Special File 125, Roll 24, M574.

# Implementing Article 9

During the two decades following the treaty, the Cherokee Nation and the United States both had occasion to articulate their understanding of Article 9. The article came up in several contexts, including Cherokee governance, further treaty negotiations with the United States, and citizenship claims. In each case, the parties expressed their understanding that Article 9 conferred Cherokee citizenship on the freedmen.

## Cherokee Governance

In October 1866, newly elected Principal Chief William P. Ross sent a message to the Cherokee National Council that reflected his perspective on the provision.[71] He discussed the need for a census of the Cherokee people to include "the names, ages, and residence of all whites who are legal citizens by adoption, and of all blacks admitted to the full rights of Cherokee citizenship by the 9th Article of the Treaty . . . ."[72] Ross's statement predated by more than a month the Cherokee Nation's constitutional amendment echoing Article 9. In other words, Ross believed the full rights of citizenship flowed directly from the treaty.

The people of the Cherokee Nation amended the 1839 constitution's citizenship provision on November 28, 1866. Article III, Section 5, was revised to contain the following language:

> All Native Born Cherokees, all Indians and Whites Legally Members of the Nation by Adoption, and all Freedmen who have been Liberated by Voluntary Act of their Former Owners or by Law, as well as Free Colored Persons who were in the Country at the Commencement of the Rebellion, and are now Residents therein, or who may return within Six Months from the 19th day of July, 1866, and their Descendants, who Reside within the Limits of the Cherokee Nation, shall be taken, and deemed to be Citizens of the Cherokee Nation.[73]

Principal Chief Ross proclaimed this amendment (and others) to be part of the Cherokee constitution on December 7, 1866.[74] The amendment brought the Cherokee constitution into compliance with the 1866 treaty by replacing language that had excluded people of African descent

---

[71] John Ross died on August 1, 1866. William Ross was his nephew. Moulton, *John Ross, Cherokee Chief*, 195.

[72] "Message of Hon. Wm. P. Ross to the Cherokee Council," October 19, 1866, File: W. P. Ross, October 19, 1866, Box 1, William P. Ross Collection, Western History Collections, University of Oklahoma, Norman, Oklahoma.

[73] *The Act of Union Between the Eastern and Western Cherokees, the Constitution and Amendments, and the Laws of the Cherokee Nation, Passed During the Session of 1868 and Subsequent Sessions*, 19.

[74] *The Act of Union Between the Eastern and Western Cherokees, the Constitution and Amendments, and the Laws of the Cherokee Nation, Passed During the Session of 1868 and Subsequent Sessions*, 22.

from "all the rights and privileges of this Nation" in the 1839 version.[75] Today, the Cherokee Nation argues that the 1866 amendment conferred citizenship on the freedmen, rather than the treaty itself. Read in the context of William Ross's October 1866 statement, however, the November amendment appears to confirm an understanding that freedmen who complied with the treaty were, in fact, citizens of the Cherokee Nation.

## Supplemental Treaty Negotiations

In the years following the 1866 treaty, the Cherokee Nation and the United States attempted to enter into a supplemental treaty agreement. The purpose of the new treaty was to clarify some aspects of the 1866 treaty and to preserve harmony by addressing points of conflict among the Cherokees, and between the Cherokees and the United States. The parties signed an agreement on July 9, 1868, but it was never ratified, despite urging from Principal Chief Lewis Downing and other Cherokee representatives.[76] The 1868 agreement reaffirmed "[s]o much of articles 4 and 9 of the treaty of 1866 as relates to freedmen and free negroes . . . ."[77] That was the only mention of the freedmen in the 1868 agreement.

In 1870, Secretary of the Interior J. D. Cox proposed amendments to the 1868 agreement—essentially, a substitute agreement—noting that the Cherokee delegation then in Washington had approved the amendments.[78] One of the proposed amendments (Article 4) addressed the question of who was subject to jurisdiction of federal courts in Indian Territory, pursuant to Article 13 of the 1866 treaty. The proposed Article 4 stated that the parties agreed to the following definitions "as to who are and who are not Cherokee Indians as contemplated by the thirteenth article of the Cherokee treaty of 1866 . . .":

> 1. That all persons legally resident in the Cherokee country as citizens thereof, having Cherokee blood in their veins, shall be deemed to be Cherokee Indians.
>
> 2. That all white persons who have married, or may hereafter marry, Cherokees, or who have been made, according to the laws and constitution of the Cherokee nation, or may hereafter by made, Cherokees by act of the Cherokee council, and have settled or may hereafter settle, according to law, in the Cherokee country, as Cherokee Indians, shall be held to be Cherokee citizens as contemplated

---

[75] *The Act of Union Between the Eastern and Western Cherokees, the Constitution and Amendments, and the Laws of the Cherokee Nation, Passed During the Session of 1868 and Subsequent Sessions*, 7.

[76] Senate, *Memorial of the Principal Chief and Delegates of the Cherokee Nation of Indians*, 41ˢᵗ Cong., 2d sess., 1870, S. Miscdoc. 83, serial 1408, 6.

[77] Deloria and DeMallie, *Documents of American Indian Diplomacy*, II: 936. Article 4 of the July 19, 1866, treaty allowed Cherokees, former slaves, and free negroes who had resided in the Cherokee Nation prior to June 1, 1861, to settle in the Canadian district. Treaty of July 19, 1866, 14 Stat. 799 at 800.

[78] Senate, *Letter of the Secretary of the Interior to the Chairman of the Committee on Indian Affairs, Communicating Amendments to the Cherokee Treaty Concluded July 9, 1868*, 41ˢᵗ Cong., 2d sess., 1870, S. Miscdoc. 148, serial 1408, 1.

in said thirteenth article of said Cherokee treaty of 1866, so long as they shall remain residents in said country.

3. That all colored people who, by the fourth and ninth articles of the said treaty of 1866, have been invested with "all the rights of native-born Cherokees," shall be held to be Cherokee citizens, and within the contemplation of the said thirteenth article of the said treaty of 1866.

4. That all Indians that have been, or that may be, adopted as Cherokee citizens, by virtue of treaty stipulation between the United States and the Cherokee nation, or by act of the Cherokee national council, shall be deemed Cherokee citizens.[79]

While the second and fourth provisions included language related to the Cherokee constitution and acts of the Cherokee council, the provision pertaining to freedmen did not. In my opinion, this reflects the parties' understanding that citizenship for freedmen derived from the treaty, rather than from the Cherokee constitutional amendment of 1866. That the Cherokees had reviewed and agreed to these provisions is confirmed by a letter of May 16, 1870, in which Principal Chief Lewis Downing and members of the Cherokee delegation commented on the proposed amendments and provided language that became the fourth provision of Article 4.[80] It does not appear that Congress took any subsequent action on the proposed amendments or on the 1868 agreement.

## Citizenship Claims

Issues related to the six-month deadline in Article 9 of the 1866 treaty led U.S. government representatives to reflect further on citizenship for freedmen.[81] Historian Daniel Littlefield described a variety of obstacles to freedmen returning within the six-month period:

- Age (some children had been sold to slaveholders elsewhere and were too young to travel back);

- Lack of knowledge about the treaty provision or about the six-month limit;

- Lack of means to travel;

- Relocation to Texas or Mexico by their owners;

- Armed violence from Cherokees.[82]

---

[79] Senate, *Letter of the Secretary of the Interior to the Chairman of the Committee on Indian Affairs, Communicating Amendments to the Cherokee Treaty Concluded July 9, 1868*, 41st Cong., 2d sess., 1870, S. Miscdoc. 148, serial 1408, 2–3.

[80] Lewis Downing, Principal Chief, et al., to E. S. Parker, Commissioner of Indian Affairs, May 16, 1870, in Senate, *Letter of the Secretary of the Interior to the Chairman of the Committee on Indian Affairs, Communicating Amendments to the Cherokee Treaty Concluded July 9, 1868*, 41st Cong., 2d sess., 1870, S. Miscdoc. 148, serial 1408, 5.

[81] Article 9 extended "all the rights of native Cherokees" only to those former slaves and free colored persons "who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months, and their descendants . . . ." Treaty of July 19, 1866, 14 Stat. 799 at 801.

Littlefield concluded, "The Treaty of 1866 formed the legal basis for the rights of the Cherokee freedmen to citizenship in the Cherokee Nation. Yet the same treaty, by its six months' limitation clause, denied rights to many blacks who had been as much a part of the antebellum Nation as had those admitted to citizenship."[83]

Government agents advocated leniency in enforcing the six-month limit. As a census of the Cherokee Nation proceeded in September 1870, Agent Jonathan Craig noted,

> The class of those whose citizenship is controverted that most seriously engages attention is made up of colored people, former residents of the country as slaves or freedmen, who cannot be considered citizens under the treaty, because being absent at the close of the war they did not return within the term of six months from its ratification. . . . It was certainly intended they should have the option of accepting or declining Cherokee citizenship, but the provision for their benefit was altogether insufficient. It is probable the Cherokee legislature will take steps to include all colored people legally residing within the country in 1861 among citizens of the nation, in anticipation of an amendment of the existing treaty provision for their benefit, and it is very desirable the subject should be acted upon in the ratification of the pending treaty with the Cherokees. As the law now stands, the persons in question are required to be removed as intruders.[84]

Agent John Jones echoed Craig's concerns in 1872. He explained, "For two consecutive years the principal chief, Lewis Downing, has recommended in his annual message to the national council, that these freedmen [who failed to return within six months] be adopted as citizens, but the measure failed to pass at both sessions of the national council."[85] Ultimately, neither the Cherokee Nation nor the federal government took formal action to change the six-month limit.

By 1878, the Cherokee Nation had created a Cherokee Commission on Citizenship that adopted rules for documenting citizenship claims. A claimant needed to submit a statement in writing that

> should show whether he claims by virtue of Cherokee blood, with what Cherokee family he is connected if any &c. Under the clause having reference to the Treaty of 1866, the claimant must aver that he was a Slave and owned at the breaking out of the Rebellion, by a citizen of the Nation, or that he was a free person of Color &c. -- just what the Treaty provides, in short[.][86]

However, the problem persisted of determining who legitimately qualified for citizenship under Article 9. U.S. Indian Inspector Henry Ward and Special Indian Agent Cyrus Breed conducted an investigation of disputed citizenship among the Five Civilized Tribes in 1883. They found that no lists existed of Cherokee freedmen entitled to citizenship. Among other things, they proposed that

---

[82] Littlefield, *The Cherokee Freedmen*, 29.

[83] Littlefield, *The Cherokee Freedmen*, 29.

[84] *ARCIA 1870*, 283–84.

[85] *ARCIA 1872*, 233.

[86] D. L. Nicholson to James M. Bell, April 23, 1878, Folder 7413, Roll 49, CNP.

the Department of the Interior take jurisdiction over appeals of citizenship decisions rendered by Indian courts.[87] They concluded,

> The cases of many of the colored people residing in the Cherokee nation deserve the kindly consideration of the Interior Department. They would be excluded from the rights of citizenship by a strict construction and severe application of the six months limitation clause in Article nine of the treaty of 1866[.] By the spirit and equities of the treaty they are entitled to citizens['] rights. By its letter they would be excluded.[88]

Like the citizenship commission, the investigators referred to the 1866 treaty as the source of citizenship for freedmen.

## Conclusion

In the first two decades after the Cherokee treaty was ratified, both the Cherokee Nation and the U.S. government demonstrated understandings that freedmen who complied with the provisions of Article 9 were entitled to Cherokee citizenship. Principal Chief William Ross expressed this idea three months after the treaty was signed, and the Cherokee people followed a month later by amending their constitution to comply with the treaty. When questions arose in the 1870s and 1880s about which freedmen actually qualified for citizenship, both the Cherokee Citizenship Commission and U.S. inspectors referred to Article 9 as the source of the right.

---

[87] Henry Ward, U.S. Indian Inspector, and Cyrus Beede, Special Indian Agent, to H. M. Teller, Secretary of the Interior, June 2, 1883, 2–3, 12, Folder 240, Roll 3, CNP.

[88] Henry Ward, U.S. Indian Inspector, and Cyrus Beede, Special Indian Agent, to H. M. Teller, Secretary of the Interior, June 2, 1883, 13, Folder 240, Roll 3, CNP.

# Claims to Proceeds from Cherokee Lands

In the 1880s and 1890s, the Cherokee Nation agreed to sell portions of its lands to the United States. These sales led to a debate over who could share in per capita distributions of the proceeds, during which Articles 9 and 15 of the 1866 treaty were cited. The Cherokee National Council took the position that only Cherokees by blood were entitled to receive such distributions, arguing that Article 9 gave freedmen a right to citizenship but not an equitable interest in Cherokee land. The freedmen contested their exclusion from payments, as did Shawnee and Delaware Indians who had become Cherokee citizens under Article 15 and subsequent agreements. The United States government and the federal courts consistently supported the freedmen's claims (as well as those of the Shawnees and Delawares) and ensured that the freedmen received payments equal to the Cherokees by blood.

## Acts of the Cherokee National Council

On March 3, 1883, Congress appropriated $300,000 "to be paid into the treasury of the Cherokee Nation" for lands west of the Arkansas River (within the Cherokee Outlet) to be conveyed to other tribes that the United States had settled there.[89] The Cherokee National Council enacted legislation on May 19, 1883, to distribute the proceeds per capita "to the citizens of the Cherokee Nation by Cherokee blood."[90] The freedmen later petitioned the president of the United States for their share of the payment, on the grounds that council's act violated Article 9 of the 1866 treaty.[91]

---

[89] Act of March 3, 1883, 22 Stat. 603 at 624.

[90] Act of the Cherokee National Council, May 19, 1883, *Laws and Joint Resolutions of the Cherokee Nation Enacted During the Regular and Special Sessions of the Years 1881-2-3* (Tahlequah: Cherokee Nation, 1884), 139.

[91] The petition, dated February 8, 1886, is reprinted in House Committee on Indian Affairs, *Report to Accompany Bill H. R. 9109*, 49th Cong., 1st sess., 1886, H. Rept. 2614, serial 2443, 6–7. The records collected to date do not make clear why the freedmen did not protest until 1886.



Figure 3. Indian Territory after Removal.
Source: Francis Paul Prucha, *Atlas of American Indian Affairs* (Lincoln: University of Nebraska Press, 1990), 70.

Commissioner of Indian Affairs J. D. C. Atkins agreed that the act violated the treaty. He wrote, "As has been seen by the 9th article of that treaty, these persons [freedmen] *acquired all the rights of native Cherokees*, and if they are possessed of those rights, it is a violation of the treaty to deny them such rights. There is not the slightest doubt in my mind upon the subject. These people, having the vested rights of native Cherokees, they were entitled to their pro rata share of this fund."[92] Atkins similarly believed that Shawnee and Delaware Indians who came under Article 15 of the treaty were entitled to share in the payment.[93] Secretary of the Interior L. Q. C. Lamar shared Atkins' assessment.[94]

---

[92] Emphasis in original. Senate, *Message from the President of the United States Transmitting a Communication from the Secretary of the Interior Relative to Legislation in Behalf of Certain Cherokee Indians*, 49th Cong., 1st sess., 1886, S. Exdoc. 82, serial 2339, 3.

[93] Senate, *Message from the President of the United States Transmitting a Communication from the Secretary of the Interior Relative to Legislation in Behalf of Certain Cherokee Indians*, 49th Cong., 1st sess., 1886, S. Exdoc. 82, serial 2339, 4.

[94] Senate, *Message from the President of the United States Transmitting a Communication from the Secretary of the Interior Relative to Legislation in Behalf of Certain Cherokee Indians*, 49th Cong., 1st sess., 1886, S. Exdoc. 82, serial 2339, 2–3.

On April 27, 1886, the Cherokee National Council enacted further legislation to limit the distribution of payments for land to Cherokees by blood. Citing the council's powers under Article III, Section 20 of the Cherokee constitution to determine the construction of treaty provisions, the act provided as follows:

> That the phrase "all the rights of Native Cherokees," as used in the 9th and 15th Articles of the Treaty of July 19, 1866, between the United States and this Nation, is hereby construed to mean the individual rights, privileges, and benefits enjoyed by white adopted citizens of this Nation, before and at the making of said Treaty, and who had been by law admitted to "all the rights of Native Cherokees"—civil, political, and personal, as subjects of the Cherokee Nation of Indians—without acquiring any right or title to the Cherokee Domain, or to the proceeds thereof when made subject to a division among those to whom such domain had been conveyed—all the right to the lands then held and owned by this Nation, and to the principal of the proceeds thereof when realized, being reserved by and to the original Cherokee owners, as in the case of white adopted citizens, as aforesaid, subject to be conveyed or granted only at the option of said owners, or for value received according to agreements provided to be made with friendly Indians in conformity with the 15th Article of said Treaty.[95]

The act continued,

> *Be it further Construed and Declared*, That, in pursuance of the aforesaid understanding of this Nation, the free colored persons and freedmen, described in the 9th Article of said treaty, were admitted to, and are now entitled to, those rights of "Native Cherokees" as had been and were, when the said treaty was made, previously held and enjoyed by Native Cherokees and adopted whites who had been granted all the rights of Native Cherokees as citizens of this government, yet had been excluded from *per capita* of money realized by this Nation from the sale of land, the said colored persons and freedmen did not acquire by the use of the phrase, "all the rights of Native Cherokees" any individual or other title to the Cherokee domain or any part of the same other than the use thereof in common with all other citizens, nor to the benefit of the proceeds thereof except such benefit as was or might be provided to be conferred by investments of such proceeds and expenditure of the interest by the Cherokee government for the benefits of all citizens alike.[96]

In essence, the 1886 act asserted that the treaty conferred citizenship on the freedmen, but only in the form of civil, political, and personal rights—not as an interest in land. Congress and the courts ultimately disagreed with this interpretation, determining that the treaty conferred an interest in common lands, as well as other rights of citizenship.

## Congressional Remedies

The freedmen petitioned the President of the United States for their share of the land cession payment on February 8, 1886 (prior to the passage of the Cherokee Nation's April 27 act). On

---

[95] *Constitution and Laws of the Cherokee Nation, 1892* (Parsons, Kan.: The Foley R'Y Printing Co., 1893), 371–72, Roll CHN 89, Cherokee National Records.

[96] *Constitution and Laws of the Cherokee Nation, 1892*, 373, Roll CHN 89, Cherokee National Records. The National Council apparently passed two other acts related to citizenship of freedmen: one on November 25, 1890 (see 28 Ct. Cl. 281 at 319), and one on May 3, 1894 (see 30 Ct. Cl. 180 at 192). Research to date has not yielded either of those acts.

March 2, President Grover Cleveland transmitted draft legislation to Congress that responded to the freedmen's petition.[97] On May 25, 1886, the House Committee on Indian Affairs reported on the proposed legislation, saying that it deemed the Cherokee council's 1883 act to be "in conflict with the treaties existing between said nation and the United States . . . ." The committee further argued "that Congress [through its 1883 act appropriating the $300,000] could not confer power upon the Cherokee legislature to do an act in violation of existing law . . . and under such act the Cherokee legislature could not discriminate against any of its citizens legally entitled to their part of said appropriation."[98] Similarly, Commissioner of Indian Affairs J. D. C. Atkins said that the act violated the 1866 treaty, along with the agreements with the Shawnees and Delawares, the Constitution of the United States, and the Act of March 3, 1883.[99]

In 1888, Congress succeeded in passing legislation to remedy the situation. The act appropriated $75,000 to make a per capita distribution equal to that made to Cherokees by blood, "among such freedmen and their descendants as are mentioned in the ninth article of the treaty of July nineteenth, eighteen hundred and sixty-six, between the United States and the Cherokee Nation of Indians," and also to Shawnee and Delaware Indians per the terms of Article 15 and subsequent agreements. The amount was to be deducted from future payments to the Cherokee Nation for the ceded lands.[100] The act explicitly linked the right of the freedmen to participate in payment for the ceded lands to the terms of Article 9.

The next step was to determine who was entitled to share in the $75,000. In 1889, Congress authorized the Secretary of the Interior to investigate the matter and also directed the secretary "to make inquiry and report to the next session of Congress what other sums of money, if any, have been appropriated by the Cherokee Nation in violation of their treaty obligations in reference to freedmen in said nation, and what sum would be required to secure to said freedmen those treaty rights in respect to the same."[101] A census was then taken, resulting in an 1890 list of freedmen who

---

[97] House Committee on Indian Affairs, *Report to Accompany Bill H. R. 9109*, 49th Cong., 1st sess., 1886, H. Rept. 2614, serial 2443, 2, 6–8.

[98] House Committee on Indian Affairs, *Report to Accompany Bill H. R. 9109*, 49th Cong., 1st sess., 1886, H. Rept. 2614, serial 2443, 1–2.

[99] J. D. C. Atkins, Commissioner of Indian Affairs, to Secretary of the Interior, February 13, 1866, in House Committee on Indian Affairs, *Report to Accompany Bill H. R. 9109*, 49th Cong., 1st sess., 1886, H. Rept. 2614, serial 2443, 4–5.

[100] Act of October 19, 1888, 25 Stat. 608 at 609. The documents collected to date do not make clear why it took Congress more than two years to enact this legislation.

[101] Act of March 2, 1889, 25 Stat. 980 at 994.

qualified for citizenship, called the Wallace roll after its preparer, Special Commissioner John W. Wallace.[102]

## Sale of the Cherokee Outlet

In 1891, the Cherokee Nation agreed to sell the tract known as the Cherokee Outlet to the United States. Article 2 of the agreement provided for Congress to authorize "the classes of persons provided for in the ninth and fifteenth articles of the treaty of July 19, 1866," to bring suit if they claimed to have been "unjustly or illegally discriminated against" in the subsequent distribution of payment for the land. [103] Congress approved the agreement (with amendments) two years later, authorizing payment of $8,595,736 to the Cherokee Nation. The money would be paid in five annual installments. Congress provided that "a sufficient amount" of the funds to be paid would be "retained in the Treasury to pay the freedmen who are citizens of the Cherokee Nations or their legal heirs and representatives such sums as may be determined by the courts of the United States to be due them. Nor shall anything herein be held to abridge or deny to said freedmen any rights to which they may be entitled under existing laws or treaties."[104]

## Court of Claims Rulings

As a further effort to address the ongoing dispute over payments, Congress passed a jurisdictional act in 1890 allowing the Shawnee and Delaware Indians and the freedmen of the Cherokee Nation to file suit in the U.S. Court of Claims. The act authorized suits

> against the Cherokee Nation and the United States Government to recover from the Cherokee Nation all moneys due either in law or equity and unpaid to the said Shawnees, Delawares, or freedmen, which the Cherokee Nation have before paid out, or may hereafter pay, per capita, in the Cherokee Nation, and which was, or may be, refused or neglected to be paid to the said Shawnees, Delawares, or freedmen by the Cherokee Nation, out of any money or funds which have, or may be, paid into the treasury of, or in any way have come, or may come, into the possession of the Cherokee Nation, Indian Territory, derived from the sale, leasing, or rent for grazing purposes on Cherokee lands west of ninety-six degrees west longitude, and which have been, or may be, appropriated and directed to be paid out per capita by the acts passed by the Cherokee council, and for all moneys, lands, and rights which shall appear to be due to the said Shawnees, Delawares, or freedmen under the provisions of the aforesaid articles of the treaty [9 and 15] and articles of agreement.[105]

---

[102] House, *Enrollment of Cherokee Freedmen, Delawares, and Shawnees*, 51st Cong. 1st sess., 1890, H. Exdoc. 456, serial 2752, 1.

[103] Deloria and DeMallie, *Documents of American Indian Diplomacy, I*: 350.

[104] Act of March 3, 1893, 27 Stat. 612 at 641.

[105] Act of October 1, 1890, 26 Stat. 636.

The Shawnees, Delawares, and freedmen subsequently sued the Cherokee Nation and the United States in the Court of Claims, under the terms of the 1890 act.

In 1893, the Court of Claims ruled on claims filed by Delaware Indians under the jurisdictional act. It found that the Delawares were entitled to participate in per capita payments for land on the same footing as citizens by Cherokee blood or parentage. It further decreed that "The Cherokee Nation and the defendants The United States as trustees of The Cherokee Nation be enjoined and prohibited from making any discrimination between Cherokee citizens of Cherokee blood or parentage and Cherokee citizens of Delaware blood or parentage to the injury or prejudice of the latter."[106] Research to date has not yielded a similar Court of Claims ruling for the Shawnee Indians, but the U.S. Supreme Court affirmed that Article 15 "secured to the Shawnees equal rights with the native Cherokees in that which was the common property of the Cherokee Nation, to wit, the reservation and the outlet, as well as all profits and proceeds thereof."[107]

Problems with the distribution of payments continued in 1894. A federal commission to the Five Civilized Tribes linked citizenship to the 1866 treaty when it reported that the Cherokee freedmen "have been adopted according to the requirements of the treaties. They are yet very far from the enjoyment of all the rights, privileges, and immunities to which they are entitled under the treaties."[108] The commission continued, "[the freedmen] are excluded from participation in the per capita distribution of all funds, and are ignored in almost all respects as a factor in the government of a people of whose citizenship they are by the treaties in all respects made a part."[109] Soon thereafter, Commissioner of Indian Affairs D. M. Browning called for one-fifth of the amount due for the sale of the Cherokee Outlet to be held out of the payment made to the Cherokee Nation, pending a court ruling as to who was entitled to share in the funds.[110]

In 1895 and 1896, the Court of Claims made a series of rulings in Docket No. 17209, which had been filed by Moses Whitmire as trustee for the Cherokee freedmen. On March 18, 1895, the court wrote,

> It is ordered, adjudged, and decreed that so much of the acts of the Cherokee national council of date April 26, 1886, November 25, 1890, and May 3, 1894, as restricts the distribution of funds which were derived from the public domain and from the sale of lands by the Cherokee Nation to the

---

[106] *Charles Journeycake, Principal Chief of the Delaware Indians, v. The Cherokee Nation and the United States*, 28 Ct. Cl. 281 at 320 (1893).

[107] *Cherokee Nation v. Blackfeather*, 155 U.S. 218 at 220 (1894).

[108] Senate, *Report of the Commission to the Five Civilized Tribes*, 53d Cong., 3d sess., 1894, S. Miscdoc. 24, serial 3281, 11–12.

[109] Senate, *Report of the Commission to the Five Civilized Tribes*, 53d Cong., 3d sess., 1894, S. Miscdoc. 24, serial 3281, 12.

[110] House, *Cherokee Outlet, Letter from the Acting Secretary of the Treasury Transmitting an Estimate of Appropriation Submitted by the Secretary of the Interior to Meet the Payment Due for the Cession of the Cherokee Outlet*, 53d Cong., 3d sess., 1895, H. Exdoc. 188, serial 3323, 2.

> Government of the United States, to citizens of the nation by blood, be held and decreed void and contrary to and in derogation of the constitution of the Cherokee Nation and the provisions and stipulations of article 9 of the aforesaid treaty of July 19, 1866, with respect to the rights of said freedmen . . . .[111]

The court determined that the freedmen were entitled to share in the proceeds of common property of the Cherokee Nation and that the Cherokee Nation "be enjoined and prohibited from making any discrimination between the Cherokee citizens of Cherokee blood or parentage and Cherokee citizens who are or were freedmen . . . ."[112] Although the court referred to the Cherokee constitution as one of the bases of citizenship for freedmen, it relied equally on the 1866 treaty. In fact, the 1866 treaty alone appears to have provided sufficient grounds for the court to reach its conclusion. Support for this proposition can be found in another section of the decision, which reads as follows:

> And it appearing to the court that under the provisions of article 9 of the treaty of July 19, 1866, made by and between the Cherokee Nation and the United States, the said freedmen, who had been liberated by voluntary act of their former owners, or by law, and all free colored persons who resided in the Cherokee country at the commencement of the rebellion and were residents therein at the date of said treaty, or who had returned thereto within six months of said last-mentioned date, and their descendants, were admitted into and became a part of the Cherokee Nation and entitled to equal rights and immunities, and to participate in the Cherokee national funds and common property in the same manner and to the same extent as Cherokee citizens of Cherokee blood.[113]

Disputes over the legitimacy of the 1890 Wallace roll led the Court of Claims to decree that the Secretary of the Interior prepare "a new and corrected roll" so that payments to the freedmen could be made.[114] A commission appointed to prepare a new roll—subsequently called the Kern-Clifton roll—completed its work in late 1896 or in 1897.[115] Yet another roll of the Cherokee freedmen was completed in 1907 as part of a comprehensive listing of members of the Five Civilized Tribes entitled to receive allotments under an 1898 act of Congress. The 1907 rolls are known as the Dawes rolls, named for Henry Dawes, who headed the Commission to the Five Civilized Tribes.[116] The Dawes rolls separated the list of "Cherokee Freedmen" from that of "Cherokees by Blood," and

---

[111] *Moses Whitmire, Trustee for the Cherokee Freedmen v. The Cherokee Nation and the United States*, 30 Ct. Cl. 180 at 192 (1895).

[112] *Moses Whitmire, Trustee for the Cherokee Freedmen v. The Cherokee Nation and the United States*, 30 Ct. Cl. 180 at 193 (1895).

[113] *Moses Whitmire, Trustee for the Cherokee Freedmen v. The Cherokee Nation and the United States*, 30 Ct. Cl. 180 at 190–91. (1895).

[114] *Moses Whitmire, Trustee for the Cherokee Freedmen v. The Cherokee Nation and the United States*, 30 Ct. Cl. 180 at 195 (1895). The court amended the decree on February 3, 1896, authorizing a commission to prepare a new roll of the freedmen. The modified decree is reprinted in *ARCIA 1903*, Part II, 129–31 (see particularly page 130).

[115] House, *Report of the Secretary of the Interior*, 54th Cong., 1st sess., 1896, H. Doc. 5, serial 3488, CLIII; House, *Report of the Secretary of the Interior*, 54th Cong., 2d sess., 1897, H. Doc. 5, vol. 2, serial 3489, 74.

[116] National Archives and Records Administration, "About the Dawes Rolls," <http://www.archives.gov/research/native-americans/dawes/intro.html> (September 19, 2013); 85 Ct. Cl. 76 at 95.

other subgroups of Cherokees were similarly listed separately. But all persons on the rolls were entitled to allotments.

In 1905, as the Dawes rolls were being prepared, the Court of Claims ruled in a case involving Cherokee enrollment, unrelated to the per capita payment claims. The 1905 decision dealt primarily with whether intermarried whites could receive allotments of land, but a section addressed the relationship between the July 1866 treaty and the November 1866 amendments to the Cherokee constitution:

> These constitutional amendments were brought about by the action of the United States at the close of the civil war in dictating that the slaves or freedmen or free persons of color in the Cherokee country should not only be admitted to the rights of citizenship, but to an equal participation in the communal or common property of the Cherokees. The Cherokees seem to have veiled their humiliation by these general declarations of the persons who should be taken and deemed to be citizens. But, be that as it may, the overthrow of the Cherokee Nation and the treaty of peace, 1866, and the terms dictated by the United States whereby their former slaves were made their political equals and the common property of the Cherokees was to be shared equally with their servants and dependents was in effect a revolution. The constitutional amendment quoted was simply declaratory of the new order of things.[117]

Similar to prior rulings, the court gave the 1866 treaty primacy over subsequent actions of the Cherokee Nation.

Another ruling related to the freedmen came under a 1924 jurisdictional act that authorized the Cherokee Nation to bring "any and all legal and equitable claims arising under or growing out of any treaty or agreement between the United States and the Cherokee Indian Nation or Tribe," among other things.[118] A group of "Cherokees by blood" then filed suit to reclaim moneys paid to the freedmen and lands allotted to the freedmen, arguing that ownership of the money and land rested solely with Cherokees by blood.[119] The Court of Claims dismissed the petition, determining that the "Cherokees by blood" could not bring suit under the 1924 act. The Court of Claims noted, "It is quite clear that in these decisions from which citations will be hereinafter made [including the Delaware and Whitmire cases], this court and the Supreme Court treated the Cherokees by blood as only part of the Cherokee Nation . . . ."[120] The court added,

> The contention of the plaintiff is in effect that the treaty of 1866 and the prior treaties which we have mentioned are not binding on the Cherokees by blood. To hold so would practically nullify all of the transactions which the Government has had with the Cherokee Indians since the time when they were removed from the State of Georgia and require enormous payments to be made to Indians with

---

[117] *In the Matter of Enrollment of Persons Claiming Rights in the Cherokee Nation*, 40 Ct. Cl. 411 at 441–42 (1905).

[118] *The Cherokee Nation v. The United States*, No. K-17, 80 Ct. Cl. 1 at 2 (1932).

[119] *The Cherokee Nation v. The United States*, No. K-17, 80 Ct. Cl. 1 at 6 (1932).

[120] *The Cherokee Nation v. The United States*, No. K-17, 80 Ct. Cl. 1 at 4 (1932).

> whom the whole matter was believed to have been closed through treaties and settlements which involved the transfer of large tracts of land and large amounts of money.[121]

In other words, Cherokees by blood were bound by the treaty of 1866 and could not act contrary to its provisions.

## Conclusion

Distribution of proceeds from Cherokee land sales raised questions of exactly what rights freedmen and their descendants obtained under Article 9. The Cherokee National Council asserted that Article 9 conferred civil, political, and personal rights on the freedmen. They disputed the freedmen's entitlement to an interest in Cherokee land, but the council argued that freedmen possessed "the individual rights, privileges, and benefits enjoyed by white adopted citizens" of the Cherokee Nation.[122] U.S. officials and Congress argued that Article 9 conferred all the rights of citizenship, including an interest in land. The freedmen sued for their fair share of proceeds from the land sales, and the U.S. Court of Claims determined that the treaty granted freedmen and their descendants all the same rights as Cherokees by blood.

---

[121] *The Cherokee Nation v. The United States*, No. K-17, 80 Ct. Cl. 1 at 8 (1932).

[122] *Constitution and Laws of the Cherokee Nation, 1892*, 371–72, Roll CHN 89, Cherokee National Records.

# Indian Claims Commission Dockets

The 1946 Indian Claims Commission Act (ICCA) authorized tribes or identifiable groups of Indians to file claims against the United States that fell within certain broad categories. Rather than the past procedure of having to petition Congress for a specific jurisdictional act before filing a suit, tribes now had five years to file any accrued claims against the United States within five broad categories, including claims related to treaties and takings.[123] The Cherokee freedmen and the Cherokee Nation separately filed claims that touched on the status of freedmen and their descendants.

## Docket 123

The freedmen filed Docket 123 "for the value of properties and money of the Cherokee Nation wrongfully withheld from the Cherokee Freedmen."[124] In its opinion, the Indian Claims Commission noted, "It was established by litigation resulting from a jurisdictional act passed in 1890 that qualified Cherokee Freedmen were not only entitled to civil and political rights equal to native Cherokees, but were equally entitled to per capita shares in tribal property."[125] When the United States moved to dismiss the docket, arguing that the petitioners did not constitute a tribe, band, or other identifiable group of American Indians under the terms of the ICCA, the commission held that "on the basis of the pleadings it appeared that the treaties, and related litigation and statues involved, referred to Cherokee Freedmen as a class to whom full citizenship rights were given, and that, therefore, plaintiffs have shown themselves to appear to be a group entitled to maintain the claim."[126] However, the commission determined that the claims brought by the freedmen were of an individual nature and therefore outside its jurisdiction.[127]

---

[123] Act of August 13, 1946, 60 Stat 1049 at 1050.

[124] Memorandum Opinion on Defendant's Motion to Dismiss, Docket No. 123, September 9, 1952, 2 Ind. Cl. Ct. 231 at 232.

[125] Opinion of the Commission, Docket No. 123, December 28, 1961, 10 Ind. Cl. Comm. 109 at 129.

[126] Opinion of the Commission, Docket No. 123, December 28, 1961, 10 Ind. Cl. Comm. 109 at 131.

[127] Opinion of the Commission, Docket No. 123, December 28, 1961, 10 Ind. Cl. Comm. 109 at 136.

## Dockets 173 and 173-A

The Cherokee Nation filed a claim for additional compensation for the Cherokee Outlet, which the commission designated Docket 173. The commission awarded the Cherokee Nation $14,789,476.15 for 6,022,754.17 acres of the Cherokee Outlet. The claim for the remaining 2,121,928.74 acres was severed for further proceedings as Docket 173-A.[128] The plaintiffs in Docket 123 subsequently sought to intervene in Docket 173, but the commission determined that it no longer had jurisdiction, as it had entered final judgment in the case, Congress had authorized distribution of the award, and a per capita distribution of the award had begun. It therefore denied the freedmen's motion to intervene in Docket 173. However, because Docket 173-A was still pending, the commission allowed the freedmen to intervene in that claim.[129] The commission later rejected a motion by the Cherokee Nation to have the petition to intervene dismissed.[130]

The commission entered final judgment in Docket 173-A on May 30, 1973, awarding $3,887,557.57 in additional compensation for more than 2 million acres taken from the Cherokee Outlet to settle "friendly Indians."[131] Under the plan for use and distribution of the award, $1 million would be paid per capita to living enrollees listed on the final Dawes rolls, including Cherokee freedmen.[132]

## Docket 190

Under Docket 190, which directly addressed Article 9 of the 1866 treaty, the Cherokee Nation sought recovery of funds paid to the Cherokee freedmen from land cessions. The tribe's 1951 complaint contained allegations of duress exerted upon the Cherokee delegates during the 1866 treaty negotiations.[133] The petitioners further alleged that the United States had led the Cherokees to believe that the resulting provision, Article 9 of the treaty, was designed

---

[128] Opinion of the Commission, Docket No. 173-A, August 8, 1963, 12 Ind. Cl. Comm. 426 at 437.

[129] Opinion, Docket No. 123, January 6, 1964, 13 Ind. Cl. Comm. 33 at 38-39. The order granting the Freedmen's motion to intervene was issued October 12, 1964. See U.S. Indian Claims Commission, *Final Report* (Washington: U.S. Government Printing Office, 1979), 31.

[130] Order Denying Motion to Dismiss Petition of Intervention, Docket No. 173-A, October 5, 1966, 17 Ind. Cl. Comm. 337a.

[131] Order Amending Opinion and Findings of Fact, and Amended Final Award, Docket No. 173-A, May 30, 1973, 27 Ind. Cl. Comm. 23 at 34-A. For the original award, see Final Award, Docket No. 173-A, February 2, 1972, 27 Ind. Cl. Comm. 23 at 33. The Court of Claims ordered that additional offsets be allowed against the original award, but it upheld the commission's determination that the date of taking was June 14, 1883. Opinion, *The United States of America v. The Cherokee Nation*, Appeal No. 1-72, 200 Ct. Cl. 583 (1973).

[132] *Federal Register* 41: 1929–30 (January 13, 1976).

[133] Petition, Docket No. 190, August 2, 1951, 7, File: 190-O.P. Box 1847, RG 279, NARA I.

> to secure to said Freedmen in the Cherokee Nation only civil and political rights as then evidenced by
> the Fourteenth Amendment of the Constitution of the United States . . . . It was the understanding of
> the Cherokees when they executed said treaty provision that the rights granted said Freedmen in said
> treaty provision would not give or vest in said Freedmen any right, title, estate or interest in or to any
> of the properties, real or personal, owned and held by said Cherokees.[134]

The petitioners said that various acts of Congress "compelled them to make division and distribution of their properties to said Cherokee Freedmen without consideration, and without due and just, or any compensation therefore," which constituted a taking.[135] They placed the value at $4,734,071.[136] Among the requested remedies, the petitioners asked for the 1866 treaty to be "treated or considered as revised so as to provide that Article 9 of the Treaty of 1866 grant to Cherokee Freedmen only civil or political rights."[137]

The commission found that the plaintiff failed to prove "that the 1866 treaty or its antecedent 1865 and 1866 negotiations were attended by duress, fraud, intimidation, falsehood, or mistake."[138] The commission said that the freedmen, on conclusion of the treaty, became "newly-accepted citizens, with their exactly equal rights, [who] had no greater interests than any blood Cherokees to the common property of The Cherokee Nation. Nor did they have any lesser interests. The interest of each Cherokee citizen was equal and, as to lands and funds, wholly intangible."[139] Therefore, the commission dismissed the claim.[140]

---

[134] Petition, Docket No. 190, August 2, 1951, 8, File: 190-O.P. Box 1847, RG 279, NARA I.

[135] Petition, Docket No. 190, August 2, 1951, 9, File: 190-O.P. Box 1847, RG 279, NARA I.

[136] Petition, Docket No. 190, August 2, 1951, 13, File: 190-O.P. Box 1847, RG 279, NARA I.

[137] Petition, Docket No. 190, August 2, 1951, 10, File: 190-O.P. Box 1847, RG 279, NARA I.

[138] Final Order, Docket No. 190, September 25, 1963, 12 Ind. Cl. Comm. 570 at 643a.

[139] Opinion, Docket No. 190, September 25, 1963, 12 Ind. Cl. Comm. 570 at 642.

[140] Final Order, Docket No. 190, September 25, 1963, 12 Ind. Cl. Comm. 570 at 643a.

# Findings

Article 9 of the 1866 treaty achieved the United States government's goal of placing former slaves and free blacks among the Cherokee on an equal footing with other members of the Cherokee Nation, just as it sought to incorporate those former slaves and free blacks outside Indian Territory into the United States as citizens. Cherokee Nation representatives' understanding of this goal is demonstrated throughout the historical record, particularly in the following documents:

- The record of negotiations for September 16, 1865, when the Southern Cherokees explained their opposition to incorporating former slaves into the tribes "on an equal footing with the original members."[141]

- The undated draft treaty (prepared by or in consultation with the Southern Cherokees), which provided that freedmen "shall be entitled to all the rights, privileges and immunities of citizens."[142]

- The unratified treaty with the Southern Cherokees of June 13, 1866, which provided that freedmen "shall be entitled to all the rights, privileges, and immunities belonging to any member of the Cherokee Nation parties hereto."[143]

- Principal Chief William Ross's message of October 19, 1866, in which he called for a census to include "all blacks admitted to the full rights of Cherokee citizenship by the 9th Article of the Treaty . . . ."[144]

- The November 28, 1866, amendment to the Cherokee constitution, which brought the constitution into compliance with the 1866 treaty.[145]

- The Cherokee Citizenship Commission's rules for documenting claims to citizenship, which referred to the terms of the 1866 treaty.[146]

---

[141] *ARCIA 1865*, 339.

[142] Article 13, draft treaty, no date, Special File 125, Roll 24, M574.

[143] Articles of Agreement with Southern Cherokees, June 13, 1866, 7-8, Special File 125, Roll 24, M574.

[144] "Message of Hon. Wm. P. Ross to the Cherokee Council," October 19, 1866, File: W. P. Ross, October 19, 1866, Box 1, William P. Ross Collection, Western History Collections, University of Oklahoma, Norman, Oklahoma.

[145] *The Act of Union Between the Eastern and Western Cherokees, the Constitution and Amendments, and the Laws of the Cherokee Nation, Passed During the Session of 1868 and Subsequent Sessions*, 19.

[146] D. L. Nicholson to James M. Bell, April 23, 1878, Folder 7413, Roll 49, CNP.

- The April 27, 1886, act of the Cherokee National Council, which asserted that "all the rights of native Cherokees" as used in Article 9 conferred civil, political, and personal rights the same as those of adopted white citizens of the nation.[147]

- The complaint in Docket 190 of the Indian Claims Commission, in which the Cherokee Nation stated that Article 9 granted the freedmen civil and political rights in the same fashion as the Fourteenth Amendment of the U.S. Constitution.[148]

The United States government's goal of assuring tribal citizenship for the freedmen is equally clear in the historical record. Key documents supporting this fact include the following:

- The instruction from commissioners at the 1865 Fort Smith treaty council that former slaves must be "[incorporated] the tribes on an equal footing with the original members, or suitably provided for."[149]

- Secretary of the Interior James Harlan's directive that assure that "no distinction is made between members of the Cherokee tribe who were held in bondage and those who were free. That, in all cases they would receive the same annuities, lands and educational advantages."[150]

- The 1866 treaties with the Seminole and Creek tribes, which accorded freedmen "all the rights of native citizens."[151]

- A proposed amendment to the unratified 1868 agreement between the United States and the Cherokee Nation, which confirmed that freedmen complying with Article 9 were to be understood as Cherokee citizens.[152]

- The May 25, 1886, report of the House Committee on Indian Affairs in reference to the exclusion of freedmen from a share in payment for land, stating that the Cherokee legislature "could not discriminate against any of its citizens legally entitled to their part of said appropriation."[153]

---

[147] *Constitution and Laws of the Cherokee Nation, 1892*, 371–72, Roll CHN 89, Cherokee National Records.

[148] Petition, Docket No. 190, August 2, 1951, 8, File: 190-O.P. Box 1847, RG 279, NARA I.

[149] *ARCIA 1865*, 318.

[150] James Harlan, Secretary of the Interior, to D. N. Cooley, Commissioner of Indian Affairs, November 17, 1865, Roll 100, M234.

[151] Treaty of March 21, 1866, 14 Stat. 755; Treaty of June 14, 1866, 14 Stat. 785.

[152] Senate, *Letter of the Secretary of the Interior to the Chairman of the Committee on Indian Affairs, Communicating Amendments to the Cherokee Treaty Concluded July 9, 1868*, 41st Cong., 2d sess., 1870, S. Miscdoc. 148, serial 1408, 3.

[153] House Committee on Indian Affairs, *Report to Accompany Bill H. R. 9109*, 49th Cong., 1st sess., 1886, H. Rept. 2614, serial 2443, 1-2.

- The Act of March 3, 1893, which referred to the freedmen as "citizens of the Cherokee Nations" and stated, "Nor shall anything herein be held to abridge or deny to said freedmen any rights to which they may be entitled under existing laws or treaties."[154]

Finally, the federal courts, along with the Indian Claims Commission, have consistently determined that the freedmen were citizens of the Cherokee Nation, relying in whole or in part on the 1866 treaty. Decisions that contain such a finding include the following:

- *Moses Whitmire, Trustee for the Cherokee Freedmen v. The Cherokee Nation and the United States*, 30 Ct. Cl. 180 (1895).

- *In the Matter of Enrollment of Persons Claiming Rights in the Cherokee Nation*, 40 Ct. Cl. 411 (1905).

- Opinion of the Commission, Docket No. 123, December 28, 1961, 10 Ind. Cl. Comm. 109 at 127.

- Opinion, Docket No. 190, September 25, 1863, 12 Ind. Cl. Comm. 570 at 586.

---

[154] Act of March 3, 1893, 27 Stat. 612 at 641.