**THE CHEROKEE NATION,**

**Plaintiff/
Counter Defendant,**

**v.**

**RAYMOND NASH, et al.,**

**Defendants/
Counter Claimants/
Cross Claimants,**

**--and--**

**MARILYN VANN, et al.,**

**Intervenor Defendants/
Counter Claimants/
Cross Claimants,**

**--and--**

**RYAN ZINKE, SECRETARY OF THE
INTERIOR, AND THE UNITED STATES
DEPARTMENT OF THE INTERIOR,**

**Counter Claimants/
Cross Defendants.**

Civil Action No.  13-01313 (TFH)

## <u>MEMORANDUM OPINION</u>

Although it is a grievous axiom of American history that the Cherokee Nation's narrative is

steeped in sorrow as a result of United States governmental policies that marginalized Native American

Indians and removed them from their lands,[1] it is, perhaps, lesser known that both nations' chronicles share the shameful taint of African slavery.[2]  This lawsuit harkens back a century-and-a-half ago to a treaty entered into between the United States and the Cherokee Nation in the aftermath of the Civil War. In that treaty, the Cherokee Nation promised that "never here-after shall either slavery or involuntary servitude exist in their nation" and "all freedmen who have been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months, and their descendants, shall have all the rights of native Cherokees . . . ."  Treaty With The Cherokee, 1866, U.S.-Cherokee Nation of Indians, art. 9, July 19, 1866, 14 Stat. 799 [hereinafter 1866 Treaty].

The parties to this lawsuit have called upon the Court to make a judicial determination resolving what they believe to be the "core" issue in this case, which is whether the 1866 Treaty guarantees a continuing right to Cherokee Nation citizenship for the extant descendants of freedmen listed on the Final Roll of Cherokee Freedmen compiled by the United States Commission to the Five Civilized

---

[1]     See, e.g., Coleman v. U.S. Bureau of Indian Affairs, 715 F.2d 1156, 1158 n.12 (7th Cir. 1983) (noting that the Cherokees were subjected to forced migration along the "trail of tears" to lands west of the Mississippi after President Andrew Jackson's "methods of procuring voluntary emigration became more coercive"); Hayes v. United States, 73 Fed. Cl. 724, 726 n.4 (Fed. Cl. 2006) (stating that "[f]rom approximately 1815 to 1846, the federal government instituted a policy of removing Indians from their lands in the eastern United States to lands in the West" and this "removal policy had a tremendous impact on [the Cherokees, Chickasaws, Choctaws, Creeks and Seminoles]"); United States v. Michigan, 471 F. Supp. 192, 211 (W.D. Mich. N. Div. 1979) ("In Georgia, the peaceful Cherokee sought and won from the Supreme Court a favorable decision, to which neither the state officials nor President Jackson paid any attention. Like the other Indian tribes, the Cherokee embarked on a long journey to the West, along a 'trail of tears.'").

[2]     Vann v. Kempthorne, 534 F.3d 741, 744 (D.C. Cir. 2008) ("The Cherokee Nation shares with the United States a common stain on its history: the Cherokees owned African slaves.").

Tribes,[3] also known as the "Dawes Commission."[4]  As partially reflected in the case caption, the parties to this lawsuit are as follows:  Plaintiffs and Counter Defendants the Cherokee Nation and Principal Chief Bill John Baker (collectively the "Cherokee Nation"); Defendants, Counter Claimants and Cross Claimants Raymond Nash, Larry Wasson, Robert Allen, Kathy Washington and Lisa Duke, as well as Intervenor Defendants, Counter Claimants and Cross Claimants Marilyn Vann, Ronald Moon, Donald Moon, Charlene White, Ralph Threat, Faith Russell, Angela Sanders, and Samuel E. Ford (collectively the "Freedmen"—descendants of Cherokee slaves listed on the Dawes Commission's Final Roll of Cherokee Freedmen[5]); and the United States Department of the Interior and Ryan Zinke, Secretary of the Interior (collectively the "Interior").  Pending before the Court are the following four motions they filed:  (1) Cherokee Nation and Principal Chief Baker's Motion for Partial Summary Judgment, ECF No. 233; (2) The Department of the Interior's Motion for Summary Judgment, Memorandum of Points and Authorities In Support Thereof, and Opposition to the Cherokee Nation and Principal Chief Baker's Motion for Partial Summary Judgment, ECF No. 234; (3) Cherokee Freedmen's Cross-Motion for Partial Summary Judgment, ECF No. 235; and (4) Cherokee Nation and Principal Chief Baker's Motion to Strike Expert Report of Emily Greenwald, ECF No. 240.  As will be explained, because the 1866

---

[3]  The Cherokee Nation states that "[t]oday, the Cherokee, Choctaw, Chickasaw, Seminole and Muscogee (Creek) Nation prefer the term 'Five Tribes' to 'Five Civilized Tribes.'"  Cherokee Nation's Reply Br. 1 n.2, ECF No. 239.  The Court is sympathetic to the obvious reasons for this preference and will hereafter refer to the Five Tribes accordingly.

[4]  *U.S. Express Co. v. Friedman*, 191 F. 673, 677 (8th Cir. 1911) (stating that "[t]he so-called Five . . . Tribes . . . are the Choctaw, Chickasaw, Creek, Cherokee, and Seminole" and the United States Commission to the Five Tribes is "commonly known as the 'Dawes Commission'").

[5]  In this opinion, references to "Freedmen" as a proper noun are intended to identify the parties to this lawsuit who are descendants of Cherokee slaves listed on the Dawes Commission's Final Roll of Cherokee Freedmen, whereas references to "freedmen" as a common noun are intended to identify freed Cherokee slaves, generally, as that term was used in historical documents, including the 1866 Treaty.

Treaty guarantees that extant descendants of Cherokee freedmen shall have "all the rights of native Cherokees," including the right to citizenship in the Cherokee Nation, the Court will deny the Cherokee Nation's motion for partial summary judgment and grant both the Interior's and Cherokee Freedmen's motions. The Cherokee Nation's motion to strike will be denied as moot.

## LEGAL STANDARD

As indicated, each of the parties have moved for full or partial summary judgment in their favor on the principal issue of whether the 1866 Treaty provides a lasting right to Cherokee Nation citizenship for the descendants of freedmen who were listed on the Dawes Commission's Final Roll of Cherokee Freedmen. Rule 56 of the Federal Rules of Civil Procedure mandates that "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For the most part, the parties appear to agree about the historical events and facts that are material to this case,[6] albeit the parties' characterizations of the events and facts are contested, particularly to the extent that such characterizations touch on interpretive matters that are at the heart of the legal question.[7] Because there

---

[6]    The Cherokee Nation "does not dispute the content of the historical documents, letters, legislation, and cases cited and attached as exhibits by the other parties." Cherokee Nation's Reply Br. 4, ECF No. 239. The Freedmen "do not dispute the basic facts cited by the Cherokee Nation regarding the occurrence of historical events and statements that were made." The Cherokee Freedmen's Mem. of P. & A. In Opp'n to the Cherokee Parties' Mot. for Partial Summ. J. & In Supp. of the Cherokee Freedmen's Cross-Mot. for Partial Summ. J. 4 n.2, ECF No. 235-1 [hereinafter cited as Cherokee Freedmen's Opp'n Br.]. Although the Interior asserts that "the Court should disregard all purported factual statements in the Cherokee Nation's filing," Interior's Mot. for Summ. J. iii, ECF No. 234, given that, with the exception of the Interior's expert report, the Cherokee Nation does not dispute the contents of the exhibits submitted by either the Interior or the Freedmen, and it does not appear from the record that the Interior or the Freedmen noted objections to each other's exhibits, the Court views these exhibits to supply the undisputed material facts.

[7]    See Interior's Mot. for Summ. J. ii, ECF No. 234 (challenging a historical summary and chronological timeline submitted by the Cherokee Nation on the grounds, among others, that these documents contain statements that are "unsupported," "opinions," or are statements that "represent a biased view of history"); Cherokee Nation's Mot. to Strike 2, ECF No. 240 (arguing that the Interior's expert report discussing the history of Article 9 of the 1866 Treaty contains "conclusions on the core

is no genuine dispute about the material facts, though, the focus of the Court's consideration will be directed at determining which of the moving parties, if any, is entitled to judgment as a matter of law. The Court will summarize the undisputed facts that are material to the legal issue in this case but commends one who has a historical interest in these matters to engage in a studied examination of all sources cited by the parties for a more nuanced portrait of the Cherokee Freedmen's tangled fate with the Cherokee Nation.

Although the undisputed facts can be found in the documents, letters, legislation, and cases cited and attached as exhibits by the parties, *see supra* note 7, these documents do not offer a particularly cohesive presentation of the sequence of historical events that lend context to the legal issues raised in this case. In the absence of comprehensive statements of facts, which were not submitted by the parties,[8] and given the disagreements about the characterizations of historical events provided in the background sections of the parties' legal briefs, as well as the sources cited in those sections of the briefs, the Court found itself at somewhat of a disadvantage to furnish the historical background, which it views as a helpful foundation to understand the legal arguments and issues. The historical events that underlie the issues in this case are, however, well documented in legal precedent. To be clear, though, the historical events discussed in other legal precedent are cited only to set the scene for the legal

issue, which the Nation and Principal Chief dispute"); Cherokee Freedmen's Opp'n Br. 4 n.2, ECF No. 235-1 (stating that "the Freedmen dispute the Cherokee Nation's characterization of historical facts . . .").

[8] Although all three parties ultimately submitted statements of undisputed facts, these statements were extremely brief and unadorned with details about the historical background. Cherokee Freedmen's Opp'n Br. 4-6, ECF No. 235-1; Interior's Mot. for Summ. J. Ex. 1, ECF No. 234-1; Cherokee Nation's Reply Br. Ex. B, ECF No. 239-2.

contentions but otherwise serve no evidentiary purpose whatsoever with respect to the resolution of the pending motions.[9]

**BACKGROUND, UNDISPUTED FACTS
AND PROCEDURAL POSTURE**

## I.    Historical Background:  Pre-Civil War

At the outset, it is "[b]eyond doubt the Cherokees were the owners and occupants of the territory where they resided before the first approach of [European settlers] to the western continent," *Holden v. Joy*, 84 U.S. 211, 243 (1872), and "they claimed the principal part of the territory . . . comprised within the states of North and South Carolina, Georgia, Alabama, and Tennessee," *Heckman v. United States*, 224 U.S. 413, 429 (1912).  Before the Revolutionary War, as territories where the Cherokees resided were being colonized and settled by Europeans, "England claimed sovereignty over this territory but recognized the rights of the Indians to possession of the land on which they lived and to self-government."  *E. Band of Cherokee Indians v. Lynch*, 632 F.2d 373, 375 (4th Cir. 1980).  After the Revolutionary War and formation of the United States of America, "the United States succeeded to England's sovereignty," *id.*, and so began a lamentable saga of governmental treaties and policies by which the United States condescended to exercise dominion over the Cherokees, remove them from their lands, and dissolve their tribal government to serve the goals of expansionism and assimilation. [10]

---

[9]    Although a court may take judicial notice of an opinion filed in another case for the purpose of establishing the existence of the opinion, it may not take judicial notice of the truth of the facts asserted in the opinion.  *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

[10]    *See Choctaw Nation v. Oklahoma*, 397 U.S. 620, 623 (1970) (noting that the United States entered into treaties to purchase land from the Native American Indians "to provide room for the increasing numbers of new settlers who were encroaching upon Indian lands during their westward migrations" but "the Indians continued to live on the land not ceded under their own laws and way of life, and their rights to those lands were 'solemly' guaranteed by the United States," although "[e]ven while it was making this solemn guarantee, however, the United States adopted a policy aimed at completely extinguishing these Indian Nations' right to their native lands"); *Marlin v. Lewallen*, 276 U.S. 58, 61 (1928) (stating that the Dawes Commission "was created and specially authorized to conduct

In the decades before the Civil War, the Cherokee Nation became fragmented[11] and was

repeatedly removed, forcibly and tragically in the end, from all lands it possessed east of the Mississippi

_____

negotiations with each of the tribes looking to the allotment of a part of its lands among its members, to some appropriate disposal of the remaining lands and to further adjustments preparatory to the dissolution of the tribe"); *Cherokee Nation v. United States*, 270 U.S. 476, 479 (1926) (discussing disputes relating to removal); *Stephens v. Cherokee Nation*, 174 U.S. 445, 483 (1899) (stating that the "policy of the government . . . in dealing with the Indian nations, was definitely expressed in a proviso inserted in the Indian appropriation act of March 3, 1871," which stated that "'hereafter no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe or power with whom the United States may contract by treaty'"); *Holden*, 84 U.S. at 237 ("Enough appears in [the treaties concluded in 1828 and 1833 between the United States and the Cherokees] to show that it was the policy of the United States to induce the Indians of that nation, resident in any of the States or organized Territories of the United States, to surrender their lands and possessions to the United States, and emigrate and settle in the territory provided for them in those treaties."); *Fellows v. Blacksmith*, 60 U.S. (19 How.) 366, 370-71 (1856) (discussing "[t]he removal of tribes and nations of Indians from their ancient possessions to their new homes in the West, under treaties made with them by the United States"); *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 15 (1831) (observing that "[a] people once numerous, powerful, and truly independent, found by our ancestors in the quiet and uncontrolled possession of an ample domain, gradually sinking beneath our superior policy, our arts and our arms, have yielded their lands by successive treaties, each of which contains a solemn guarantee of the residue, until they retain no more of their formerly extensive territory than is deemed necessary to their comfortable subsistence"); *E. Band of Cherokee Indians*, 632 F.2d at 375 ("With the 1785 Treaty of Hopewell, the United States initiated a policy of extinguishing Cherokee possessory rights in the southeast . . . ."); *Henry Gas Co. v. United States*, 191 F. 132, 136 (8th Cir. 1911) (stating that a 1902 allotment act "provide[d] for the distribution of the tribal property of [the Cherokee Nation] equally among its members . . . and a dissolution of the tribal government"); *Harjo v. Kleppe*, 420 F. Supp. 1110, 1119 (D.D.C. 1976) (discussing the policy of forcible removal that stemmed from "the increasingly substantial expansionist pressures from the white population" that led to the Indian Removal Act of 1830, which "eventually resulted in the relocation of the Creek, Cherokee, Seminole, Choctaw and Chickasaw tribes to what is presently the state of Oklahoma"); *Cherokee Nation of Indians In Okla. ex rel. W. (Old Settler) Cherokee Indians v. United States*, 109 F. Supp. 238, 239-40 (Ct. Cl. 1953) (offering a summarized historical accounting of land treaties the Cherokee's entered into with the United States).

[11]     In the early 1800s, a faction consisting of about one third of the Cherokees then residing in lands east of the Mississippi River reportedly sought to "remove across the Mississippi river on vacant lands of the United States" along the Arkansas River and White River and entered into a treaty with the United States in 1817 whereby that faction settled on such lands west of the river in exchange for the relinquishment of "their proportionate rights in the lands east, which they had left and were about to leave," the payment of an annuity and certain other provisions to "aid in removal, and to pay for improvements adding to the real value of the lands ceded." *United States v. Old Settlers*, 148 U.S. 427, 435-36 (1893) (statement by Fuller, C.J.) (reciting statements made in the preamble to an 1817 treaty between the United States and the Cherokees). The Cherokees that migrated to lands west of the

Mississippi River were referred to as the "Old Settlers" or "Western Cherokees" while the Cherokees that remained east of that river were referred to as the "Eastern Cherokees." *Id.* at 437, 446.

By 1835, the Eastern Cherokees had become "prisoners in Georgia, under the guard of 5,000 United States soldiers, who had hunted them down from their mountains and driven them out of their valleys and were now bringing them to the terms of an enforced emigration." *W. Cherokee Indians v. United States*, 27 Ct. Cl. 1, 20 (Ct. Cl. 1891). In 1835, a "small body" of Cherokee men "exceptionally friendly to the United States" who were identified in relation to one of their political leaders, "Ridge," executed the so-called Treaty of New Echota, *id.* at 20, by which "the Cherokees ceded to the United States all the lands owned, claimed, or possessed by them east of the Mississippi river, and all claims for spoliations of every kind, for the sum of five million of dollars, and agreed to remove to 'their new home' west of the Mississippi within two years from its ratification," *E. Band of Cherokee Indians v. United States*, 117 U.S. 288, 301 (1886). "This treaty was made by unauthorized persons and was repudiated by the responsible officials of the Eastern Cherokees." *Cherokee Nation of Indians in Okla. ex. rel. W. Cherokee Indians*, 109 F. Supp. at 534. As a result, this so-called "Ridge" or "treaty party" had "brought down on themselves the suspicion and enmity of nearly all their race," *W. Cherokee Indians*, 27 Ct. Cl. at 20, and they voluntarily migrated to the lands west of the Mississippi River to join the Western Cherokees, *id.* at 21. Meanwhile, the remaining Eastern Cherokees, under the leadership of John Ross, continued to oppose removal until the United States "sent a military force" to "effect a forcible removal." *Id.* at 21. In a federal judicial opinion issued in 1891, Chief John Ross's leadership of the Eastern Cherokees was described as follows:

> The Eastern Cherokees had been controlled by a chief whose intellectual successes deserve to be ranked among the extraordinary achievements of diplomacy, if not of statesmanship. For eight years he had maintained a contest with the Government and the State of Georgia in the field of intellectual resource—objecting, procrastinating, evading; sometimes invoking moral forces, sometimes foreshadowing forceful resistance, and again and again he had achieved the negative triumph of frustrating the emigration of his people. And it is not a trivial element of the case that for six years his resistance was effectual against the iron determination of Andrew Jackson. The Indian name of this leader was Kooweskoowe, but he is generally known only by his adopted name of John Ross.

*W. Cherokee Indians*, 27 Ct. Cl. at 21.

Once the Eastern Cherokees arrived in the Indian Territory west of the Mississippi River, "they, being in the majority, refused to submit to the established government of the Western Cherokees" so they "set up their own laws and government" and "persecuted the Treaty Party Cherokees and the Western Cherokees," resulting in "a period of sanguinary strife, bordering on civil war." *Cherokee Nation of Indians ex. rel. W. Cherokee Indians*, 109 F. Supp. at 534. *Accord E. Band of Cherokee Indians*, 117 U.S. at 305-306 (describing the "bitter feeling between the old settlers and the new-comers" who "being the more numerous, claimed to control the government of the country, and endeavored to compel the old settlers to submit to their rule"). The animus and divisions these events wrought in the Cherokee Nation would linger, *see W. Cherokee Indians*, 27 Ct. Cl. at 23 (stating that "[t]he treaty of New Echota [was] the root from which controversies innumerable, involving force, bloodshed, diplomatic negotiations, Congressional action, and judicial determination [had] for more than

River, as well as land set aside in the Arkansas Territory, and the Nation ultimately resettled and reunited in land that was designated "Indian Territory" and is now Oklahoma.[12]  Sadly, contemporaneous records suggest that the Cherokee Nation's experience of subjugation by the United States did not cultivate the compassion to moderate the treatment of slaves in its own nation.

The Cherokee Nation acknowledges that, before the Civil War, "[s]ome Cherokees . . . adopted the American institution of slavery."  Cherokee Nation's Mem. In Support of Mot. for Summ. J. 4, ECF No. 233.  *See also* Cherokee Freedmen's Opp'n Br. 4, ECF no. 235-1 (stating that "[p]rior to and during the Civil War, members of the Cherokee Nation owned slaves of African descent").  Although not all Cherokees owned slaves, and the Cherokee Nation appears to contend that the practice of slavery was adopted out of a misguided attempt to mirror the "'systems and ideologies of governance from the United States to avoid being colonized by the United States,'" Cherokee Nation's Mem. In Support of Mot. for Summ. J. 4-5, ECF No. 233 (quoting Tiya Alicia Miles, Bone of My Bone:  Stories of a Black-Cherokee Family, 1790-1826, at 50 (2000) (unpublished Ph.D. dissertation, University of Minnesota)), it nevertheless is the case that the Cherokee Nation was complicit in legitimizing slavery within the Nation and securing the intended durability of the practice, as well as the disenfranchisement of people of

---

half a century been springing"), and resurface during later attempts to negotiate a treaty with the United States after the Civil War, *see* Interior's Mot. for Summ. J. Ex. 30, Report of the Comm'r of Indian Affairs 11 (Oct. 22, 1866), ECF No. 234-30 (discussing treaty negotiations and stating that "[i]t will be well to remember that the Cherokee nation had long been divided into two factions known as the Ross and Ridge parties, whose quarrel dates back to the time when the people lived in Georgia, and that blood had been frequently shed in their quarrels").

[12]      *Choctaw Nation*, 397 U.S. at 622-626; *accord* Cherokee Freedmen's Opp'n Br. 7-8, ECF No. 235-1 (describing aspects of the Cherokee's history before the Civil War).  *See also Cherokee Nation of Okla. v. Babbitt*, 117 F.3d 1489, 1492 (D.C. Cir. 1997) (stating that "the Indian Territory . . . is now the State of Oklahoma"); *Cherokee Nation of Okla. v. United States*, 782 F.2d 871, 874 n.5 (10th Cir. 1986) (noting that "[m]ore than 4,000 Cherokees perished" during the forced migration along the Trail of Tears, which "'has come to symbolize the brutality of Indian removal'" (quoting F. Cohen, *Handbook of Federal Indian Law* 78-84 (1982 ed.))), *rev'd*, 480 U.S. 700 (1987).

African descent, as expressly evidenced by a constitution the Nation adopted and subsequent laws it enacted before the Civil War.

For example, on September 6, 1839, the reunited[13] Cherokee Nation established a constitution that excluded slaves from the right to vote, excluded slaves from eligibility to obtain a seat in the law-making legislative department of the Cherokee Nation's government, and provided that the rights and privileges of the Cherokee Nation were vested in the descendants of Cherokee men by all free and non-African women or the descendants of Cherokee women by all free men. Cherokee Freedmen's Opp'n Br. Ex. 3, The Const. & Laws of the Cherokee Nation: Passed at Tahlequah, Cherokee Nation, 1839-51 7 (Tahlequah, Cherokee Nation 1852), Cherokee Nation Const. art. III, §§ 5, 7, ECF No. 235-3. "At that time, therefore, the right of citizenship was strictly limited to native Cherokees of Cherokee descent." *Journeycake v. Cherokee Nation*, 28 Ct. Cl. 281, 312 (Ct. Cl. 1893), *aff'd* 155 U.S. 196 (1894). The 1839 Cherokee Nation Constitution also expressly prohibited people of "negro or mulatto parentage, either by the father or mother's side" from being "eligible to hold any office of profit, honor, or trust under this Government." Cherokee Freedmen's Opp'n Br. Ex. 3, The Const. & Laws of the Cherokee Nation: Passed at Tahlequah, Cherokee Nation, 1839-51 7 (Tahlequah, Cherokee Nation 1852), Cherokee Nation Const. art. III, § 5, ECF No. 235-3.

Shortly after the 1839 Cherokee Nation Constitution was established, and continuing for several years afterward, the Nation enacted punitive slave codes that not only served to recognize the legality of slavery within the Nation, but also ensured slavery's endurance by preventing slaves from owning property, becoming literate, or otherwise being aided to seek freedom. For example, on September 19, 1839, the Cherokee Nation enacted a law making marriage unlawful between free Cherokee citizens and

---

[13] *See* n.12, *supra*.

slaves or people of color[14] and imposing corporal punishment for the offense in the form of beating or

whipping, most harshly against "colored male[s]":

> Be it enacted by the National Council, That intermarriage shall not be lawful between a
> free male or female citizen with any slave or person of color not entitled to the rights of
> citizenship under the laws of this Nation, and the same is hereby prohibited, under the
> penalty of such corporeal punishment as the courts may deem it necessary and proper to
> inflict, and which shall not exceed fifty stripes for every such offence;—but any colored
> male who may be convicted under this act shall receive one hundred lashes.[15]

Cherokee Freedmen's Opp'n Br. Ex. 3 at 19, An Act to Prevent Amalgamation with Colored Persons

(Sept. 19, 1839), ECF No. 235-3. The following year, the Cherokee Nation enacted a law prohibiting

slaves and "any free negro or mulatto, not of Cherokee blood" from owning certain property and

imposing as a Sheriff's "duty" the public sale of any such prohibited property as well as the infliction of

39 whippings on the bare skin of "any slave, free negro, or mulatto, not of Cherokee blood" who

introduced or sold liquor:

> Be it enacted by the National Council, That it shall not be lawful for any free negro or
> mulatto, not of Cherokee blood, to hold or own any improvement within the limits of this
> Nation; neither shall it be lawful for slaves to own any property of the following
> description, viz:  horses, cattle, hogs, or fire arms.  And it is hereby made the duty of the
> Sheriffs of the several Districts, from and after the first day of June next, (1841) to sell, at
> public sale, to the highest bidder, after ten days notice, all such property as may be found
> owned by slaves, in violation of this prohibition:  the proceeds of such sale to be paid to
> the said violator, after deducting eight per cent. for the Sheriff's fee.

> And if any slave, free negro, or mulatto, not of Cherokee blood, shall introduce into the
> Nation, or sell, any spirituous liquors, it shall be the duty of the Sheriff of the District, up-
> on being notified thereof, to waste or destroy such spirituous liquors, and to inflict thirty-
> nine lashes on the bare back of any such person, as above named, for so offending.

---

[14]    Less than 10 days later, the Cherokee Nation enacted a law providing, among other things, for
the legalization of marriages between "any white man" and a Cherokee woman.  Cherokee Freedmen's
Opp'n Br. Ex. 3 at 32-33, An Act to Legalize Intermarriage with White Men (Sept. 28, 1839), ECF No.
235-3.

[15]    A "stripe" is defined in relevant part as "a stroke or blow with a rod or lash." *Stripe Definition*,
MERRIAM-WEBSTER.COM, www.merriam-webster.com/dictionary/ stripe.  A "lash" is defined in relevant
part as "punishment by whipping." *Lash Definition*, MERRIAM-WEBSTER.COM, www.merriam-
webster.com/dictionary/lash.

Cherokee Freedmen's Opp'n Br. Ex. 3 at 44 (Nov. 7, 1840), ECF No. 235-3. The next year, the

Cherokee Nation enacted a law prohibiting anyone from teaching literacy to slaves and free people of

African descent who did not have Cherokee blood:

> Be it enacted by the National Council, That from and after the passage of this act, it shall
> not be lawful for any person or persons whatever, to teach any free negro or negroes not of
> Cherokee blood, or any slave belonging to any citizen or citizens of the Nation, to read or
> write.

Cherokee Freedmen's Opp'n Br. Ex. 3 at 55-56, An Act Prohibiting the Teaching of Negroes to Read

and Write (Oct. 22, 1841), ECF No. 235-3. Another year later, in 1842, apparently in reaction to the

revolt and escape of 20 slaves,[16] the Cherokee Nation enacted a law commanding that free people of

African descent who were not former Cherokee slaves voluntarily leave the Cherokee Nation or face

expulsion, mandating that any Cherokee Nation citizen who freed a slave of African descent be held

responsible for the freed slave's conduct, requiring that, upon the death of the Cherokee Nation citizen

who freed a slave of African descent, such freed slave shall be required to "give satisfactory security . . .

for their conduct" or be subject to removal, and further providing that:

> [S]hould any free negro or negroes be found guilty of aiding, abetting or decoying any
> slave or slaves, to leave his or their owner or employer, such free negro or negroes, shall
> receive for each and every such offence, one hundred lashes on the bare back, and be
> immediately removed from this Nation.

Cherokee Freedmen's Opp'n Br. Ex. 3 at 71, An Act In Regard to Free Negroes (Dec. 2, 1842), ECF

No. 235-3.

---

[16] Cherokee Freedmen's Opp'n Br. 9, ECF No. 235-1 (asserting that Cherokee slave laws were expanded "[f]ollowing a Cherokee slave revolt in 1842" and "the Cherokee Nation took steps to remove all free blacks from its territory"). *See also* Lolita Buckner Inniss, *Cherokee Freedmen & the Color of Belonging*, 5 Colum. J. Race & L. 107 n.52 (2015) (stating that "[i]n 1842 one of the largest slave escapes recorded among the Cherokee occurred" when "a group of 20 black slaves owned by the Cherokee escaped and tried to reach Mexico, where slavery had been abolished in 1836").

## II.     Undisputed Facts:  The Civil War and the 1866 Treaty

After the Civil War began in 1861, the Cherokee Nation not only aligned itself with the

Confederate States of America (also referred to as the "Confederacy") but also, as a people,

unanimously and formally resolved that they had a legal and constitutional right to treat slaves of

African descent as property.  Indeed, although the Cherokee Nation remained neutral at the inception of

the war, several months after hostilities commenced the Nation held a meeting to decide, among other

things, whether to offer allegiance to the Confederacy.  Cherokee Freedmen's Opp'n Br. Ex. 6,

*Cherokee Nation v. United States*, No. 190, 12 Ind. Cl. Comm. 570, 572, 596, *aff'd* 180 Ct. Cl. 181, ECF

No. 235-3; Interior's Mot. for Summ J. Ex. 4, *Cherokee Nation*, 12 Ind. Cl. Comm. at 570, 572, 596,

ECF No. 234-4.  During that meeting, Principal Chief John Ross presaged in error that the Confederacy

likely would be victorious and "emphasized that adherence to the Confederacy would promote

preservation of the institution of slavery, instead of its destruction."  Cherokee Freedmen's Opp'n Br.

Ex. 6, *Cherokee Nation*, 12 Ind. Cl. Comm. at 596, ECF No. 235-3; Interior's Mot. for Summ J. Ex. 4,

*Cherokee Nation*, 12 Ind. Cl. Comm. at 596, ECF No. 234-4.  Principal Chief Ross recommended

abandoning the Nation's position of neutrality in favor of an alliance with the Confederacy.  Cherokee

Freedmen's Opp'n Br. Ex. 6, *Cherokee Nation*, 12 Ind. Cl. Comm. at 596, ECF No. 235-3; Interior's

Mot. for Summ J. Ex. 4, *Cherokee Nation*, 12 Ind. Cl. Comm. at 596, ECF No. 234-4.  The Cherokee

people responded by proposing the following resolutions, among others, which were unanimously

carried:

> *Resolved*, That among the rights guaranteed by the constitution and laws we distinctly
> recognize that of property in negro slaves, and hereby publicly denounce as calumniators
> those who represent us to be abolitionists, and as a consequence hostile to the South, which
> is both the land of our birth and the land of our home.
>
> * * *
>
> *Resolved*, That, reposing full confidence in the constituted authorities of the Cherokee
> Nation, we submit to their wisdom the management of all questions which affect our

interests growing out of the exigencies of the relations between the United and Confederate States of America, and which may render an alliance on our part with the latter States expedient and desirable.

Cherokee Freedmen's Opp'n Br. Ex. 6, *Cherokee Nation*, 12 Ind. Cl. Comm. at 597, ECF No. 235-3;

Interior's Mot. for Summ J. Ex. 4, *Cherokee Nation*, 12 Ind. Cl. Comm. at 597, ECF No. 234-4.

In pursuit of this ill-fated imperative, the Cherokee Nation entered into a Treaty of Friendship and Alliance with the Confederacy on October 7, 1861.[17]  Interior's Mot. for Summ. J. Ex. 41, A Treaty of Friendship and Alliance, Confederate States of Am.-Cherokee Nation, Oct. 7, 1861, *reprinted in* Vine Deloria, Jr. & Raymond J. DeMallie, *Documents of American Indian Diplomacy: Treaties, Agreements, & Conventions, 1775-1979* 666-679 (Gordon Morris Bakken, et al. eds., Univ. of Okla. Press 1999), ECF No. 234-41; Cherokee Freedmen's Opp'n Br. 4, ECF No. 235-1; Cherokee Freedmen's Opp'n Br. Ex. 6, *Cherokee Nation*, 12 Ind. Cl. Comm. at 597, ECF No. 235-3; Cherokee Nation's Mem. In Support of Mot. for Summ. J. 5, ECF No. 233.  Although the treaty with the Confederacy was adopted unanimously by the Cherokee National Council, over the course of the war individual Cherokees' commitment to the alliance appears to have faltered[18] so that, by the end of the war, the Nation was

---

[17]      The Cherokee Nation was not alone in siding with the Confederacy and, of all the Indian nations that aligned with the Confederacy (i.e., the Creek Nation, the Choctaws and Chickasaws, the Seminoles, the Shawnees, Delawares, Wichitas and affiliated tribes, the Comanches, the Great Osages, the Senecas and Shawnees, and the Quapaws) the Cherokee Nation was the last to join.  Interior's Mot. for Summ. J. Ex. 5, Report of Charles E. Mix, *Southern Superintendency* 314, 318 (Sept. 8, 1865), ECF No. 234-5.

[18]      Several explanations for the defections have been advanced.  Early defections by Cherokee regiments have been characterized as reflecting an aversion to fight against other Indians:

The first Confederate regiment of Cherokees, under the command of Col. John Drew, was put into action shortly after the [1866 Treaty] was signed on October 7, 1861.  Another Cherokee regiment was put into action under the command of a prominent Cherokee leader, Stand Watie.  This regiment was active in the confederate military service until the end of the war.  Col Drew's forces proved less reliable, from the Southern standpoint.  At the battle of Bird Creek, the northern element was composed of Creeks and Seminoles who had elected to cast their lot with the North.  On the day of battle, December 9, 1861, four companies of Drew's regiment defected from the Confederate forces and fought on the side of the Creeks and Seminoles.  A historian relied on by the [Cherokee Nation] suggested

again divided into factions of Cherokees according to those who supported the Union versus those who supported the Confederacy.  Cherokee Nation's Mem. In Support of Mot. for Summ. J. 6-7, ECF No. 233; Cherokee Freedmen's Opp'n Br. Ex. 6, *Cherokee Nation*, 12 Ind. Cl. Comm. at 598, 600, ECF No. 235-3; Interior's Mot. for Summ J. Ex. 4, *Cherokee Nation*, 12 Ind. Cl. Comm. at 598, 600, ECF No. 234-4.

In 1865, as the Civil War ended, President Andrew Johnson designated a commission to travel to Fort Smith, Arkansas, to convene a council for the purpose of negotiating new treaties with the

---

that the desertion was occasioned by the Cherokee's disinclination to fight against other Indians.

Cherokee Freedmen's Opp'n Br. Ex. 6, *Cherokee Nation*, 12 Ind. Cl. Comm. at 598-99, ECF No. 235-3 (internal citation omitted).  The scope and reasons for other defections during the Civil War appear to be uncertain although a Confederate military officer speculated that these defections were a matter of finances:

> While exact figures are not available, it was estimated by northern authorities at the end of the war that of the more than 14,000 Cherokees, 6,500 of the more wealthy cooperated with the south throughout the war and 9,000 others left the south at various times during the war, thus swelling the ranks of those denoted as 'northern' or 'loyal' Cherokees. Certainly, 2,200 Cherokee troops raised for the defense of the south deserted to the north by mid-1862, and these fought on the side of the north to the end of the war.  After the war, Albert Pike, the man who had done the most to secure the Indians' allegiance to the cause of the eleven rebellious states, opined that the Cherokees who professed an allegiance to the north during the course of the war did so solely because the Confederacy defaulted in its financial commitments.

Cherokee Freedmen's Opp'n Br. Ex. 6, *Cherokee Nation*, 12 Ind. Cl. Comm. at 600-601, ECF No. 235-3 (internal citations omitted).   In any event, by early 1863 it appears that Chief John Ross and the members of the Cherokee National Council had reneged on the treaty with the Confederacy, reasserted their loyalty to the Union and passed legislation that, among other things, "[a]brogat[ed] the treaty with the south," and "provid[ed] for the abolition of slavery in The Cherokee Nation."  Cherokee Freedmen's Opp'n Br. Ex. 6, *Cherokee Nation*, 12 Ind. Cl. Comm. at 601, ECF No. 235-3.  "These promulgations of the Cherokee national council coincided in point of time with the Union army's first, and unsuccessful, efforts to regain control of the Indian Territory."  Cherokee Freedmen's Opp'n Br. Ex. 6, *Cherokee Nation*, 12 Ind. Cl. Comm. at 601-602, ECF No. 235-3.  The Cherokee National Council reportedly also "acted to confiscate the property of the Cherokees who remained loyal to their treaty ties with the Confederacy, thus rendering about 5,500 Cherokees homeless and houseless."  Cherokee Freedmen's Opp'n Br. Ex. 6, *Cherokee Nation*, 12 Ind. Cl. Comm. at 602, ECF No. 235-3.

Cherokee Nation and other Indian nations and tribes that allied with the Confederacy during the war. Cherokee Freedmen's Opp'n Br. Ex. 7, Report of D.N. Cooley, *Southern Superintendency* 296, 298 (Oct. 30, 1865), ECF No. 235-3; Interior's Mot. for Summ. J. Ex. 4, *Cherokee Nation*, 12 Ind. Cl. Comm. at 602, ECF No. 234-4. The members of this presidential commission declared that a treaty with the United States "must" contain certain stipulations, including that "'[t]he institution of slavery, which has existed among several of the tribes, must be forthwith abolished, and measures taken for the unconditional emancipation of all persons held in bondage, and for their incorporation into the tribes on an equal footing with the original members, or suitably provided for.'" Cherokee Freedmen's Opp'n Br. Ex. 7, *Southern Superintendency* at 298, ECF No. 235-3; Interior's Mot. for Summ. J. Ex. 5, Report of Charles E. Mix, *Southern Superintendency* 314, 318 (Sept. 8, 1865), ECF No. 234-5. Although the faction of Cherokees who supported the Union did not resist this particular stipulation, the faction of Cherokees who supported the Confederacy accepted the abolition of slavery but "insisted . . . that it would neither be for the benefit of the emancipated negro nor for that of the Indian to incorporate the former into the tribe on an equal footing with its original members." Cherokee Freedmen's Opp'n Br. Ex. 8, Charles C. Royce, *The Cherokee Nation of Indians: A Narrative of Their Official Relations with the Colonial & Fed. Gov'ts* 344 (Smithsonian Inst.—Bureau of Ethnology), ECF No. 235-3. In the end, although both factions signed a treaty at Fort Smith, that treaty was never ratified. Cherokee Freedmen's Opp'n Br. Ex. 6, *Cherokee Nation*, 12 Ind. Cl. Comm. at 581, ECF No. 235-3; Interior's Mot. for Summ J. Ex. 4, *Cherokee Nation*, 12 Ind. Cl. Comm. at 581, ECF No. 234-4.

Several months later, two delegations representing the two factions of the Cherokee Nation resumed treaty negotiations with the United States in Washington, D.C., which were described as follows by the Commissioner of Indian Affairs:

> Two delegations, representing these opposing views, came on to Washington, and conference after conference ensued, now with one party—now with the other. Both sides

had engaged as counsel gentlemen eminent for legal ability, who appeared in their behalf on many occasions, where the discussions of the important question at issue were marked with great interest. Draught after draught of treaties was made, and several clearly agreed upon, when some new difference would arise, and all arrangements be overturned. The so-called southern delegates insisted that their people must be separated from the remainder of the nation—that they could not and would not live with them; while the other party, with whom alone, as holding the national organization, the government could treat, except as a last resort, insisted that the nation should not be divided. About the middle of June, the commissioners, despairing of a satisfactory arrangement with the national party, made a treaty with the others, whose marked feature was a provision that the southern party, though not formally separated from the nation, should be allowed a certain part of the territory for their exclusive use and occupancy; they agreeing to sell their right to certain portions of the national domain. This treaty was not, however, laid before the Senate; but after another month of negotiation, a treaty was finally concluded on the 19th of July, which, although not entirely satisfactory to any party, was the best possible settlement of the matter attainable.

Interior's Mot. for Summ. J. Ex. 30, Report of the Comm'r of Indian Affairs at 12, ECF No. 234-30.

The United States reportedly advanced nine compromises during the negotiations, but the status of freedmen garnered no objection from either faction of the Cherokee Nation and it appears that the Nation instead focused on successfully averting four other compromises that it "deemed . . . repugnant." Cherokee Freedmen's Opp'n Br. Ex. 6, *Cherokee Nation*, 12 Ind. Cl. Comm. at 582, ECF No. 235-3; Interior's Mot. for Summ J. Ex. 4, *Cherokee Nation*, 12 Ind. Cl. Comm. at 582, ECF No. 234-4. As indicated, although the Commissioner of Indian Affairs stated that "[m]ore difficulty was experienced in arriving at the consummation of a treaty with the Cherokees than with any of the other tribes or nations of the Indian country," Interior's Mot. for Summ. J. Ex. 30, Report of the Comm'r of Indian Affairs at 11, ECF No. 234-30, a treaty was finally negotiated on July 19, 1866,[19] Article 9 of which stated:

> The Cherokee nation having voluntarily, in February, eighteen hundred and sixty-three, by an act of their national council, forever abolished slavery, hereby covenant and agree that never hereafter shall either slavery or involuntary servitude exist in their nation otherwise than in the punishment of crime, whereof the party shall have been duly convicted, in accordance with laws applicable to all the members of said tribe alike. They further agree that all freedmen who have been liberated by voluntary act of their former owners or by

---

[19]    It has been stated that, pursuant to the 1866 Treaty, "the alliance with the Confederacy was declared void, amnesty was granted to the Cherokees, and their title to the lands west of the Mississippi River was reconfirmed." *United States v. Cherokee Nation*, 474 F.2d 628, 630 (Ct. Cl. 1973).

law, as well as all free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months, and their descendants, shall have all the rights of native Cherokees: Provided, That owners of slaves so emancipated in the Cherokee nation shall never receive any compensation or pay for the slaves so emancipated.

Interior's Mot. for Summ. J. Ex. 8, Treaty With The Cherokee, 1866, U.S.-Cherokee Nation of Indians, art. 9, July 19, 1866, 14 Stat. 799, 801, ECF No. 234-8. With the advice and consent of the United States Senate, the 1866 Treaty was ratified by President Andrew Johnson on August 11, 1866. Interior's Mot. for Summ. J. Ex. 8, Treaty With The Cherokee, 14 Stat. at 809, ECF No. 234-8.

Approximately two months after the 1866 Treaty was ratified, Principal Chief William P. Ross, who succeeded to leadership of the Cherokee Nation upon Principal Chief John Ross's death, addressed the Nation's National Council regarding amendments to the Nation's Constitution that he believed were necessitated by the 1866 Treaty. Interior's Mot. for Summ. J. Ex. 9, Message of Hon. Wm. P. Ross to the Cherokee Council (Oct. 19, 1866), ECF No. 234-9. In support of the constitutional amendments, Principal Chief William Ross advised:

The treaty concluded at Washington by the delegation of the Cherokee Nation on the 19th of July 1866, having met the approval, and being signed by the President of the United States, is now the supreme law. Whatever may be our opinion as to the justice and wisdom of some of the stipulations it imposes, we have full assurance that the delegation obtained the most favorable terms they could, and it is our duty to comply in good faith with all of its provisions. By this course the Cherokee people will not only perform a simple duty, but may be able to render harmless those articles of the treaty which regardless of our constitution, changes its provisions and clearly contains the germs of future strife and division.

As you have now before you such amendments to the constitution of the Nation as appear to be rendered necessary by the treaty, I simply recommend their careful consideration and early adoption.

Interior's Mot. for Summ. J. Ex. 9, Message of Hon. Wm. P. Ross to the Cherokee Council, ECF No. 234-9. He went on to observe that implementation of certain provisions of the 1866 Treaty would "cause a census to be taken of the Cherokee people" that would include "the names, ages, and residence . . . of all blacks admitted to the full rights of Cherokee citizenship by the 9th Article of the Treaty . . . ."

Interior's Mot. for Summ. J. Ex. 9, Message of Hon. Wm. P. Ross to the Cherokee Council, ECF No. 234-9. After the Cherokee National Council adopted the amendments to the Cherokee Nation Constitution, a proclamation seeking ratification of the amendments by a convention of the Cherokee people acknowledged that "[w]hereas, [b]y the treaty executed at Washington, on the 19th day of July, A. D. 1866, between the United States and the Cherokee Nation, through its delegation . . . certain things were agreed to between the parties to said treaty, involving changes in the Constitution of the Cherokee Nation, which changes can not be accomplished by the usual mode . . . ." Interior's Mot. for Summ. J. Ex. 10, Proclamation & Amendments to the Const. 17 (Nov. 28, 1866), ECF No. 234-10. Amendments to the Cherokee Nation Constitution were thereafter ratified, including the following amendment to Article III, Section 5:

> All native born Cherokees, all Indians, and whites legally members of the Nation by adoption, and all freedmen who have been liberated by voluntary act of their former owners or by law, as well as free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months from the 19th day of July, 1866, and their descendants, who reside within the limits of the Cherokee Nation, shall be taken, and deemed to be, citizens of the Cherokee Nation.

Cherokee Freedmen's Opp'n Br. Ex. 9, Proclamation & Amends. to the Const. 25 (Nov. 26, 1866), ECF No. 235-3; Interior's Mot. for Summ. J. Ex. 10, Proclamation & Amends. to the Const. 19 (Nov. 26, 1866), ECF No. 234-10.

## III.    Historical Background:  Post-Civil War and the Dawes Rolls

Almost a decade after the 1866 Treaty was ratified and the Cherokee Nation had amended its constitution, the Cherokee Nation's Principal Chief assured Congress that "'[b]y the treaty of 1866 all freed persons who were former slaves to the Cherokees . . . and who should return to the nation within six months from the date of the treaty, and their descendants, have all the rights of native Cherokees'" and "'[t]he Cherokees . . . have been munificent toward them, placing them upon an equal footing with native citizens, and this signifies equal rights under the laws in political franchises, in lands and

moneys.'" Cherokee Freedmen's Opp'n Br. Ex. 6, *Cherokee Nation*, 12 Ind. Cl. Comm. at 621, ECF

No. 235-3 (quoting Principal Chief William P. Ross's testimony before the House Committee on Indian

Affairs on February 9, 1874). As the following history reveals, however, after making this assurance,

the Cherokee Nation increasingly sought to diminish the scope of these "equal rights," particularly with

respect to Cherokee Nation lands and the proceeds therefrom as the United States government shifted to

a policy of allotment and assimilation.

The Supreme Court has observed that, "[b]y the 1880's . . . white settlers increasingly clamored

for the land . . . tribes held in Indian Territory." *Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114,

117 (1993). "In response to these 'familiar forces' . . . Congress retreated from the reservation concept

and began to dismantle the territories that it had previously set aside as permanent and exclusive homes

for Indian tribes."[20] *S. Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 335 (1998). Consequently, "[t]he

division of Indian lands in severalty or allotments to individual Indians evolved as a distinct policy of

the federal government in the latter half of the 19th century," *Thurston Cnty., Neb. v. Andrus*, 586 F.2d

1212, 1217 (8th Cir. 1978), and, in the years after the 1866 Treaty, as the Cherokee Nation's lands

continued to be ceded to the United States pursuant to historical treaties and new agreements, disputes

arose about which Cherokee Nation citizens were entitled to share in the allotment and proceeds of those

lands, *see*, *e.g.*, *Cherokee Nation v. Whitmire*, 223 U.S. 108, 109 (1912) ("This appeal is prosecuted to

review a supplemental decree of the court of claims enjoining and directing the Secretary of the Interior

to enroll upon the final roll of the citizens of the Cherokee Nation for allotment of lands the names of

certain persons and their descendants claiming rights as Cherokee freedmen . . . ."); *Red Bird v. United*

---

[20] In the early to mid-1800s "federal Indian policy focused on removing tribes from the eastern half of the country and relocating them on western lands," but by mid-century "'federal policy had shifted from removal to concentration on fixed reservations.'" *Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 998-99 (8th Cir. 2010) (quoting *Cohen's Handbook of Federal Indian Law* § 1.03[6][a], at 65 (2005 ed.)).

*States*, 203 U.S. 76, 77 (1906) (stating that the "subject-matter of this suit consists of 4,420,406 acres of land in the Cherokee country about to be allotted among the Cherokee people entitled to participate in the distribution of the common property of the Cherokee Nation"); *Cherokee Nation v. Journeycake*, 155 U.S. 196, 204 (1894) (stating that "[t]his case hinges on the status of the individual Delawares as members and citizens of the Cherokee Nation").

One such example is demonstrated by the Cherokee Nation's response to a March 3, 1883 congressional appropriation that authorized a $300,000 payment to the Cherokee Nation as additional compensation for land in the so-called "Cherokee Outlet" that the Cherokee Nation ceded pursuant to the 1866 Treaty for the purpose of establishing reservations for other Indian tribal groups.[21] Congress mandated that "such sum shall be expended as the acts of the Cherokee legislature direct." Interior's Mot. for Summ. J. Ex. 13, Act of March 3, 1883, 22 Stat. 603, 624 (1883), ECF No. 234-13. Accordingly, the Cherokee National Council passed an act to restrict the distribution of the appropriated funds to be "'paid out, 'per capita[,]' to the citizens of the Cherokee Nation by Cherokee blood.'" *In re Enrollment of Persons Claiming Rights in Cherokee Nation*, 40 Ct. Cl. 411, 428 (1905) (factual findings quoting *An Act Providing for the Payment of the Balance Due on Lands West of 96°, Per Capita* (May 19, 1883), *available at* https://www.loc.gov/law/help/american-indian-consts/PDF/ 2002615553.pdf), *aff'd sub nom. Red Bird*, 203 U.S. 76; Interior's Mot. for Summ. J. Ex. 14, Laws & Joint Resolutions of the Cherokee Nation, Enacted During the Regular & Special Sessions of the Years 1881-2-3 139 (Tahlequah, Cherokee Nation 1884), ECF No. 234-14. The Cherokee Nation's Principal Chief at that time, Dennis Wolf Bushyhead, vetoed the law and cautioned that:

---

[21] "[U]nder Article XVI of the [1866] Treaty . . . the Cherokees agreed to allow the United States to settle other tribes of friendly Indians on reservations to be set aside on the Cherokee Outlet, but the Cherokees were to receive compensation for the tracts taken for the use of the other tribes." *United States v. Cherokee Nation*, 474 F.2d 628, 630 (Ct. Cl. 1973).

"(3) The [land] 'patent' was made to the 'Cherokee Nation' in 1838, and the Cherokee Nation was then composed of citizens by right of blood, and so continued to be until the exigencies of the late war arose, when, in 1866, it became necessary to make a new treaty with the United States government. By this treaty, made by and with this Nation, other classes of persons were provided to be vested with all the rights of 'native Cherokees' upon specified conditions. These conditions have been fulfilled as regards the acknowledged colored citizens of this Nation and the so-called Delaware and Shawnee citizens. I refer you to article 9th of said treaty, in regard to colored citizens, and article 15th, first clause, as regards Indians provided to be settled east of 96°. The language is, they shall have all the rights of native Cherokees, 'and' they shall be incorporated into, and ever after remain a part of, the Cherokee Nation, on equal terms in every respect with native Cherokees."

"(6) If the lands of the Nation were and are the common property of citizens, then no citizen can be deprived of his or her right and interest in the property without doing an injustice, and without a violation of the constitution, which we are equally bound to observe and defend. While the lands remain common property, all citizens have an equal right to the use of it. When any of the land is sold under provisions of treaty, all citizens have an equal right to the proceeds of their joint property, whether divided per capita or invested."

"Senators, such is the treaty and such is the constitution. I have referred you to them, and stated their evident meaning in the premises 'to the best of my ability,' as is my duty. To the classes of citizens this bill would exclude, attach 'all the rights and privileges of citizenship according to the constitution.' To three of these classes attach also all the rights of 'native Cherokees,' according to treaty."

*Journeycake*, 155 U.S. at 217–18 (quoting without citation "extracts" of Principal Chief Bushyhead's "veto message"). *See also* Cherokee Freedmen's Opp'n Br. Ex. 6, *Cherokee Nation*, 12 Ind. Cl. Comm. at 621-22, ECF No. 235-3. Principal Chief Bushyhead's message went unheeded, however, and the Cherokee Nation National Council passed the act over the veto, *Journeycake*, 155 U.S. at 217, and directed the Principal Chief to appoint two people in each district of the Cherokee Nation to conduct a census of Cherokees entitled to the distribution of the appropriated funds, *In re Enrollment of Persons Claiming Rights in Cherokee Nation*, 40 Ct. Cl. at 428 (quoting the May 19, 1883 act of the Cherokee Nation National Council, cited *supra*).

Nearly three years later, in 1886, the Cherokee Nation's National Council went a step further and expressly sought to exclude freedmen from rights or title to <u>any</u> Cherokee Nation land or proceeds by

approving an act that construed the 1866 Treaty's phrase "all the rights of native Cherokees" to be limited to:

> [T]he individual rights, privileges, and benefits enjoyed by white adopted citizens of this Nation, before and at the making of said Treaty, and who had been by law admitted to "all the rights of Native Cherokees"—civil, political, and personal, as subjects of the Cherokee Nation of Indians—without acquiring any right or title to the Cherokee Domain, or to the proceeds thereof when made subject to a division among those to whom such domain had been conveyed—all the right to the lands then held and owned by this Nation, and to the principal of the proceeds thereof when realized, being reserved by and to the original Cherokee owners, as in the case of white adopted citizens, as aforesaid, subject to be conveyed or granted only at the option of said owners, or for value received according to agreements provided to be made with friendly Indians in conformity with the 15th Article of said Treaty.

Interior's Mot. for Summ. J. Ex. 15, Construction of the Rights of Cherokee Citizenship as Designed to be Conferred Upon Freedmen & Civilized Indians by the 9th and 15th Articles of the Treaty of 1866 (Apr. 27, 1886), *Compiled Laws of the Cherokee Nation* 370, 371-72, art. XXXV (The Foley R'Y Printing Co. 1893), ECF No. 234-15. *See also Whitmire v. Cherokee Nation*, 30 Ct. Cl. 138, 152-53 (Ct. Cl. 1895) ("*Whitmire I*"). "Accordingly, the Cherokee Nation distributed the proceeds from the sale of common lands only to 'Cherokees by blood,' excluding the freedmen." *Robinson v. United States*, 7 Cl. Ct. 155, 157 (Cl. Ct. 1984).

It should be noted that, only a year earlier, during a congressional hearing before the Senate Committee on Indian Affairs regarding the condition of Indian tribes in Indian Territory, former Principal Chief William P. Ross responded to a question seeking his knowledge about "the complaint of the freedmen that they are not recognized as citizens" and testified in part that:

> I know this, that the treaty of 1866 provided what class of colored people were to be citizens, and fixed a limitation as to the time of their return. The largest portion of those who returned within the time so fixed have been admitted to citizenship and have regularly enjoyed their rights as citizens, and there are a great many others who, if they had returned within six months would have been citizens, were not barred by the limitation of the treaty.

Cherokee Freedmen's Opp'n Br. Ex. 11, Comm. on Indian Affairs of the U.S. Senate In Relation to the Condition of the Indian Tribes In the Indian Territory, & Upon Other Reservations, Under Resolutions

of the Senate of June 11 & Dec. 3, 1884, & Feb. 23, 1885 106 (1886), ECF No. 235-3.  Principal Chief

Ross conceded, however, that there were Cherokee citizens "under the terms of the treaty" who claimed

the right to participate in the per capita distribution of funds resulting from the proceeds of Cherokee

lands but recent distributions had been "confined to Cherokees by blood."  *Id.* (stating "[y]es, sir" in

response to the question of whether "in regard to this last payment those who were citizens under the

terms of the treaty claimed the right to participate in the funds, but that was confined to Cherokees by

blood").  Principal Chief Ross also agreed that "[t]here was a good deal of complaint about that."  *Id.*

On October 19, 1888, Congress expressed by legislation its disapproval that "by the [May 19,

1883] act . . . of the Cherokee legislature the . . . freedmen . . . have been deprived of their legal and just

dues guaranteed them by treaty stipulations."  Interior's Mot. for Summ. J. Ex. 16, An Act to Secure to

the Cherokee Freedmen & Others Their Proportion of Certain Proceeds of Lands, Under the Act of

March Third, Eighteen Hundred & Eighty-Three, 25 Stat. 608, 608 (Oct. 19, 1888), ECF No. 234-16.

Congress therefore appropriated $75,000 to be "charged against the Cherokee Nation, on account of its

lands west of the Arkansas River, and shall be a lien on said lands, and which shall be deducted from

any payment hereafter made on account of said lands" and directed the Secretary of the Interior to

distribute the appropriation "per capita, first among such freedmen and their descendants as are

mentioned in the ninth article of the treaty of July nineteenth, eighteen hundred and sixty-six, between

the United States and the Cherokee Nation of Indians[.]"  Interior's Mot. for Summ. J. Ex. 16, 25 Stat. at

609, ECF No. 234-16.  Several months later, Congress "supplemented" this legislation with an act to

"'enable the Secretary of the Interior to ascertain who are entitled to share in the per capita distribution

of the sum of $75,000 appropriated by the act approved October 19th, 1888'" and to authorize and direct

the Secretary "'to make inquiry and report to the next session of Congress what other sums of money, if

any, have been appropriated by the Cherokee Nation in violation of their treaty obligations in reference

to freedmen in said nation, and what sum would be required to secure to said freedmen those treaty rights in respect to the same.'" *Whitmire v. Cherokee Nation*, 30 Ct. Cl. 180, 183 (Ct. Cl. 1895) ("*Whitmire II*") (quoting Act, 25 Stat. 980, 994 (Mar. 2, 1889)). "Under and by virtue of these statutes a commissioner was appointed by the Secretary of the Interior," a census was taken by him, "and by him the Wallace roll was made up." *Id.* "[A]fter an investigation running through two years the Department revised and corrected the returns of the commissioner and made what is now known as the corrected Wallace roll, and upon that roll paid the freedmen." *Id.* at 184.

By 1889, allotment was underway pursuant to the General Allotment Act passed by Congress in 1887, although that Act "did not extend to the Five . . . Tribes, including the Cherokee . . . tribe[]," *Witt v. United States*, 681 F.2d 1144, 1147 (9th Cir. 1982), "because of Treaty provisions, and, more importantly, because those tribes held their land in fee simple," which meant that "those tribes had to *agree* to allotment," *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1441 (D.C. Cir. 1988) (emphasis in original). "The purpose of the policy was to assimilate Indians into American society and to open reservation lands to ownership by non-Indians." *Cass Cnty., Minn. v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 106 (1998) (internal citations omitted). Despite the fact that the Cherokee Nation was not subject to the General Allotment Act, the United States nevertheless "desired to buy from the Cherokees . . . the Cherokee Outlet in Oklahoma, embracing 8,000,000 acres for settlement as public land." *Cherokee Nation*, 270 U.S. at 480. Accordingly, on March 2, 1889, Congress authorized the United States to make an agreement with the Cherokee Nation to buy the Cherokee Outlet. *Id.* (stating that an agreement between the United States and the Cherokee Nation for the purchase of the Cherokee Outlet was "[u]nder the authority of section 14 of the Act of March 2, 1889, 25 Stat. 1005").

In 1890, as the United States continued seeking to induce the Cherokee Nation to surrender its lands and controversy lingered about the rights of freedmen to the proceeds of those lands, Congress enacted a law conferring jurisdiction on the Court of Claims "to hear and determine what are the just rights in law or in equity . . . of the Cherokee freedmen, who are settled and located in the Cherokee Nation under the provisions and stipulations of article nine of the . . . treaty of eighteen hundred and sixty-six . . . ." Interior's Mot. for Summ. J. Ex. 17, Act to Refer to the Court of Claims Certain Claims of the Shawnee and Delaware Indians and the freedmen of the Cherokee Nation, and for Other Purposes, § 1, 26 Stat. 636, 636 (Oct. 1, 1890), ECF No. 234-17. "In accordance with the 1890 Act, Moses Whitmire, a trustee for the Cherokee freedmen, filed suit in the U.S. Court of Claims to recover the freedmen's proportionate share of moneys derived from the sale of Cherokee lands." *Robinson*, 7 Cl. Ct. at 157-58.[22]

The following year, on December 19, 1891, the United States negotiated an agreement with the Cherokee Nation by which the Cherokee Nation agreed to convey the Cherokee Outlet to the United States for $8,595,736.12. *Cherokee Nation*, 270 U.S. at 480-81. That agreement was approved by the Cherokee Nation's National Council in 1892 and was ratified by Congress via a March 3, 1893, appropriations act, which provided for the immediate availability of $295,736 and payment by annual installment of the remaining $8,300,000. Interior's Mot. for Summ. J. Ex. 18, Act Making Appropriations for Current & Contingent Expenses, & Fulfilling Treaty Stipulations with Indian Tribes, for Fiscal Year Ending June 30, 1894, 27 Stat. 612, 640, 641 (1893), ECF No. 234-18. The March 3, 1893 appropriations act also stated in relevant part that, of the appropriated funds being paid for the Cherokee Outlet, "a sufficient amount shall also be retained in the Treasury to pay the freedmen who are

---

[22]  This lawsuit and its subsequent proceedings will be referred to in this opinion as the "*Whitmire* litigation."

citizens of the Cherokee Nation[] or their legal heirs and representatives such sums as may be determined by the courts of the United States to be due them" and "[n]or shall anything herein be held to abridge or deny to said freedmen any rights to which they may be entitled under existing laws or treaties." *Id.*

In addition to securing the purchase of the Cherokee Outlet for ultimate settlement, *see* Interior's Mot. for Summ. J. Ex. 18, 27 Stat. at 642, ECF No. 234-18, the March 3, 1893 appropriations act also "sought to encourage the Five . . . Tribes to themselves enter upon the policy of allotting their lands in severalty, by giving the express consent of the United States to such allotments," and "declaring that the allottees should be deemed to be citizens of the United States, and that the reversionary interest of the United States in the allotted lands should cease, and appropriating money to pay for the survey of any lands so allotted." *Woodward v. Graffenried*, 238 U.S. 284, 295 (1915). *Accord* Interior's Mot. for Summ. J. Ex. 18, 27 Stat. at 645. The act also provided:

> [F]or the appointment of a commission to enter into negotiations with the same tribes for the purpose of extinguishing the tribal titles, either by cession to the United States, or by allotment and division in severalty among the Indians, or by such other method as might be agreed upon between the several tribes and the United States, with a view to the ultimate creation of a state or states of the Union to embrace the lands within the territory. This was the origin of the Commission to the Five . . . Tribes, familiarly known as the Dawes Commission.

*Woodward*, 238 U.S. at 295. "The Dawes Commission was a quasi-judicial tribunal[,]" *United States v. Mid-Continent Petroleum Corp.*, 67 F.2d 37, 43 (10th Cir. 1933), that was "empowered" to "negotiate allotment agreements with the Five . . . Tribes" but, over the course of several years, it failed to negotiate agreements with any of them, *Muscogee (Creek) Nation*, 851 F.2d at 1441.

In the meantime, the *Whitmire* litigation was advancing before the United States Court of Claims, which initially issued two decisions within about two weeks of each other in 1895. *See Whitmire I*, 30 Ct. Cl. 138; *Whitmire II*, 30 Ct. Cl. 180. As summarized by the United States Claims

Court (successor to the United States Court of Claims and predecessor to the United States Court of Federal Claims) the *Whitmire* litigation proceeded as follows:

> The U.S. Court of Claims found that under Article IX of the 1866 treaty, the Cherokee freedmen possessed the same rights as blood Cherokees, including equal rights to property and any proceeds. However the court found the record insufficient to determine the number of Cherokees who had previously received distributions and the number of freedmen claimants.
>
> Thereafter, the court held that a census taken by the United States of the Cherokee Nation, including freedmen, (known as the Wallace Roll) established the total number of freedmen (3,524) entitled to share in previously distributed Cherokee funds. The court entered its decree directing the Secretary of the Interior to pay the individuals listed on the Wallace Roll, with some modifications.
>
> Both parties appealed the decree. However, they stipulated to a withdrawal of their appeals upon entry of an agreed upon revised decree, which the Court of Claims issued on February 3, [1896].
>
> The court's decree authorized the Secretary of the Interior to prepare a new roll of freedmen, which then became known as the Kern-Clifton roll.

*Robinson*, 7 Cl. Ct. at 158. Based on the Kern-Clifton Roll, "the freedmen's proportionate interest in the proceeds of the sale of the Cherokee Outlet was distributed to them . . . ." *Whitmire v. United States*, 44 Ct. Cl. 453, 460 (Ct. Cl. 1909) ("*Whitmire III*"). *Accord Whitmire*, 223 U.S. at 115.

In the Indian Appropriation Act of 1896, 29 Stat. 321, c. 398 (June 10, 1896), Congress directed the Dawes Commission to make a roll identifying the citizens of the Five Tribes, including the Cherokee Nation, in anticipation of the eventual allotment of tribal lands, dissolution of tribal governments and intended statehood. *Cherokee Nation v. United States*, 85 Ct. Cl. 76, 95- 97 (Ct. Cl. 1937). *See also Stephens*, 174 U.S. at 453. Because the Dawes Commission theretofore had failed to secure allotment agreements with the Five Tribes, "in 1897, Congress added several provisions to the Indian Department Appropriations Act designed to coerce the tribes to negotiate with the Commission." *Muscogee (Creek) Nation*, 851 F.2d at 1441. "When it became apparent that the Creeks, Choctaws, Chickasaws and Cherokees would not cooperate, Congress passed the Curtis Act" in 1898, which "provided for forced

allotment and termination of tribal land ownership without tribal consent unless the tribe agreed to allotment." *Id.* In addition, the Curtis Act mandated that the Dawes Commission make a roll of the Cherokee freedmen in strict compliance with the revised decree of the Court of Claims that was issued on February 3, 1896. *Cherokee Nation*, 85 Ct. Cl. at 95.

On July 1, 1902, Congress enacted a law that was subsequently ratified by the Cherokee Nation and "embodie[d] the Cherokee Agreement, in accordance with the terms of which the United States, the Cherokee Nation and its members agreed that the lands of that nation should be alloted to and thereafter owned by its members in severalty." *Welch v. First Trust & Sav. Bank of Pasadena, Cal.*, 15 F.2d 184, 185 (8th Cir. 1926). *See also* Act to Provide for the Allotment of the Lands of the Cherokee Nation, for the Disposition of Town Sites Therein, & for Other Purposes §§ 11-23, 63, 32 Stat. 716, 717-19, 725 (1902). The act further mandated that the Cherokee Nation tribal government would cease as of March 4, 1906. Act to Provide for the Allotment of the Lands of the Cherokee Nation § 63, 32 Stat. at 725. As a result of "[d]ifficulty in completing tribal rolls and resistance to allotment," however, Congress in 1906 passed an act that "extended indefinitely the existence and government of each of the Five Tribes." *Muscogee (Creek) Nation*, 851 F.2d at 1442. That act, which is referred to as the "Five Tribes Act of 1906," also provided that:

> The roll of Cherokee freedmen shall include only such persons of African descent, either free colored or the slaves of Cherokee citizens and their descendants, who were actual personal bona fide residents of the Cherokee Nation August eleventh, eighteen hundred and sixty-six, or who actually returned and established such residence in the Cherokee Nation on or before February eleventh, eighteen hundred and sixty-seven: but this provision shall not prevent the enrollment of any person who has heretofore made application to the Commission to the Five . . . Tribes or its successor and has been adjudged entitled to enrollment by the Secretary of the Interior.

Act to Provide for the Final Disposition of the Affairs of the Five Civilized Tribes in the Indian Territory, & for Other Purposes, 34 Stat. 137, 138 (1906) [hereinafter Five Tribes Act of 1906].

Thereafter, the Dawes Commission "proceeded to perform its work" and completed the rolls on March

4, 1907. *Cherokee Nation*, 85 Ct. Cl. at 95. "The rolls for the Cherokees . . . resulted in two lists: a 'Blood Roll' for native Cherokees, and a 'Freedmen Roll' for former slaves and their descendants." *Vann v. Kempthorne*, 534 F.3d 741, 744 (D.C. Cir. 2008). On November 16, 1907, Indian Territory "became a part of the state of Oklahoma upon [Oklahoma's] admission to the Union." *Priddy v. Thompson*, 204 F. 955, 956-57 (8th Cir. 1913).

By the mid-1930s, "Congress . . . repudiated its earlier policies of [tribal] termination and enacted legislation designed to restore governmental powers to the Oklahoma tribes." *Indian Country, U.S.A., Inc. v. Okla. ex rel. the Okla. Tax Comm'n*, 829 F.2d 967, 981 (10th Cir. 1987) (citing Oklahoma Indian Welfare Act, ch. 831, 49 Stat. 1967 (1936) (codified as amended at 25 U.S.C. §§ 501–509 (1982)), Indian Reorganization Act, ch. 576, 48 Stat. 984 (1934) (codified as amended at 25 U.S.C. §§ 461 et seq. (1982)), and *Bd. of Cnty. Comm'rs v. Seber*, 318 U.S. 705, 718 (1943)). Indeed, "[i]n 1934 the congress passed the Wheeler-Howard Indian Reorganization Act, (48 Stat. 984, 25 U.S.C. § 476)," which "permit[ted] an Indian tribe to organize for its common welfare and adopt an appropriate constitution and by-laws which [were] to become effective when ratified by the members of the tribe and approved by the Secretary of the Interior." *Colliflower v. Garland*, 342 F.2d 369, 373 (9th Cir. 1965). In addition, "[o]ne of the purposes of the [Indian] Reorganization Act was to put an end to the allotment system[,] which had resulted in a serious diminution of Indian land base and which, through the process of intestate succession, had resulted in many Indians holding uneconomic fractional interests of the original allotments." *Stevens v. Comm'r of Internal Revenue*, 452 F.2d 741, 748 (9th Cir. 1971). Under the Indian Reorganization Act, however, "[c]ertain tribes, primarily those in Oklahoma . . . were excluded from six of the provisions of the [Act] including the sections dealing with self-government and corporate charters." *Muscogee (Creek) Nation*, 851 F.2d at 1442. Accordingly, "[t]wo years later, Congress passed the Oklahoma Indian Welfare Act (OIWA) Act of June 26, 1936, 49 Stat. 1967

(codified at 25 U.S.C. §§ 501 et seq. (1983)). *Id.* The Oklahoma Indian Welfare Act "expanded the Indian Reorganization Act . . . to include Indian tribes in Oklahoma," *Memphis Biofuels, LLC v. Chickasaw Nation Indus., Inc.*, 585 F.3d 917, 918 (6th Cir. 2009), although "the language used in the self-government provision of the [Act] differed from that of the [Indian Reorganization Act]," *Muscogee (Creek) Nation*, 851 F.2d at 1442.

To round out the historical events that are relevant, even if only tangentially, to matters raised in the instant lawsuit, it also is helpful to know that, as federal policy regarding Indian tribes continued to forge a new course that favored tribal self-government, on October 22, 1970, Congress enacted the Act to Authorize Each of the Five Civilized Tribes of Oklahoma to Popularly Select Their Principal Officer, & for Other Purposes, Pub. L. 91-495, 84 Stat. 1091 (1970), which "was passed to permit the members of the Five . . . Tribes of Oklahoma to select their own principal chiefs or governors, rather than accepting such appointments by the Secretary of the Interior." *Morris v. Watt*, 640 F.2d 404, 409 n.12 (D.C. Cir. 1981). This act is also referred to as the "Principal Chiefs Act." *See Vann*, 534 F.3d at 744; *Cherokee Nation v. Nash*, 724 F. Supp. 2d 1159, 1161 (N.D. Okla. 2010); *Seminole Nation of Okla. v. Norton*, 223 F. Supp. 2d 122, 124 (D.D.C. 2002); Cherokee Freedmen's Opp'n Br. 28, ECF No. 235-1.

## IV.    Procedural Posture

There is no dispute that, in 1976, the Cherokee Nation held an election to adopt a new constitution to supersede the 1839 Constitution. Interior's Mem. In Support of Mot. for Summ. J. 19, ECF No. 234; Cherokee Freedmen's Opp'n Br. 28, ECF No. 235-1; Cherokee Nation's Reply Br. 8, ECF No. 239. The Freedmen were permitted to vote in that election. Cherokee Freedmen's Opp'n Br. 28, ECF No. 235-1. The new constitution provided that "[a]ll members of the Cherokee Nation must be citizens as proven by reference to the Dawes Commission Rolls . . . ." Cherokee Nation's Reply Br. Ex. C, art. III, ECF No. 239-3.

On September 12, 1992, the Cherokee Nation Council passed an act to "establish the policies and procedures governing the issuance of tribal membership," section 6 of which stated that "Tribal Membership is derived only through proof of Cherokee blood based on the final rolls" of the Dawes Commission. Cherokee Freedmen's Opp'n Br. Ex. 18, Act Relating to the Process of Enrolling as a Member of the Cherokee Nation §§ 4(c), 6(a) (Sept. 12, 1992), ECF No. 235-3. A descendant of individuals who were listed on the Dawes Commission Rolls as "Cherokee Freedmen" challenged this act before the Judicial Appeals Tribunal of the Cherokee Nation. *See Allen v. Cherokee Nation Tribal Council*, No. JAT-or-09 (Mar. 7, 2006).

In 2003, the Cherokee Nation held a special election for the purpose of voting to amend the 1976 Cherokee Nation Constitution by striking a provision that required the President of the United States or an authorized representative (e.g., the Secretary of the Interior) to approve amendments to the constitution or a new constitution. Cherokee Nation's Reply Br. 8, ECF No. 239; Cherokee Freedmen's Opp'n Br. 29, ECF No. 235-1. Before that vote took place, the Cherokee Nation appears to have requested that the Department of the Interior make a determination about whether the proposed amendment would be approved, to which the Assistant Secretary of Indian Affairs responded that "[w]e have no objection to the referendum as proposed and I am prepared to approve the amendment deleting the requirement for Federal approval of future amendments." Cherokee Nation's Reply Br. Ex. D, Letter from Neal A. McCaleb, Assistant Secretary-Indian Affairs, U.S. Dep't of the Interior, to Hon. Chad Smith, Principal Chief, Cherokee Nation (Apr. 23, 2002), ECF No. 239-4. Via the special election, the Cherokee people voted in favor of the amendment on March 24, 2003. Cherokee Nation's

Reply Br. 9, ECF No. 239; Cherokee Freedmen's Opp'n Br. 29, ECF No. 235-1. The Cherokee people subsequently voted to approve the new constitution on June 26, 2003.[23] Cherokee Nation's Reply Br. 9.

According to the Freedmen, they were not permitted to vote in the 2003 special election to amend the 1976 Cherokee Nation Constitution—"the Cherokee Nation permitted only Cherokees who traced their Cherokee citizenship to the Dawes Commission Blood Roll to vote; the Cherokee Nation did not permit Cherokees who traced their Cherokee citizenship only to the Freedmen Roll to vote." Cherokee Freedmen's Opp'n Br. 29, ECF No. 235-1. The Freedmen further contend that they lodged objections to the 2003 election and the denial of their right to vote to both the Cherokee Nation and the Secretary of the Department of the Interior but "[t]he Cherokee Nation did not alter its course" and "[t]he Secretary initially supported the Freedmen . . . but then reversed course." *Id.* at 29-30. Consequently, "the Freedmen, specifically Intervenor-Defendants Marilyn Vann, et al., brought . . . the related action *Vann v. Jewell* on August 11, 2003, seeking relief against the Federal Defendants only." *Id.* at 30.

For its part, the Cherokee Nation claims that approval of the 2003 amendment and constitution "languished at the federal level." Cherokee Nation's Reply Br. 9, ECF No. 239. As a result, "[m]embers of the Cherokee Nation's Constitution[al] Convention Commission brought an action before the Cherokee Nation's highest court—the Judicial Appeals Tribunal—to obtain a ruling on whether the 1976 or the 2003 Constitution were in effect given the earlier statement of [the Assistant Secretary of Indian Affairs], an affidavit he offered in the subsequent litigation, and the inaction and non-appearance of the federal government." *Id.*

---

[23]     The Cherokee Nation explains that the version of the constitution approved in 2003 "is variously referred to as the '1999 Constitution,' the '2003 Constitution,' or the '2006 Constitution,'" but that "[i]t is the same document." Cherokee Nation's Reply Br. 8 n.14, ECF No. 239.

2006 appears to have been a somewhat eventful year with respect to litigation relating to the Cherokee Nation's efforts to limit tribal membership and amend the 1976 Cherokee Nation Constitution via the 2003 special election. First, on March 7, 2006, in the lawsuit challenging the 1992 Cherokee Nation Council act providing that tribal membership be limited to those with proof of Cherokee blood based on the final Dawes Commission rolls, the Judicial Appeals Tribunal of the Cherokee Nation held that the act violated the Cherokee Nation Constitution. *See Allen v. Cherokee Nation Tribal Council*, No. JAT-or-09 (Judicial Appeals Tribunal 2006); Interior's Mem. In Support of Mot. for Summ. J. 19, ECF No. 234. Second, on June 7, 2006, in the lawsuit in which the Cherokee Nation sought a judicial determination about which constitution was in effect, "the Judicial Appeals Tribunal held that the 2003 Constitution had been in effect since its passage by the Cherokee people . . . ." Cherokee Nation's Reply Br. 9, ECF no. 239 (citing *In re Status & Implementation of the 1999 Const. of the Cherokee Nation*, JAT-05-04 (Judicial Appeals Tribunal 2006)).

In March 2007, the Cherokee Nation voted to amend its constitution "to limit citizenship in the Nation to only those persons who were Cherokee, Shawnee, or Delaware by blood." Cherokee Nation's Mem. In Support of Mot. for Summ. J. 16 & Ex. D, Notice of Special Election & Official Election Results (Mar. 3, 2007), ECF No. 233-4. The Cherokee Nation's ballot measure stated that "[t]his amendment would take away citizenship of current citizens and deny citizenship to future applicants who are solely descendants of those on either the Dawes Commission Intermarried Whites or Freedmen Rolls." Cherokee Nation's Mem. In Support of Mot. for Summ. J. Ex. D, Notice of Special Election, ECF No. 233-4. In response, "[o]ver 300 affected Freedmen citizens (out of 2869 affected by the 2007 Amendment) file[d] a lawsuit in the [Cherokee] Nation's district court challenging their disenrollment . . . ." Cherokee Nation's Mot. for Summ. J. Ex. C, Procedural Timeline, ECF No. 233-3.

On May 21, 2007, the Assistant Secretary for Indian Affairs at the Department of the Interior notified the Principal Chief of the Cherokee Nation that the Department was disapproving the 2003 amendment to the Cherokee Nation Constitution that removed the requirement for federal approval of constitutional amendments and new constitutions. Cherokee Freedmen's Opp'n Br. Ex. 19, Letter from Carl J. Artman, Assistant Secretary-Indian Affairs, U.S. Dep't of the Interior, to Hon. Chad Smith, Principal Chief, Cherokee Nation (May 2, 2007), ECF No. 235-3. The following month, the Cherokee Nation proceeded by general election to again approve amending the Cherokee Nation Constitution to remove the requirement for federal approval of amendments and "[t]he few Freedmen who were registered as Cherokee citizens were permitted to vote in that general election, in accordance with an injunction entered in tribal court." Cherokee Freedmen's Opp'n Br. 31, ECF No. 235-1. That amendment subsequently was approved by the Department of the Interior on August 9, 2007. Cherokee Freedmen's Opp'n Br. Ex. 20, Letter from Carl J. Artman, Assistant Secretary-Indian Affairs, U.S. Dep't of the Interior, to Hon. Chadwick Smith, Principal Chief, Cherokee Nation (Aug. 9, 2007), ECF No. 235-3.

The Cherokee Nation commenced this civil action by filing a complaint in the Northern District of Oklahoma on February 3, 2009, seeking a declaration that "the Five Tribes Act and federal statutes modified the Treaty of 1866 thereby resulting in non-Indian Freedman descendants, including the individual defendants, no longer, as a matter of federal law, having rights to citizenship of the Cherokee Nation and benefits derived from such citizenship." Compl. ¶ 18, ECF No. 2. The named defendants in the case were non-Indian Freedmen descendants[24] who "publicly claim rights as alleged citizens of the Cherokee Nation under the Treaty of 1866," as well as the Secretary of the Interior and the Department

---

[24]     Raymond Nash, Larry Wasson, Robert Allen, Kathy Washington and Lisa Duke. Compl. ¶ 2, ECF No. 2.

of the Interior, both of whom were alleged to be "responsible for the administration of the Treaty[.]" Compl. ¶ 2, ECF No. 2.

On April 9, 2009, descendants of the original enrollees of the Dawes Commission Roll moved to intervene as a class. Freedmen's Mot. to Intervene, ECF No. 8. The intervenors, who include the Freedmen who are named defendants, claim they were enrolled "following the Cherokee high court's decision in *Allen v. Cherokee Nation*, JAT-04-09, decided in March of 2006, which found descendants of Cherokee Freedmen were entitled to tribal citizenship." *Id.* at 1, ECF No. 8. They are represented by Class Counsel, who was appointed by the tribal district court in response to a class appeal of the Tribal Registrar's actions dis-enrolling them in response to the 2007 amendment of the Cherokee Constitution, which the "Cherokee Nation interpreted . . . as applying the new criteria for citizenship retroactively . . . ." *Id.* at 2, ECF No. 8.

On July 2, 2010, in accordance with the so-called first-to-file rule, Judge Terence Kern ordered that this case be transferred to this Court for a determination of the proper venue given that this case raised similar issues against similar parties as those raised in the related 2003 case—*Vann v. Dep't of the Interior*, No. 03-cv-1711 (HHK)—over which former Judge Henry Kennedy was then presiding. Opinion & Order, No. 09-CV-52-TCK-PJC (N.D. Okla. July 2, 2010), ECF No. 48.

On August 22, 2011, the Supreme Court of the Cherokee Nation issued a decision regarding the lawsuit that was filed by disenrolled Freedmen in response to the March 3, 2007 amendment of the Cherokee Nation Constitution, which limited citizenship to the original enrollees of descendants of Cherokees by blood, Delawares by blood or Shawnees by blood as listed on the Final Rolls of the Dawes Commission. Cherokee Freedmen's Opp'n Br. Ex. 22, *Cherokee Nation Registrar v. Nash*, No. SC-2011-02 (S. Ct. of the Cherokee Nation 2011), ECF No. 235-3. The Supreme Court of the Cherokee Nation held that the Cherokee courts lacked subject-matter jurisdiction to preside over the

question of whether the March 3, 2007 amendment to the Cherokee Nation Constitution was unconstitutional or void. *Id.*

On September 30, 2011, Judge Kennedy ordered that the instant case be transferred back to the Northern District of Oklahoma because the *Vann* case was dismissed and "it would be inappropriate to retain a suit transferred under the first to file rule now that the first-filed case is no longer before the Court." Order, No. 10-cv-1169 (HHK), at 2 (D.D.C. Sept. 30, 2011), ECF No. 83. On December 14, 2012, the United States Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit") reversed Judge Kennedy's dismissal of the *Vann* case. *Vann v. Dep't of the Interior*, No. 11-5322 (D.C. Cir. 2012), ECF No. 174-1. Although motions to dismiss were fully briefed and pending in the Northern District of Oklahoma, Judge Terence Kern nevertheless transferred the case back to this Court on the grounds that:

> The Oklahoma action and the D.C. action present identical underlying questions regarding the meaning of the Treaty of 1866 and the rights of the descendants of Cherokee Freedmen. Ideally, these questions would have been resolved years ago in a forum agreeable to the Cherokee Nation, the Federal Defendants, and the Freedmen. Instead, this Court and the D.C. Court have been forced to resolve questions related to immunity and venue, delaying any meaningful progress on the underlying issues.
>
> Upon reconsideration of its March 15, 2013 Order, the Court now concludes that the D.C. Court should have discretion in deciding threshold legal issues, applying the first to file rule, and deciding where this action shall proceed.

Opinion & Order, No. 11-CV-648-TCK-TLW, at 8 (N. D. Okla. Aug. 19, 2013), ECF No. 220. Because Judge Kennedy had retired, upon transfer the case was reassigned to the undersigned.

By agreement of the parties, the ripe motions to dismiss have been stayed in favor of proceeding to resolve by summary judgment "the core issue in dispute in this action – *i.e.*, whether the Freedmen possess a right to equal citizenship in the Cherokee Nation under the Treaty of 1866 . . . ." Joint Mot. for Order Setting Briefing Schedule 1, ECF No. 223.

Accordingly, on November 29, 2013, the Cherokee Nation and Principal Chief Baker filed a Motion for Partial Summary Judgment that argued that "it was the Nation's own 1866 Constitutional Amendment that granted citizenship to the Freedmen, *not* the 1866 Treaty." Cherokee Nation's Mem. In Support of Mot. for Summ. J. 2, ECF No. 233 (emphasis in original).

On January 31, 2014, Interior Secretary Sally Jewell and the United States Department of the Interior (collectively the "Interior Department") moved for summary judgment regarding their counterclaim against the Cherokee Nation and, at the same time, opposed the Cherokee Nation's motion. The Interior Department seeks a declaration that "the Treaty of 1866 between the Cherokee Nation and the United States guaranteed certain Cherokee Freedmen and their descendants 'all the rights of native Cherokees,' including the right to citizenship in the Cherokee Nation, and that this Treaty provision continues to guarantee descendants of eligible Freedmen with citizenship and all other rights of 'native' Cherokees." Interior's Mot. for Summ. J. i, ECF No. 234. The Interior Department also requests that the Cherokee Nation be enjoined from denying tribal membership rights to descendants of individuals listed on the "Freedmen" portion of the Cherokee Dawes Rolls. *Id.* An objection to the factual assertions contained in the Cherokee Nation's motion was also lodged by the Interior Department on the grounds that "[m]any statements in [the historical summary and chronological timeline] are entirely unsupported; other statements are supported by citations to unpublished dissertations which were not provided to the Court or the parties." *Id.* at ii.

Also on January 31, 2014, the Freedmen filed their cross motion for partial summary judgment and argued that "the plain language of the Treaty grants the Freedmen 'all the rights of native Cherokees,' which includes equal citizenship, and the Treaty has never been abrogated." Cherokee Freedmen's Mot. for Summ. J. 2, ECF No. 235.

On February 28, 2014, the Cherokee Nation and Principal Chief Baker filed a Motion to Strike Expert Report of Emily Greenwald, which is Exhibit 3 to the Interior Department's motion for summary judgment. The motion to strike argues that the expert report contains legal conclusions, no such reports were anticipated during summary judgment proceedings, no opportunity to take discovery of the expert was afforded, and the expert report "runs contrary to the joint agreement between the parties and is unfairly prejudicial to the Nation and Principal Chief." Cherokee Nation's Mot. to Strike 2, ECF No. 240.

## ANALYSIS

The paramount question in this case is whether the 1866 Treaty's statement in Article 9 that qualifying freedmen[25] "shall have all the rights of native Cherokees"[26] encompasses a right to citizenship in the Cherokee Nation. If so, then the secondary question is whether Article 9 extends that citizenship right to extant descendants of qualifying freedmen identified in the Final Roll of Cherokee Freedmen compiled by the Dawes Commission (referred to as the "Freedmen" portion of the "Dawes Rolls"). Answers to these questions will foretell whether the 2007 amendment to the Cherokee Nation Constitution violated Article 9 of the 1866 Treaty and therefore is unlawful.

The Cherokee Nation contends that Article 9 of the 1866 Treaty never offered qualifying freedmen and their extant descendants an enduring right to citizenship, or any right to citizenship for that matter. According to the Cherokee Nation, "it was the Nation's Constitution, and not the 1866 Treaty, [that] bestowed citizenship rights upon the Freedmen." Cherokee Nation's Mot. for Summ. J. 2, ECF No. 233. *Accord* Cherokee Nation's Reply Br. 11, ECF No. 239. The Cherokee Nation further

---

[25]    By "qualifying freedmen" the Court simply means freedmen who satisfied the terms of Article 9 of the 1866 Treaty.

[26]    1866 Treaty art. 9.

argues that, even if Article 9 could be interpreted to encompass a right to citizenship, that right was coextensive with the rights of native Cherokees but was temporary and dependent on the geographical existence of Indian Territory. Cherokee Nation's Reply Br. 19, ECF No. 239. The Cherokee Nation further claims that Article 9 affords no rights to extant descendants of Cherokee freedmen because any such rights were displaced by Congress's enactment of the Five Tribes Act of 1906, which altered the language in Article 9 to limit its scope to freedmen and their descendants who were bona-fide residents of the Nation by February 11, 1867[27] and who are now deceased. *Id.* at 11, 19. Finally, the Cherokee Nation argues that the 2007 amendment to the Cherokee Nation Constitution—which required "that one must trace an Indian ancestor to the Dawes Rolls in order to be entitled to current citizenship within the Nation"—did not violate Article 9 of the 1866 Treaty and otherwise was within the Nation's inherent right to determine its own membership. Cherokee Nation's Mem. In Support of Mot. for Summ. J. 2, ECF No. 233. The Cherokee Nation also protests that "[s]hould the Court embrace the Freedmen's position and find that the Nation's electorate was forestalled by the 1866 Treaty from making such a citizenship determination, it will be the first time a United States court has ever infringed upon such an inherent tribal sovereignty right." *Id.* at 26.

Both the Interior and the Cherokee Freedmen are essentially aligned in their rejection of the Cherokee Nation's construction of Article 9 of the 1866 Treaty as well as the notion that the treaty was amended or abrogated by the Five Tribes Act of 1906. Cherokee Freedmen's Opp'n Br. 34, ECF No. 235-1; Interior's Reply Br. 9-16, 21-22, ECF No. 243. The Interior and the Cherokee Freedmen argue

_____

[27] The Five Tribes Act stated that "the roll of Cherokee freedmen shall include only such other persons of African descent, either free colored or the slaves of Cherokee citizens and their descendants, who were actual bona fide residents of the Cherokee Nation August 11th, 1866 or who actually returned and established such residence in the Cherokee Nation on or before February 11, 1867." Five Tribes Act § 3, 34 Stat. at 138.

that, because the 1866 Treaty mandates that the Cherokee Nation give qualifying freedmen and their

descendants "all the rights of native Cherokees," and one such right that native Cherokees possess is a

right to citizenship in the Cherokee Nation, it therefore follows that the Cherokee Nation must give

extant descendants of qualifying freedmen a right to citizenship in the Cherokee Nation. Cherokee

Freedmen's Opp'n Br. 2, 34, ECF No. 235-1; Interior's Reply Br. 2, 9, ECF No. 243.

## I.

There is no dispute that Article 9 of the 1866 Treaty states that the Cherokee Nation:

> [F]urther agree that all freedmen who have been liberated by voluntary act of their former
> owners or by law, as well as all free colored persons who were in the country at the
> commencement of the rebellion, and are now residents therein, or who may return within
> six months, and their descendants, shall have all the rights of native Cherokees . . . .

Interior's Mot. for Summ. J. Ex. 8, Treaty With The Cherokee, 14 Stat. 799, 801, ECF No. 234-8;

Cherokee Nation's Reply Br. 1, ECF No. 239 (arguing that "all the parties in this litigation agree that

Article 9 of [the 1866 Treaty] means what it says, that Freedmen were granted 'all the rights of native

Cherokees'"). The Court must assess, however, what is meant by the phrase "all the rights of native

Cherokees" to determine whether the 1866 Treaty guarantees qualifying freedmen citizenship in the

Cherokee Nation. The Court also must construe the phrase "and are now residents therein, or who may

return within six months, and their descendants," to determine whether extant descendants of qualifying

freedmen can claim present entitlement to "all the rights of native Cherokees." The meaning of these

textual phrases is a legal question that is subject to well-recognized canons of interpretation.

"Treaties between the United States and Indian tribes are congressional acts akin to statutes," as

well as "contracts subject to special rules of contract interpretation." *Menominee Indian Tribe of Wis. v.

Thompson*, 161 F.3d 449, 457 (7th Cir. 1998). "Of course treaties are construed more liberally than

private agreements, and to ascertain their meaning we may look beyond the written words to the history

of the treaty, the negotiations, and the practical construction adopted by the parties." *Choctaw Nation of*

*Indians v. United States*, 318 U.S. 423, 431–32 (1943).  They are not, however, "to be considered as exercises in ordinary conveyancing."  *Choctaw Nation*, 397 U.S. at 630 (1970).  Because "treaties were imposed upon [Indian nations] and they had no choice but to consent," such treaties "must be interpreted as [Indian nations] would have understood them, and any doubtful expressions in them should be resolved in the Indians' favor."  *Id.* at 631 (internal citations omitted).  That being said, "even Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties."  *Choctaw Nation of Indians*, 318 U.S. at 432.  "The canon of construction regarding the resolution of ambiguities in favor of Indians . . . does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress."  *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986).

### A.

Turning to the primary question of whether Article 9's statement that qualifying freedmen shall have "all the rights of native Cherokees" means that such freedmen are made citizens of the Cherokee Nation, the Court is mindful that "[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text."  *Medellin v. Texas*, 552 U.S. 491, 506 (2008).  The Court therefore must deconstruct the textual phrase "all the rights of native Cherokees" to determine its meaning and the scope of the term "rights" as construed in relation to "native Cherokees."

### i.

To begin, the meaning of the term "all" in the phrase "all the rights of native Cherokees" is not defined in the 1866 Treaty.  In the absence of a prescribed treaty definition, the Court must construe the term "all" in accordance with its ordinary meaning.  *See Santovincenzo v. Egan*, 284 U.S. 30, 40 (1931) ("As treaties are contracts between independent nations, their words are to be taken in their ordinary meaning 'as understood in the public law of nations.'" (quoting *Geofroy v. Riggs*, 133 U. S. 258, 271

(1890)).  *Cf. Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.").  The term "all" ordinarily means "the whole amount, quantity, or extent of " a thing.  *All Definition*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/all (last visited February 5, 2017).  It therefore follows that "all the rights of native Cherokees" means the whole amount, quantity or extent of the rights of native Cherokees.  *See Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36, 43 (1st Cir. 2012) ("All means all, or if that is not clear, all, when used before a plural noun . . . means [t]he entire or unabated amount or quantity of, the whole extent, substance, or compass of, the whole." (internal quotation marks omitted)).  The term "all" is unambiguous in its scope and covers the entirety of rights with no limitation whatsoever—otherwise the result logically would be something less than the "whole" and, instead, merely "most of," "some of" or "part of" the rights at issue.  *See McLean v. United States*, 226 U.S. 374, 383 (1912) (stating that the term "'[a]ll' excludes the idea of limitation").  Thus, the term "all" in Article 9's phrase "all the rights of native Cherokees" means that qualifying freedmen are extended the entirety of the rights possessed by native Cherokees without limitation.

## ii.

Although the Court readily finds that the plain meaning of the term "all" in Article 9 secures for qualifying freedmen the entirety of the rights of native Cherokees without limitation, the treaty does not expressly define or identify those "rights."  The Cherokee Nation takes the position that, when considered as a whole, the 1866 Treaty impliedly affords only "the right to settle and occupy the lands within the Cherokee Nation of Indian Territory as a distinct class of individuals with rights of self-governance and equal protection of law."  Cherokee Nation's Mem. In Support of Mot. for Summ. J. 8, ECF No. 233.  With respect to the right of citizenship, the Cherokee Nation further argues that the 1866

Treaty essentially contemplates two types of "citizens":  (1) "citizens residing in the Nation's portion of Indian Territory" and (2) "tribal citizenship in the body-politic of the Nation." *Id.*  The Cherokee Nation claims that the 1866 Treaty afforded qualifying freedmen "the right of occupancy in the Nation's territory with rights of self-governance and equal protection of law residing as a group distinct from the native citizenry" but "[a]t no point in these provisions are the Freedmen deemed to have been adopted or otherwise incorporated into the body-politic of the Nation as tribal citizens." *Id.* at 10.  The Cherokee Nation points to Articles 4, 5, 6, 12 and 15 of the 1866 Treaty as support for the claim that the "rights" referred to in Article 9 contemplated that qualifying freedmen would have "'equal rights' to native Cherokees" but that Article 9 "does not declare a right of citizenship" for such freedmen.  *Id.* at 10-11.

With one exception, the Court is not persuaded that the cited provisions of the 1866 Treaty stand for the propositions advanced by the Cherokee Nation with respect to the meaning of the term "rights" in Article 9, the scope of the term "rights" as defined in relation to "native Cherokees," or whether Article 9 conferred citizenship in the Cherokee Nation.  None of the 1866 Treaty provisions cited by the Cherokee Nation serve to limit or otherwise define the rights of qualifying freedmen vis-à-vis native Cherokees.  To the contrary, articles 4, 5 and 6 of the 1866 Treaty generally address the settlement and occupancy of a geographical area identified as the "Canadian district" and prescribe certain rights of self-government, equal protection, and representation:

> ARTICLE 4.   All the Cherokees and freed persons who were formerly slaves to any Cherokee, and all free negroes not having been such slaves, who resided in the Cherokee Nation prior to June first, eighteen hundred and sixty-one, who may within two years elect not to reside northeast of the Arkansas River and southeast of Grand River, shall have the right to settle in and occupy the Canadian district southwest of the Arkansas River, and also all that tract of country lying northwest of Grand River, and bounded on the southeast by Grand River and west by the Creek reservation to the northeast corner thereof; from thence west on the north line of the Creek reservation to the ninety-sixth degree of west longitude; and thence north on said line of longitude so far that a line due east to Grand River will include a quantity of land equal to one hundred and sixty acres for each person who may so elect to reside in the territory above-described in this article: Provided, That that part of said district north of the Arkansas River shall not be set apart until it shall be

found that the Canadian district is not sufficiently large to allow one hundred and sixty acres to each person desiring to obtain settlement under the provisions of this article.

ARTICLE 5.  The inhabitants electing to reside in the district described in the preceding article shall have the right to elect all their local officers and judges, and the number of delegates to which by their numbers they may be entitled in any general council to be established in the Indian Territory under the provisions of this treaty, as stated in Article XII, and to control all their local affairs, and to establish all necessary police regulations and rules for the administration of justice in said district, not inconsistent with the constitution of the Cherokee Nation or the laws of the United States; Provided, The Cherokees residing in said district shall enjoy all the rights and privileges of other Cherokees who may elect to settle in said district as hereinbefore provided, and shall hold the same rights and privileges and be subject to the same liabilities as those who elect to settle in said district under the provisions of this treaty; Provided also, That if any such police regulations or rules be adopted which, in the opinion of the President, bear oppressively on any citizen of the nation, he may suspend the same. And all rules or regulations in said district, or in any other district of the nation, discriminating against the citizens of other districts, are prohibited, and shall be void.

ARTICLE 6.  The inhabitants of the said district hereinbefore described shall be entitled to representation according to numbers in the national council, and all laws of the Cherokee Nation shall be uniform throughout said nation. And should any such law, either in its provisions or in the manner of its enforcement, in the opinion of the President of the United States, operate unjustly or injuriously in said district, he is hereby authorized and empowered to correct such evil, and to adopt the means necessary to secure the impartial administration of justice, as well as a fair and equitable application and expenditure of the national funds as between the people of this and of every other district in said nation.

Cherokee Nation's Mem. In Support of Mot. for Summ. J. Ex. A, Treaty With The Cherokee, 1866, U.S.-Cherokee Nation of Indians, arts. 4-6, July 19, 1866, 14 Stat. 799, ECF No. 233-1.  Articles 4, 5 and 6 do not distinguish between Cherokees and freedmen but, rather, refer to them collectively as "inhabitants" of the Canadian district.  Consequently, these articles have no bearing, either expressly or impliedly, on the interpretation of Article 9's text stating that qualifying freedmen "shall have all the rights of native Cherokees," nor do they indicate one way or the other whether freedmen are deemed to be citizens of the Cherokee Nation by virtue of the 1866 Treaty.

Article 12 likewise offers no assistance to determine the meaning of the term "rights" in Article 9 of the 1866 Treaty.  Article 12 provides for the convening of a general council "consisting of delegates elected by each nation or tribe lawfully residing within the Indian Territory" and states in part that

"[s]aid general council shall have power to legislate upon matters pertaining to the intercourse and relations of the Indian tribes and nations and colonies of freedmen resident in said Territory . . . ." Cherokee Nation's Mem. In Support of Mot. for Summ. J. Ex. A, Treaty With The Cherokee, 1866, 14 Stat. 799, ECF No. 233-1. Article 12's reference to "colonies of freedmen resident in said Territory" encompasses freedmen residing in colonies anywhere in Indian Territory and not just in the geographic boundaries of the Cherokee Nation. *Id.* Accordingly, the "freedmen" to whom Article 12 refers arguably could be freedmen of other tribes or even Cherokee freedmen who did not qualify for all the rights of native Cherokees pursuant to Article 9 because of their failure to meet the residency requirement. For these reasons, no insight can be gleaned from Article 12 about the meaning of Article 9's promise that qualifying Cherokee freedmen "shall have all the rights of native Cherokees."

With respect to Article 15, although this provision of the 1866 Treaty also does not expressly limit or otherwise define the rights of qualifying freedmen—indeed, as discussed below, it has nothing to do with the status of freedmen—it nevertheless is the Court's view that this provision's structure and text arguably reveal by implication something about the intended meaning of the phrase "all the rights of native Cherokees" when used in the 1866 Treaty. Article 15 addresses the status of other tribes that the United States settles in the Cherokee Nation's territory and states:

> ARTICLE 15. The United States may settle any civilized Indians, friendly with the Cherokees and adjacent tribes, within the Cherokee country, on unoccupied lands east of 96 degrees, on such terms as may be agreed upon by any such tribe and the Cherokees, subject to the approval of the President of the United States, which shall be consistent with the following provisions, viz: Should any such tribe or band of Indians settling in said country abandon their tribal organization, there being first paid into the Cherokee national fund a sum of money which shall sustain the same proportion to the then existing national fund that the number of Indians sustain to the whole number of Cherokees then residing in the Cherokee country, they shall be incorporated into and ever after remain a part of the Cherokee Nation, *on equal terms in every respect with native citizens*. And should any such tribe, thus settling in said country, decide to preserve their tribal organizations, and to maintain their tribal laws, customs, and usages, not inconsistent with the constitution and laws of the Cherokee Nation, they shall have a district of country set off for their use by metes and bounds equal to one hundred and sixty acres, if they should so decide, for each

man, woman, and child of said tribe, and shall pay for the same into the national fund such price as may be agreed on by them and the Cherokee Nation, subject to the approval of the President of the United States, and in cases of disagreement the price to be fixed by the President.

And the said tribe thus settled shall also pay into the national fund a sum of money, to be agreed on by the respective parties, not greater in proportion to the whole existing national fund and the probable proceeds of the lands herein ceded or authorized to be ceded or sold than their numbers bear to the whole number of Cherokees then residing in said country, and thence afterwards they shall enjoy *all the rights of native Cherokees*. But no Indians who have no tribal organizations, or who shall determine to abandon their tribal organizations, shall be permitted to settle east of the 96 degrees of longitude without the consent of the Cherokee national council, or of a delegation duly appointed by it, being first obtained. And no Indians who have and determine to preserve the tribal organizations shall be permitted to settle, as herein provided, east of the 96 degrees of longitude without such consent being first obtained, unless the President of the United States, after a full hearing of the objections offered by said council or delegation to such settlement, shall determine that the objections are insufficient, in which case he may authorize the settlement of such tribe east of the 96 degrees of longitude.

Cherokee Nation's Mem. In Support of Mot. for Summ. J. Ex. A, Treaty With the Cherokee, 1866, U.S.-Cherokee Nation of Indians, art. 15, July 19, 1866, 14 Stat. 799, ECF No. 233-1 (emphases added).

As indicated, Article 15 provides in relevant part that a tribe that is settled in Cherokee country and abandons its tribal organization in favor of paying a sum certain into the Cherokee national fund "shall be incorporated into and ever after remain a part of the Cherokee Nation, on equal terms in every respect with native *citizens*." *Id.* (emphasis added). Article 15 goes on to state that if a tribe is settled in Cherokee country but declines to be incorporated into the Cherokee Nation—and, instead, preserves its tribal organization, laws and customs—such tribe shall pay an agreed sum into the national fund and then "shall enjoy all the rights of native *Cherokees*," *id.* (emphasis added), which is the same language used to describe the rights of qualifying freedmen in Article 9. It strikes the Court that, by drawing a distinction between tribal incorporation into the Cherokee Nation on equal terms in every respect with "native citizens," versus tribal preservation (i.e., no incorporation) but acquisition of all the rights of "native Cherokees," Article 15 makes clear that tribes that incorporate into the Cherokee Nation are vested with a status that is intended to be different from that of tribes that do not so incorporate.

- 47 -

Treaties and statutes are construed similarly and "[t]he normal rule of statutory construction assumes that 'identical words used in different parts of the same act are intended to have the same meaning.'" *Sorenson v. Sec'y of Treasury of U.S.*, 475 U.S. 851, 860 (1986) (quoting *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934)). Conversely, "[i]t is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words." *S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003).

The 1866 Treaty uses identical words in Articles 9 and 15 to describe, respectively, the status of qualifying freedmen and the status of tribes that are settled in the Cherokee Nation but remain unincorporated and preserve their tribal organization, both of which are vested with "all the rights of native Cherokees." Cherokee Nation's Mem. In Support of Mot. for Summ. J. Ex. A, Treaty With the Cherokee, 1866, 14 Stat. 799, ECF No. 233-1. Article 15 uses different words, however, to describe the status of tribes that settle in and incorporate into the Cherokee Nation and thereby "remain a part of the Cherokee Nation on equal terms in every respect with native citizens." *Id.* Notably, by stating that incorporated tribes will "ever after remain a part of the Cherokee Nation, on equal terms in every respect with native citizens," it appears to the Court that the 1866 Treaty automatically makes incorporated tribes citizens of the Cherokee Nation, assuming, of course, the conditions precedent that the tribe abandon its tribal organization and first make the required payment into the Cherokee national fund. If the Court is correct on this point, then the cited rules of statutory construction dictate that Article 15's use of different words to describe the status of unincorporated tribes that preserve their tribal organization and are granted "all the rights of native Cherokees" must mean that the parties intended the status of unincorporated tribes to be something other than the automatic grant of citizenship promised to incorporated tribes, in which case Article 9's use of identical words vesting qualifying freedmen with

"all the rights of Native Cherokees" must likewise mean something other than the automatic grant of citizenship. That being said, Article 15 goes no further to clarify the meaning of the different phrases and otherwise offers no assistance to define the "rights" that are encompassed by Article 9's statement that freedmen shall have "all the rights of native Cherokees."

Aside from Article 15, the Court is not convinced that the other provisions of the 1866 Treaty cited by the Cherokee Nation, whether considered separately or in the context of the treaty as a whole, imply anything about the meaning of Article 9's statement that qualifying freedmen shall have "all the rights of native Cherokees." With respect to the right of citizenship in particular, none of the cited provisions mention citizenship or make any reference to the scope of the qualifying freedmen's rights vis-à-vis the rights of Cherokee Nation "citizens." At best, Article 15 can be said to imply that automatic citizenship is signaled by terms that place a group (e.g., incorporated tribes) on "equal terms in every respect with native citizens," in contrast to terms stating that a group (e.g., qualifying freedmen or tribes that do not incorporate and preserve their tribal organization) is granted "all the rights of native Cherokees."[28] Cherokee Nation's Mem. In Support of Mot. for Summ. J. Ex. A, Treaty With The

[28]     The Interior contends that there is no significance to the different terms used in Article 15 versus Article 9 and arrives at that position by reference to an extrinsic agreement between the Cherokee Nation and the Delawares that was made in 1867 in anticipation of the Delawares' relocation to land in "Cherokee country" as contemplated by Article 15. Interior's Mot. for Summ. J. 26. According to the Interior, "[t]his agreement made the Delawares 'members of the Cherokee Nation, with the same rights and immunities, and the same participation (and no other) in the national funds as native Cherokees, save as hereinbefore provided,' and thus used similar language to Article 9 of the Treaty." *Id.* (quoting *Journeycake*, 155 U.S. at 206). The Court does not share the Interior's view that the language from the Delawares' agreement is so similar to Article 9 that the conclusion must be drawn that the use of different terms in Article 15 (under which the Delawares' agreement was made) versus Article 9 must be deemed to be insignificant. To the contrary, the Delawares' agreement expressly stated that the Delawares were made "members of the Cherokee Nation," which is a departure from the terms in Article 9 but consistent with Article 15's provision that certain tribes would be "incorporated into and ever after remain a part of the Cherokee Nation, on equal terms in every respect with native citizens." Nowhere in Article 9 is there any mention of qualifying freedmen being made "members" of the Cherokee Nation. The Interior also ignores the fact that the Delawares' agreement also provided that "'the children hereafter born of such Delawares [s]o incorporated into the Cherokee Nation shall in all

Cherokee, 1866, 14 Stat. 799, ECF No. 233-1 (emphases added). Accordingly, the Court is inclined to conclude that the 1866 Treaty offers no express or implied meaning for the term "rights" as used in Article 9 and, further, does not indicate that Article 9 was intended to be a self-executing provision of citizenship to qualifying freedmen.

Because the 1866 Treaty offers no express or implied meaning for the term "rights" in Article 9,[29] its meaning remains an unresolved question to be answered by the same rule of construction that applied to the Court's interpretation of the term "all" in the phrase "all the rights of native Cherokees." Thus, the term "rights" must be construed according to its ordinary meaning. *Perrin*, 444 U.S. at 42. The term "rights" ordinarily means "something to which one has a just claim . . . such as . . . the power or privilege to which one is justly entitled . . . ." *Right Definition*, Merriam-Webster Online, https://www.merriam-webster.com/ dictionary/right (last visited February 5, 2017).

As the Court already indicated, *supra*, Article 9's use of the term "all" in the phrase "all the rights of native Cherokees" is expansive and plainly means "the whole amount, quantity, or extent of " a thing. *All Definition*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/all (last visited February 5, 2017). Combined with the ordinary meaning of the term "rights" in Article 9, it can be said that Article 9's provision of "all the rights of native Cherokees" guarantees for qualifying

---

respects be regarded as native Cherokees," which the United States Supreme Court noted "was not inserted with the view of giving additional rights to such children, but to prevent any question as to their inheritance of all the rights which their fathers received under the agreement." *Journeycake*, 155 U.S. at 206. In other words, the incorporated Delawares were, like their children, to be regarded as native Cherokees and not simply vested with the same "rights" as native Cherokees. Thus, the Interior's suggestion that the phrase "same rights and immunities . . . as native Cherokees" found in the Delawares' agreement can be isolated from the other terms of the agreement to support the argument that the phrase is "interchangeab[le]" with the terms used in Article 9 is not persuasive.

[29] The Court's determination that the 1866 Treaty does not define the term "rights" disposes of the Cherokee Nation's argument that the treaty limits qualifying freedmen's rights to those of occupancy, self governance and equal protection of the law. *See* Cherokee Nation's Mem. In Support of Mot. for Summ. J. 8-12, ECF No. 233.

freedmen the entirety of things, without limitation, to which native Cherokees are justly entitled. The panoply of rights to which native Cherokees have a just claim, including citizenship, is not, however, set forth in the 1866 Treaty, as already discussed. So the identity and scope of the "rights" promised by Article 9 must be found in independent sources such as the Cherokee Nation's constitution and laws.

      To summarize, the Court interprets Article 9's statement that qualifying freedmen shall have "all the rights of native Cherokees" according to the ordinary meaning of the terms because the 1866 Treaty does not expressly or impliedly define these terms. Moreover, the 1866 Treaty offers no positive indication that the phrase "all the rights of native Cherokees" is intended to mean a self-executing and automatic citizenship in the Cherokee Nation for qualifying freedmen, whereas Article 15 arguably suggests the negative by implication. Consequently, the Court concludes that the phrase "all the rights of native Cherokees" cannot be construed to confer on qualifying freedmen self-executing citizenship in the Cherokee Nation by operation of the 1866 Treaty alone;[30] rather, qualifying freedmen are vested with the right to citizenship in the Cherokee Nation to the same extent native Cherokees justly claim such a right. As will be explained, however, the Court ultimately views this point to be, as the saying

---

[30]    The Court's conclusion that Article 9's phrase "all the rights of native Cherokees" does not serve as a self-executing and automatic conferral of citizenship is bolstered by the fact that, at the time the parties executed the 1866 Treaty, the 1839 Cherokee Nation Constitution that was still in effect contemplated that some "native Cherokees" were not "citizens" of the Cherokee Nation because they left the geographical boundary of the Nation and became citizens of another government. *See* Cherokee Freedmen's Opp'n Br. Ex. 3, THE CONST. & LAWS OF THE CHEROKEE NATION: PASSED AT TAHLEQUAH, CHEROKEE NATION, 1839-51 5 (Tahlequah, Cherokee Nation 1852), Cherokee Nation Const. art. III, § 2, ECF No. 235-3 (stating that "whenever any citizen shall remove with his effects out of the limits of this Nation, and become a citizen of any other Government, all his rights and privileges as a citizen of this Nation shall cease"). Consequently, by defining the freedmen's legal status by reference to the rights of "native Cherokees," Article 9 implies that citizenship in the Cherokee Nation was not necessarily intended by the parties to be automatic by operation of the 1866 Treaty alone. Rather, the express terms of Article 9 guarantee the freedmen the "right" to citizenship to the same extent and degree that "native Cherokees" can justly claim that right.

goes, a distinction without much of a difference as far as the Cherokee's Nation's challenged actions are concerned.

iii.

Although Article 9's statement that qualifying freedmen shall have "all the rights of native Cherokees" is not a self-executing grant of citizenship by operation of the 1866 Treaty alone, it nevertheless guarantees for qualifying freedmen the right to citizenship to the same extent that native Cherokees have a just claim to that right. This is the position advanced by both the Interior and the Cherokee Freedmen,[31] and the Court is inclined to agree with it.

The Cherokee Nation Constitution defines native Cherokees' right to citizenship in the Nation.[32] Accordingly, by virtue of Article 9 of the 1866 Treaty, qualifying freedmen have a right to citizenship as defined by the Cherokee Nation Constitution to the same extent that native Cherokees have that right. Thus, the 1866 Treaty grants qualifying freedmen the right to citizenship but the Cherokee Nation Constitution actually makes them citizens. The history, negotiations, and practical construction of the 1866 Treaty do not suggest that the parties believed otherwise.

As discussed in the background section of this opinion, the history of the 1866 Treaty reflects that the United States made clear from the outset that the emancipation and incorporation of freedmen into the Cherokee Nation, or other like provision for their status, was an ultimatum and imperative of any treaty negotiation. Cherokee Freedmen's Opp'n Br. Ex. 7, Report of D.N. Cooley, *Southern Superintendency* 298 (Oct. 30, 1865), ECF No. 235-3; Interior's Mot. for Summ. J. Ex. 5, Report of Charles E. Mix, *Southern Superintendency* 314, 318 (Sept. 8, 1865), ECF No. 234-5. The history also

---

[31]     Cherokee Freedmen's Opp'n Br. 34, ECF No. 235-1; Interior's Reply Br. 9, ECF No. 243.

[32]     Cherokee Nation's Reply Br. 15-17, ECF No. 239 (arguing that the Cherokee Nation Constitution provides for citizenship); *Whitmire I*, 30 Ct. Cl. at 157 (stating that "the constitution of the Cherokee Nation . . . defined what citizenship was").

reveals that reaching a post-Civil War accord between the United States and the Cherokee Nation involved several months of challenging negotiations complicated by the fact that the Cherokee Nation was represented by two factions.  Interior's Mot. for Summ. J. Ex. 4, *Cherokee Nation v. United States*, 12 Ind. Cl. Comm. 570, 638 (Ind. Cl. Comm. 1963), ECF No. 234-4; *id.* at Ex. 30, Report of the Comm'r of Indian Affairs at 11-12, ECF No. 234-30.  Notwithstanding the differing interests of the Cherokee Nation's two factions, however, it appears that the status of the freedmen as finally set forth in Article 9 was not the focus of lingering controversy, as other compromises the factions found objectionable took center stage during the treaty negotiations.  Cherokee Freedmen's Opp'n Br. Ex. 6, *Cherokee Nation*, 12 Ind. Cl. Comm. at 582, ECF No. 235-3; Interior's Mot. for Summ J. Ex. 4, *Cherokee Nation*, 12 Ind. Cl. Comm. at 582, 639-41 ECF No. 234-4.

Once the 1866 Treaty was finally ratified, the leadership and tribal members of the Cherokee Nation obviously interpreted it to require citizenship for freedmen on the same terms as native Cherokees, as demonstrated by the amendment to the Cherokee Nation Constitution that was made forthwith and stated:

> All native born Cherokees, all Indians, and whites legally members of the Nation by adoption, and all freedmen who have been liberated by voluntary act of their former owners or by law, as well as free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months from the 19th day of July, 1866, and their descendants, who reside within the limits of the Cherokee Nation, shall be taken, and deemed to be, citizens of the Cherokee Nation.

Cherokee Freedmen's Opp'n Br. Ex. 9, THE CONST. & LAWS OF THE CHEROKEE NATION:  PUBLISHED BY AUTHORITY OF THE NAT'L COUNCIL (Fort Gibson, June 21, 1875), Proclamation & Amends. to the Const. Adopted Nov. 26, 1866 25, Amends. to Art. III, § 5, ECF No. 235-3.  In a proclamation accompanying the constitutional amendment, then-Principal Chief William P. Ross attributed the necessity for the amendment to the fact that "certain things were agreed to between the parties to said

treaty . . . ." *Id.* Indeed, the former Indian Claims Commission[33] observed that "[w]hen, after these amendments were adopted, the Cherokees had occasion to mention the freedmen, it was the consensus of its leaders that the freedmen were in fact Cherokee citizens, with all of the rights of native Cherokees, and they acquired such rights by virtue of Article IX of the treaty of 1866." Cherokee Freedmen's Opp'n Br. Ex. 6, *Cherokee Nation*, 12 Ind. Cl. Comm'n at 583, ECF No. 235-3.

Corroborating this point, during a hearing before the Senate Committee on Indian Affairs nearly 20 years after the 1866 Treaty was ratified, Principal Chief William P. Ross testified that "the treaty of 1866 provided what class of colored people were to be citizens, and fixed a limitation as to the time of their return." Cherokee Freedmen's Opp'n Br. Ex. 11, *The Condition of the Indian Tribes in the Indian Territory, and Upon Other Reservations: Hearing Before the Comm. on Indian Affairs*, S. REP. 1278, 106 (1885) (testimony of William P. Ross, Member, Board of Education, Cherokee Nation), ECF No. 235-3. In addition, during the same hearings, William P. Boudinot, then "executive secretary" of the Cherokee Nation, offered the following when prompted to provide a statement about the freedmen's citizenship: "The treaty was made at the close of the war, declaring [freedmen] free according to law, and giving them the right of native Cherokees, and that act was construed by the Cherokees in 1867 as meaning that they were entitled to full citizenship." Cherokee Freedmen's Opp'n Br. Ex. 12, *The Condition of the Indian Tribes in the Indian Territory, and Upon Other Reservations: Hearing Before the Comm. on Indian Affairs*, S. REP. 1278, 74 (1885) (testimony of William P. Boudinot, Executive Secretary, Cherokee Nation), ECF No. 235-3.

Notably, the Cherokee Nation was characterized as accepting Article 9's provisions "reluctantly," *United States ex rel. Lowe v. Fisher*, 223 U.S. 95, 99 (1912), in which case it seems

---

[33] The Indian Claims Commission was dissolved by statute in 1978. *Six Nations Confederacy v. Andrus*, 610 F.2d 996, 998 (D.C. Cir. 1979).

unlikely that the Nation would have amended its constitution to implement citizenship for qualifying

freedmen unless it believed that the 1866 Treaty required it. As the United States Court of Claims noted

almost four decades after the treaty was negotiated:

> These constitutional amendments were brought about by the action of the United States at the close of the civil war in dictating that the slaves or freedmen or free persons of color in the Cherokee country should not only be admitted to the rights of citizenship, but to an equal participation in the communal or common property of the Cherokees. The Cherokees seemed to have veiled their humiliation by these general declarations of the persons who should be taken and deemed to be citizens. But, be that as it may, the overthrow of the Cherokee Nation and the treaty of peace, 1866, and the terms dictated by the United States whereby their former slaves were made their political equals and the common property of the Cherokees was to be shared equally with their servants and dependents was in effect a revolution. The constitutional amendment [. . .] was simply declaratory of the new order of things.

*In re Enrollment of Persons Claiming Rights in Cherokee Nation*, 40 Ct. Cl. at 441-42.

Although the Cherokee Nation more than once sought to limit the scope of Article 9, attempts to

do so were congressionally or judicially rebuffed, including an effort to declare Article 9 void as the

alleged product of duress, fraud, intimidation, falsehood or mistake.[34] As a consequence, the practical

---

[34] Interior's Mot. for Summ. J. Ex. 14, LAWS & JOINT RESOLUTIONS OF THE CHEROKEE NATION, ENACTED DURING THE REGULAR & SPECIAL SESSIONS OF THE YEARS 1881-2-3 139 (Tahlequah, Cherokee Nation 1884), ECF No. 234-14 (excluding freedmen from land proceeds via an enactment limiting the distribution of a $300,000 congressional appropriation to pay for Cherokee Nation lands west of 96° to "be paid out, per capita, to the citizens of the Cherokee Nation by Cherokee blood"); *id.* at Ex. 15, CONST. & LAWS OF THE CHEROKEE NATION 371-72 (1892), ECF No. 234-15 (stating that the Cherokee National Council construes the phrase "all the rights of Native Cherokees" as used in Articles 9 and 15 of the 1866 Treaty to be limited to the "individual rights, privileges, and benefits" that were conferred on white adopted citizens of the Nation "without acquiring any right or title to the Cherokee Domain, or to the proceeds thereof when made subject to a division among those to whom such domain had been conveyed . . . "); *id.* at Ex. 16, An Act to Secure to the Cherokee Freedmen & Others Their Proportion of Certain Proceeds of Lands, Under the Act of March Third, Eighteen Hundred & Eighty-Three, 25 Stat. 608, 608 (Oct. 19, 1888), ECF No. 234-16; *id.* at Ex. 17, An Act to Refer to the Court of Claims Certain Claims of the Shawnee & Delaware Indians & the Freedmen of the Cherokee Nation, & for Other Purposes, 26 Stat. 636, 636 (Oct. 1, 1890), ECF No. 234-17 (providing that freedmen may institute and prosecute lawsuits against the Cherokee Nation and the United States for "moneys due either in law or equity and unpaid to the said . . . freedmen, which the Cherokee Nation have before paid out, or may hereafter pay, per capita, in the Cherokee Nation, and which was, or may be, refused to or neglected to be paid to the said . . . freedmen by the Cherokee Nation"); *Whitmire I*, 30 Ct. Cl. at 155-56 (holding that the freedmen were entitled to share equally in the proceeds of Cherokee Nation common

construction of the 1866 Treaty that has prevailed for a century-and-a-half is that Article 9 of the 1866

Treaty granted qualifying freedmen the right to citizenship and the Constitution of the Cherokee Nation

implemented and effectuated that right.

## B.

The historical cases cited by the parties also reflect an understanding that there is a symbiotic

relationship between Article 9 of the 1866 Treaty and the Cherokee Nation Constitution whereby the

latter implements citizenship rights guaranteed by the former. The *Whitmire* cases,[35] *Cherokee*

*Freedmen v. United States*, 195 Ct. Cl. 39 (Ct. Cl. 1971), *In re Enrollment of Persons Claiming Rights*

*in Cherokee Nation*, 40 Ct. Cl. 411, 428 (1905), and *Cherokee Nation v. United States*, 12 Ind. Cl.

Comm. 570 (Ind. Cl. Comm. 1963), each make explicit or allusive references to both Article 9 of the

1866 Treaty and the Cherokee Nation Constitution when discussing the citizenship rights of freedmen.[36]

---

property); *Cherokee Nation v. United States*, 180 Ct. Cl. 181, 183 (Ct. Cl. 1967) (affirming an Indian Claims Commission decision dismissing the Cherokee Nation's claim that Article 9 of the 1866 Treaty was procured by duress, unilateral mistake of fact, lack of consideration, and unfairness).

[35]  *See Whitmire I*, 30 Ct. Cl. 138; *Whitmire II*, 30 Ct. Cl. 180.

[36]  *Whitmire I*, 30 Ct. Cl. at 155 (observing that the freedmen's "foothold was acquired . . . exclusively by virtue of the treaty of 1866" while the amendment to the Cherokee Nation Constitution "fixed the status of the freedman and raised him to the same rank of citizenship which [citizens of the Cherokee Nation] enjoyed"); *Whitmire II*, 30 Ct. Cl. at 193 (decreeing that a Cherokee National Council act restricting a distribution of funds to citizens of the Cherokee Nation by blood violated both Article 9 of the 1866 Treaty and the Cherokee Nation Constitution); *Cherokee Freedmen v. United States*, 195 Ct. Cl. 39, 41 (Ct. Cl. 1971) (stating that Article 9 of the 1866 Treaty granted freedmen "all the rights of native Cherokees" and, "[i]n the same year . . . Cherokee Freedmen, were taken and deemed to be citizens of the Cherokee Nation by the Nation's constitution" (internal quotation marks omitted)); *In re Enrollment of Persons Claiming Rights in Cherokee Nation v. United States*, 40 Ct. Cl. 411, 442 (Ct. Cl. 1905) (referring to the 1866 Treaty terms "whereby [the Cherokees'] former slaves were made their political equals" and noting that the constitutional amendment "was simply declaratory of the new order of things"); Interior's Mot. for Summ J. Ex. 4, *Cherokee Nation*, 12 Ind. Cl. Comm. at 640, ECF No. 234-4 (noting that the "Cherokee Nation . . . ratified such amendments to its constitution as were necessitated by the treaty" and that "[w]hen, after the treaty, the Cherokees had occasion to mention the treaty or the freedmen, it was the consensus of its leaders that the freedmen were in fact Cherokee citizens, with all of the right of native Cherokees, and that they acquired such rights by virtue of Article IX of the treaty of 1866").

These decisions therefore recognize the interdependence of the two documents with respect to qualifying freedmen's rights to citizenship. None of these cases state or imply that the Cherokee Nation Constitution is the *exclusive* source of qualifying freedmen's citizenship in the Cherokee Nation. Nor do these cases make reference to either the 1866 Treaty or the Cherokee Nation Constitution in such a way as to render the cases in conflict with each other, particularly if one accepts the construction of Article 9 in relation to the Constitution that is embraced herein. These historical cases therefore pose no incongruity with respect to the interpretation of Article 9 advanced by this Court and, indeed, substantiate it.[37]

## C.

Earlier in this decision the Court announced its conclusion that the phrase "all the rights of native Cherokees" cannot be construed to confer on qualifying freedmen self-executing citizenship in the Cherokee Nation by operation of the 1866 Treaty alone but, instead, vests qualifying freedmen with a right to citizenship in the Cherokee Nation to the same extent native Cherokees claim such a right under the Cherokee Nation Constitution. The Court then foreshadowed its view that this point is a distinction without much of a difference as far as the Cherokee's Nation's challenged actions are concerned.

---

[37]    The Court does not share the Interior's confidence that the historical cases the parties cite as addressing the rights of freedmen "preclude the re-litigation of the scope of the Freedmen's rights under the [1866] Treaty." Interior's Mot. for Summ. J. 38. In this jurisdiction, for issue preclusion to apply "the issue must have been actually litigated, that is, contested by the parties and submitted for determination by the court." *Otherson v. U.S. Dep't of Justice, Immigration & Naturalization Serv.*, 711 F.2d 267, 273 (D.C. Cir. 1983). Admittedly, whether the historical cases can be deemed to have involved the litigation of the particular issues raised in this case depends on how broadly or narrowly one frames the issues. Regardless, at a minimum, the historical cases did not involve the contest and litigation of the specific question of whether qualifying freedmen's right to citizenship in the Cherokee Nation was exclusively a proviso of the Cherokee Nation Constitution and not Article 9 of the 1866 Treaty, in which case what was granted by that Constitution may be taken away by it, as well as the question of whether the guarantees of Article 9 continue to be effective and apply to the extant descendants of freedmen.

The fact of the matter is that, unless there is some reason to think that Article 9 does not apply to extant descendants of qualifying freedmen, taking citizenship away from qualifying freedmen via constitutional amendment does not take away their right to that citizenship pursuant to Article 9 of the 1866 Treaty so long as native Cherokees continue to have a right to citizenship. If native Cherokees have any right to citizenship at all, then qualifying freedmen have a coextensive right to that same citizenship under Article 9 of the 1866 Treaty. It therefore is of no real consequence in this particular case to say that it is the Cherokee Nation Constitution that actually makes qualifying freedmen citizens of the Cherokee Nation because the 1866 Treaty continues to provide for qualifying freedmen's right to citizenship if native Cherokees have that right.

The Cherokee Nation is mistaken to treat freedmen's right to citizenship as being tethered to the Cherokee Nation Constitution when, in fact, that right is tethered to the rights of native Cherokees. Furthermore, the freedmen's right to citizenship does not exist solely under the Cherokee Nation Constitution and therefore cannot be extinguished solely by amending that Constitution. As best the Court can divine, the only ways to extinguish the freedmen's right to citizenship are by (1) extinguishing native Cherokees' rights to citizenship or (2) amending the 1866 Treaty; assuming, again, that Article 9 applies to extant descendants of qualifying freedmen. The Court now turns to that question.

## II.

The Cherokee Nation advances two arguments for the proposition that Article 9 of the 1866 Treaty does not apply to extant descendants of qualifying freedmen. First, the Cherokee Nation contends that Article 9 was limited in duration and scope to the existence of Indian Territory and the parties never intended the 1866 Treaty to create a right of citizenship in perpetuity for descendants of qualifying freedmen. Cherokee Nation's Mem. In Support of Mot. for Summ. J. 8-12, ECF No. 233; Cherokee Nation's Reply Br. 3-4, 19. Second, the Cherokee Nation asserts that the Five Tribes Act of

1906, 34 Stat. 137, amended Article 9 and limited its application to qualifying freedmen and their descendants who were actual bona-fide residents of the Cherokee Nation by February 11, 1867, thereby terminating all rights upon the death of the last freedman or descendant who resided in the Cherokee Nation as of that date. Cherokee Nation's Mem. In Support of Mot. for Summ. J. 15-16, ECF No. 233. Upon consideration, neither of these arguments bears the weight the Cherokee Nation places on them.

## A.

There is nothing in the plain language of the 1866 Treaty that expressly or by implication suggests that Article 9 was limited in duration or expired upon the occurrence of any condition antecedent, including the extinction of Indian Territory upon Oklahoma statehood. 1866 Treaty, 14 Stat. 799. Although the 1866 Treaty makes reference to Indian Territory in several provisions, such as Articles 5, 7, 10, 12 and 13, it never does so in a way that serves to qualify the duration or scope of Article 9. *Id.* At best, because the 1866 Treaty expressly states that it is an agreement between the United States and the Cherokee Nation of Indians, *id.* (Preamble), the Cherokee Nation might have had an arguable claim that the entire Treaty expired upon extinction of Indian Territory if the Cherokee Nation had been concomitantly dissolved, but the Nation concedes that "[f]ortunately, [it] lived on through Oklahoma statehood and subsequent allotment . . . [,]" Cherokee Nation's Reply Br. 17. Otherwise, though, there is no event that is identified or even suggested in the 1866 Treaty—including the extinction of Indian Territory—that post facto terminates or otherwise temporally limits the rights promised to qualifying freedmen in Article 9. The plain language of Article 9, as well as the 1866 Treaty as a whole, are silent about, and do not expressly or impliedly contemplate, the expiration of the rights provided in Article 9 or the notion that Article 9 is limited to the geographical existence of Indian Territory.

**B.**

The Court also is not persuaded by the Cherokee Nation's remaining argument that "the 1866 Treaty provisions only applied to former slaves, descendants of those slaves and 'free colored persons' who resided in the Cherokee Nation as of February 11, 1867," Cherokee Nation's Mem. In Support of Mot. for Summ. J. 15. The crux of this argument is that the Five Tribes Act of 1906 amended or abrogated Article 9 of the 1866 Treaty by moving the phrase "and their descendants" so that it appeared before the residency requirement and thereby mandated that only descendants of freedmen who were bona-fide residents of the Cherokee Nation by February 11, 1867 qualified for the rights guaranteed by the 1866 Treaty and the Cherokee Nation Constitution. Cherokee Nation's Reply Br. 19-22, ECF No. 239. The Cherokee Nation asserts that this interpretation of the Five Tribes Act is confirmed by the decisions in the *Whitmire* litigation, *Garfield v. United States ex rel. Lowe*, 34 App. D.C. 70 (D.C. Cir. 1909), *aff'd sub nom*, *United States ex rel. Lowe v. Fisher*, 223 U.S. 95 (1912), and *United States ex rel. Lowe*, 223 U.S. 95. Cherokee Nation's Reply Br. 20-21, ECF No. 239.

A side-by-side comparison of the relevant provisions of the Five Tribes Act and the 1866 Treaty reveals the difference in text position that the Cherokee Nation hails as an indication that the Act was intended to amend or abrogate the Treaty:

| Five Tribes Act | 1866 Treaty |
|---|---|
| The roll of Cherokee freedmen shall include only such persons of African descent, either free colored or the slaves of Cherokee citizens <u>and their descendants</u>, who were actual personal bona fide residents of the Cherokee Nation August eleventh, eighteen hundred and sixty-six, or who actually returned and established such residence in the Cherokee Nation on or before February eleventh, eighteen hundred and sixty-seven; but this provision shall not prevent the enrollment of any person who has heretofore made application to the Commission to the Five | [A]ll freedmen who have been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months, <u>and their descendants</u>, shall have all the rights of native Cherokees: Provided, That owners of slaves so emancipated in the Cherokee nation shall never receive any compensation or pay for the slaves so emancipated. |

> Civilized Tribes or its successor and has been
> adjudged entitled to enrollment by the
> Secretary of the Interior.

34 Stat. at 138, § 3 (emphasis added); 14 Stat. at 801 (emphasis added). There are several problems with the Cherokee Nation's theory, however, the most fundamental of which is that it misconstrues and overstates the purpose and scope of the Five Tribes Act.

The Five Tribes Act's stated purpose is to provide for the final disposition of the affairs of the Five Tribes in the Indian Territory and for the other purposes set forth therein related to allotment and dissolution. 34 Stat. at 137. The Five Tribes Act neither expressly nor impliedly indicates any purpose or intent whatsoever to address, affect or limit rights provided by Article 9 of the 1866 Treaty. The terms of section 3 of the Five Tribes Act, which is quoted above, apply only to the Executive Branch's administrative process of enrolling freedmen and their descendants on the Dawes Rolls, which is a subject that tangentially implicates the rights promised by the 1866 Treaty to the extent the Dawes Rolls were intended to identify the Cherokee citizens at that time but has no direct bearing on the interpretation of the treaty or the determination of the rights secured thereunder.

Furthermore, and importantly, the Five Tribes Act is clear and unequivocal about the fact that its provisions regarding the enrollment of Cherokee freedmen are limited to the approximately ten (10) month duration lasting from the act's enactment on April 26, 1906 to the closing of the Dawes Rolls on March 4, 1907:

> Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That <u>after the approval of this Act no person shall be enrolled</u> as a citizen or freedman of the . . . Cherokee . . . tribe[] of Indians in the Indian Territory, <u>except as herein otherwise provided, unless application for enrollment was made prior to December first, nineteen hundred and five</u>, and the records in charge of the Commissioner to the Five Civilized Tribes shall be conclusive evidence as to the fact of such application . . . .
>
> * * *

> [T]he rolls of the tribes affected by this Act shall be fully completed on or before the fourth day of March, nineteen hundred and seven, and the Secretary of the Interior shall have no jurisdiction to approve the enrollment of any person after said date . . . .

34 Stat. at 137, 138 (emphases added). As indicated, the Five Tribes Act makes clear that, even after enactment on April 26, 1906, qualifying freedmen could be enrolled without regard to the act's enrollment provisions so long as the enrollment application was made before December 1, 1905. 34 Stat. at 137. Consequently, even if there was a viable argument that section 3 of the Five Tribes Act abrogated Article 9 of the 1866 Treaty in some respect, the lifespan of that abrogation (at most from December 1, 1905 to March 4, 1907) would have been so short lived and circumscribed in its scope compared to the overall decade-long or so enrollment process that it would be hyperbole to characterize it as a consequential amendment of the treaty, particularly if the vast majority of enrollment applications were already adjudicated, as indicated in the foregoing discussion. Certainly the fact that the Five Tribes Act's enrollment provisions only applied to applications for enrollment made after December 1, 1905 counsels against the idea that it was intended to effect a global sea change in the enrollment process. To the contrary, section 3 appears to have governed a proportionately minimal number of enrollment actions taken by the Department of the Interior during a modest duration of the entire enrollment process and plainly lacks the elasticity to accommodate the stretch that the Cherokee Nation seeks to make to apply it to Article 9 of the 1866 Treaty.

That being said, the Court is not convinced by the Interior's argument that the placement of the term "descendants" in section 3 of the Five Tribes Act reflects a mere "shift in language that occurred while Congress was crafting language to clarify criteria for Freedmen eligibility" and therefore should be disregarded as a "misplaced modifier." Interior's Mot. for Summ. J. 51, ECF No. 234. The legislative history indicates that the Five Tribes Act was intended to be uncompromising about enrollment post-enactment because Congress was seeking to force the immediate completion and closing of the prolonged and protracted process of compiling the Dawes Rolls, for which applications

had been processed for over a decade.  Interior's Mot. for Summ. J. Ex. 26, 40 Cong. Rec. H5976-1241, 1244 (daily ed. Jan. 18, 1906) (statements of Rep. Curtis), ECF No. 234-26.  During a debate of the Committee of the Whole House on the state of the Union for consideration of H.R. 5976, which was later enacted as the Five Tribes Act, Representative Charles Curtis explained that the first four provisions of the bill, including section 3, "contain all necessary provisions for the closing of the rolls of each tribe . . . ."  *Id.*  More to the point, Representative Curtis responded to a question about the effect the proposed bill would have on the rights of parties to apply for membership in the different tribes by stating that, "[i]n my judgment, it prevents any further application."  Representative Curtis went on to emphasize that "[t]he object of the committee is to close the affairs of the Five Civilized Tribes as soon as possible" and, when asked more than once why the bill set March 4, 1907 as the closing date for enrollment when unresolved claims were still pending, he repeatedly stated that "we want to close those rolls."  *Id.* at 1245, 1246.

The legislative history also reflects that the bulk of the work processing applications for enrollment in the Cherokee Dawes Rolls was done by the time Congress was considering the legislation that would become the Five Tribes Act.  During the same committee debate, Representative Curtis summarized the status of the Cherokee Dawes Rolls as follows:

> In the Cherokee Nation there were 46,464 applications, of which 36,000 of all classes have been enrolled, and there are 1,674 to be acted upon, and 2,730 Intermarried whites, of whom 1,587 have a case pending in the Supreme Court of the United States to settle their rights.  It is believed that these cases will be settled within a month or two.  On the Cherokee rolls there are 32,781 by blood, 4,094 freedmen, and 1,143 intermarried whites.

Interior's Mot. for Summ. J. Ex. 26, 40 Cong. Rec. at 1241, ECF No. 234-26.  In light of this legislative history, it strikes the Court that the language placement in section 3 of the Five Tribes Act might have been purposeful and intended to discourage the filing of new applications for enrollment on the Cherokee Dawes Roll, which would explain why it expresses a more confined scope of eligibility for

descendants when compared to the broad language setting forth the general rights of Cherokee freedmen and their descendants in Article 9 of the 1866 Treaty.[38]

Notably, after reviewing the Five Tribes Act's plain language and what was presented of the legislative history, the Court has found no evidence, either express or implied, that Congress intended the Five Tribes Act to have any effect on Article 9 of the 1866 Treaty. Although Congress has the power to abrogate the provisions of an Indian treaty, the intent to do so must "be clear and plain." *United States v. Dion*, 476 U.S. 734, 738 (1986). "Absent explicit statutory language, we have been extremely reluctant to find congressional abrogation of treaty rights . . . ." *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 690 (1979), *modified sub nom. Washington v. United States*, 444 U.S. 816 (1979). An express statement of such an intent is preferred, but "where the evidence of congressional intent to abrogate is sufficiently compelling, the weight of authority indicates that such an intent can also be found by a reviewing court from clear and reliable evidence in the legislative history of a statute." *Dion*, 476 U.S. at 739 (internal quotation marks omitted). "What is essential is clear evidence that Congress actually considered the conflict between its

_____

[38]    The Interior argues that that the Five Tribes Act's placement of the term "descendants" cannot have been intended to mandate that descendants satisfy the residency requirement because a descendant of a freedman who could independently satisfy the residency requirement of the Five Tribes Act would be considered a "free colored" person as specified therein, thereby rendering the use of the term "descendants" superfluous. Interior's Mot. for Summ. J. 51, ECF No. 234. The Court is inclined to question that proposition, however, given that Article 9 of the 1866 Treaty limits the "free colored persons" to whom the treaty applies to those "free colored persons who were in the [Cherokee Nation] at the commencement of the rebellion [i.e., Civil War]." 1866 Treaty, art. 9, 14 Stat. at 799. It therefore follows that a freedman descendant who was not in the Cherokee Nation in 1861 (whether due to circumstance or because the descendant was born after 1861) would not be considered a "free colored person" for the purpose of Article 9 of the 1866 Treaty. There is no indication that Congress intended the phrase "free colored persons" in the Five Tribes Act to mean something different than what was contemplated by the same phrase in the 1866 Treaty. *See Mack v. Warden Loretto FCI*, 839 F.3d 286, 302 (3d Cir. 2016) (recognizing that, when Congress borrows the same phrase from an old statute to use in a new statute, it is presumed that Congress intends to adopt both the old phrase as well as prior judicial interpretations of that phrase, thereby indicating that the same phrase used in old and new statutes should be construed similarly absent an indication that Congress intended otherwise).

intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *Id.* at 739-40.

The Five Tribes Act lacks any express statement of intent to amend or abrogate Article 9 of the 1866 Treaty and the Cherokee Nation has offered no "clear and reliable" evidence from the legislative history to suggest such an intent; indeed, the Cherokee Nation offers no legislative history at all and the legislative history supplied by the Interior does not further the Cherokee Nation's cause with respect to the interpretation of Article 9. Consequently, there is no evidence that Congress considered the Five Tribes Act to pose a conflict with Article 9 of the 1866 Treaty and then resolved that conflict in favor of abrogation.

The contemporaneous practice of the parties, on the other hand, suggests that abrogation was perceived by no one, given that, as the Interior and the Cherokee Freedmen note (and the Cherokee Nation does not refute), numerous descendants who were not alive on February 11, 1867 and therefore could not have met the bona-fide residency requirement as of that date were nonetheless enrolled on the Dawes Roll. *See* Interior's Mot. for Summ. J. 54-55, Ex. 22, ECF No. 234. This is not surprising in light of what has been revealed to be the limited purpose and effective duration of the enrollment provisions set forth in section 3 of the Five Tribes Act, as already discussed.[39] If the status of enrollment stated by Representative Curtis was true, relatively few applications for enrollment appear to have been adjudicated after the Five Tribes Act went into effect and imposed what arguably could be characterized as a more restrictive provision for descendant eligibility, albeit the Court need not definitively characterize the provision because it is not necessary to the determination of whether the

---

[39] The Cherokee Nation has made no assertion that the plaintiffs in this lawsuit are the descendants of Cherokee freedmen who applied for inclusion on the Dawes Roll after December 1, 1905. It appears to the Court that unless application was made after December 1, 1905, the Five Tribes Act is inapplicable.

Five Tribes Act abrogated or amended Article 9 of the 1866 Treaty. There is nothing indicated in the Five Tribes Act or its legislative history that makes clear and plain that Congress intended the act to abrogate or amend Article 9 of the 1866 Treaty.

## C.

Notwithstanding the absence of any evidence that Congress intended to abrogate Article 9 of the 1866 Treaty via enactment of the Five Tribes Act, the Cherokee Nation remains convinced that the Act "was intended to incorporate the holdings of the previous Freedmen decisions, including those in the *Whitmire* cases" and the Nation's "construction of the Five Tribes Act is articulated clearly in the case of *Garfield v. United States ex rel. Lowe*, 34 App. D.C. 70 (D.C. Cir. 1909), *aff'd sub nom*[.], *United States ex rel. Lowe v. Fisher*, 223 U.S. 95 (1912)." Cherokee Nation's Reply Br. 20, ECF No. 239. The *Whitmire* and *Garfield* cases were limited to the resolution of controversies over who qualified to be identified as citizens of the Cherokee Nation on rolls made at certain historical points in time for the purpose of sharing in the disposition of the Nation's lands and proceeds, or for the purpose of eligibility for allotment. None of those cases required the courts to evaluate the broader question of whether Article 9 of the 1866 Treaty offered <u>future</u> descendants of qualifying freedmen an entitlement to all the rights of native Cherokees that outlasted the date of the residency requirement contained in Article 9. The decisions in those cases simply did not view the question that panoramically, so, as a consequence, they cannot be read to support the Cherokee Nation's sweeping interpretation of their scope. Moreover, the facts in *Garfield* and *United States ex rel. Lowe* demonstrate that descendants of Cherokee Freedmen who did not themselves meet the residency requirement in Article 9 nevertheless were considered for inclusion on the Dawes Roll so long as the ancestor upon whom they relied for eligibility met the residency requirement, undercutting the Cherokee Nation's position that the rights promised by Article 9

were limited to Cherokee freedmen and their descendants who were alive and bona-fide residents of the Nation by February 11, 1867.

The first of the *Whitmire* cases involved the legal question of whether Cherokee freedmen should be granted a decree "that the freedmen are entitled to participate with all the other members of the [Cherokee] nation in all of the remaining common property upon equal terms with the other members of the nation." *Whitmire I*, 30 Ct. Cl. at 159. As discussed in Part III of the Background section of this opinion, *supra*, the lawsuit was instituted in the United States Court of Claims by Moses Whitmire, acting as trustee for the Cherokee freedmen, and was founded on the claimed injustice of the Cherokee National Council's enactment in 1883 restricting to "citizens of the Cherokee Nation by Cherokee blood" the distribution of funds that were to be appropriated by Congress to compensate the Nation for land ceded in the "Cherokee Outlet" according to the terms of the 1866 Treaty. *See id.* at 139, 142; *In re Enrollment of Persons Claiming Rights in Cherokee Nation*, 40 Ct. Cl. at 428; Interior's Mot. for Summ. J. Ex. 14, Laws & Joint Resolutions of the Cherokee Nation, Enacted During the Regular & Special Sessions of the Years 1881-2-3 139 (Tahlequah, Cherokee Nation 1884), ECF No. 234-14.

After summarily describing the state of affairs at the time the Cherokee Nation negotiated the 1866 Treaty, 30 Ct. Cl. at 150, and after comparing and contrasting the freedmen's incorporation into the Cherokee Nation under the treaty with the incorporation of the Delawares under the treaty and the so-described "white men who became citizens by intermarriage" under Cherokee law, *id.* at 151-52, the United States Court of Claims observed that, although the Cherokees traditionally viewed Cherokee lands to be communal and "heritable, descending with the blood of the owners[,]" *id.* at 153, it nevertheless was the case that, "[b]y the adoption of the constitution in 1837 the title of the common property passed from the communal owners and became vested in the newly formed government of the nation[,]" and "[t]he character of the communal owners also changed" such that "thenceforth [they]

were to be, simply 'citizens;' citizens whose rights were defined and limited by their constitution and their laws[,]" *id.* at 154. The court went on to explain that:

> The facts that the freedmen did not pay for the homes which they acquired; that they did not contribute to the national fund; that they did not come into the nation by virtue of an express agreement; that their foothold was acquired exclusively through the interposition of the United States, and exclusively by virtue of the treaty of 1866, are facts which operate against the equity of their case, but do not take their legal rights out of the safeguard of the constitution, or the obligations of the treaty. When the Cherokee people wrote into their constitution in 1866 "all nativeborn Cherokees, all Indians and whites legally members of the nation by adoption, and all freedmen," "shall be taken and be deemed to be citizens of the Cherokee Nation," they fixed the status of the freedman and raised him to the same rank of citizenship which they themselves enjoyed. Thenceforth he was to be equal with themselves under the constitution, governed by the same laws, enjoying the same rights, possessed of the same immunities, and entitled to the same protection. If the common property was to be retained for the general welfare, he was to share equally in its benefits; if it was to be sold and its proceeds divided, the constitution made it as much his as theirs.

*Id.* at 155–56. The court further noted that, although it was "incontrovertible" that the Cherokee Nation was a sovereign power with the inherent right to govern its own internal affairs and enact laws to do so, the Cherokee National Council's legislative authority "[was] not absolute, but [was] limited and defined by the constitution of the nation" and "its action can not [sic] control or abrogate the treaty obligations of the nation to the United States." *Id.* at 157. The court therefore held that:

> The United States did not, it may be conceded, stipulate for more than that the freedmen should become citizens "with all the rights," that is, political rights, "of native Cherokees," and that "all laws of the Cherokee Nation shall be uniform throughout said nation," and that the President of the United States should have the power to secure to the freedmen "a fair and equitable application and expenditure of the national funds;" but the constitution of the Cherokee Nation then came into the case and defined what citizenship was, and in express terms ranked "freedmen" with "native-born Cherokees," and the lands of the nation as "common property." If those lands had remained common property, unsold, and held for governmental purposes, it seems incontrovertible that all classes of citizens, Cherokees by blood and Cherokees by adoption, would have been, as citizens, equally and mutually entitled to the national benefits which might be derived from them. And to the court it seems equally incontrovertible that when the national council saw fit to change the lands into money, the fund took the place of the lands and was subject to the same limitations and existed for the same beneficiaries. . . . The national council did not and could not divert the common property of the nation from the general welfare and transmute it, at will, into a communal fund belonging to a class of citizens. If the fund retained the characteristic of the lands, that of common property, it necessarily was the common property of all.

*Id.* at 157-58.

Accordingly, to recap, the court in *Whitmire I* was concerned with determining whether the Cherokee freedmen were entitled to share in the proceeds of Cherokee Nation lands that had been ceded to the United States and for which Congress had appropriated certain funds to the Nation. To make that determination, the court resolved that the 1866 Treaty obligated the Cherokee Nation to make the freedmen citizens with all the political rights of native Cherokees but the Cherokee Nation Constitution defined what citizenship meant and, in doing so, "ranked 'freedmen' with 'native-born Cherokees, and the lands of the nation as 'common property'", *id.* at 157, such that freedmen were entitled to a proportionate share in that common property, *id.* at 156, 158. The court then concluded that it lacked sufficient information about "the number of persons who were entitled to participate" in the common property and funds "or of the number of persons who constitute the body of the present claimants." *Id.* at 159. The court therefore suspended the entry of judgment in favor of the freedmen while it "entertain[ed] the suggestions of counsel as to how the requisite information shall be obtained[.]" *Id.*

The rights, if any, of future freedmen descendants under Article 9 of the 1866 Treaty were not addressed by the *Whitmire I* court except to state that "[t]he treaty . . . secured for [the freedmen] the guaranty that 'all laws of the Cherokee Nation shall be uniform throughout said nation' and that the freedmen 'and their descendants shall have all the rights of native Cherokees.'" *Id.* at 151. Furthermore, aside from quoting the 1866 Treaty and Section 5 of the Cherokee Nation Constitution, there is no mention or analysis of the general meaning of Article 9's residency provision. The Supreme Court made this same observation in *United States ex rel. Lowe v. Fisher*, 223 U.S. at 100, stating that "the court did not attempt an analysis of § 5 of the constitution nor of article 9 of the treaty (they are alike), but defined the rights of the freedmen and the free negroes in the language of the constitution and the article." Likewise, and more specifically, there is no mention of whether the residency requirement

could be deemed to set an eligibility expiration date for the rights of all descendants of freedmen under the treaty.

Two weeks after the United States Court of Claims issued the *Whitmire I* decision, the court issued a second decision and decree concluding, among other things, that the census taken by Secretary of the Interior in the 1880s, which was referred to as the "Wallace Roll,"[40] provided an accurate accounting of the number of freedmen existing in the Cherokee Nation in 1883. *Whitmire II*, 30 Ct. Cl. at 186. The Wallace Roll therefore was adjudged to serve as a baseline for determining the number of freedmen and their descendants who should be awarded recovery for the freedmen's proportionate share of common fund proceeds Congress appropriated to the Cherokee Nation to compensate for land ceded by the Nation under the 1866 Treaty. *Id.* at 186, 188-89, 194. The court decreed, however, that the Secretary of the Interior must correct the Wallace Roll "by adding thereto descendants born since March 3, 1883, and prior to May 3, 1894[.]"[41] *Id.* at 188-89.

Almost a year later, after the parties variously moved for rehearing and a new trial, and applied to the United States Supreme Court for an appeal of the *Whitmire II* court's decree, they reached an agreement to modify the decree to avoid further litigation. Interior's Mot. for Summ. J. Ex. 19, ECF No. 234-19. Thus, on February 3, 1896, the United States Court of Claims vacated its prior decree and entered a consent decree that abandoned reliance on the Wallace Roll in favor of authorizing the Secretary of the Interior to appoint three commissioners to determine the Cherokee freedmen entitled to

---

[40]     The Wallace Roll was made at the direction of Congress to ascertain who was eligible for a per capita distribution of $75,000 appropriated in protest of the Cherokee Nation's exclusion of freedmen from sharing in the proceeds of Cherokee Outlet lands after the Cherokee National Council acted to limit distributions to Cherokees by blood. *Whitmire II*, 30 Ct. Cl. at 182-83, 192.

[41]     By directing the enrollment of descendants born after the expiration of Article 9's residency requirement the court obviously viewed such descendants to be eligible for the rights that inured to qualifying freedmen.

share in the distribution of the court's award. Interior's Mot. for Summ. J. Ex. 19 at 130, ECF No. 234-19. The roll to be made by the Secretary of the Interior at the decree's direction would later come to be called the "Kern-Clifton Roll." *Whitmire*, 223 U.S. at 109.

The Kern-Clifton Roll was, by the decree, intended to reflect "the freedmen . . . and their descendants living and in being on the 3d day of May, 1894 . . . ."[42] Interior's Mot. for Summ. J. Ex. 19 at 129, ECF No. 234-19. Initially, though, the Commissioner of Indian Affairs who was tasked to execute the court's decree sought guidance from the court about the meaning of the residency requirement and whether it was intended to apply to both free colored persons and freedmen alike, to which the court responded as follows:

> The court is of the opinion that the clauses in that article in these words, '*And are now residents therein, or who may return within six months, and their descendants*,' were intended, for the protection of the Cherokee Nation, as a limitation upon the number of persons who might avail themselves of the provisions of the treaty; and consequently that they refer to both the freedmen and the free colored persons previously named in the article. That is to say, freedmen and the descendants of freedmen who did not return within six months are excluded from the benefits of the treaty and of the decree.

> The court is also of the opinion that this period of six months extends from the date of the promulgation of the treaty, August 11, 1866, and consequently did not expire until February 11, 1867.

*Journeycake v. Cherokee Nation*, 31 Ct. Cl. 140, 148 (Ct. Cl. 1896) (quotation marks and emphasis in original). It is worth noting that the court's announcement that "freedmen and the descendants of freedmen who did not return within six months are excluded from the benefits of the treaty and the decree" could be interpreted two ways depending on whether the phrase "who did not return within six months" is viewed as modifying the word "descendants" versus the word "freedmen." Thus, one could interpret the court's statement to mean either (1) descendants who did not themselves return within six

---

[42] Like the court, the parties obviously believed that descendants born after the expiration of Article 9's residency requirement were eligible for the same rights to an award as qualifying freedmen.

months were excluded from the treaty and decree or (2) descendants of freedman were excluded from the treaty and decree if that freedman ancestor did not return within six months.  The latter interpretation would be consistent with the text of Article 9 of the 1866 Treaty.

Several months after the United States Court of Claims entered the modified consent decree in the *Whitmire* litigation, Congress passed the Indian Appropriation Act of 1896, 29 Stat. 321, and directed the Dawes Commission, which was created to negotiate with the tribes to facilitate preparations for allotment and dissolution, to make another roll of the citizens of the Cherokee Nation to determine who was eligible to participate in the allotment process.  *Cherokee Nation*, 85 Ct. Cl. at 95-97; *Stephens*, 174 U.S. at 453.  The direction to create a roll of Cherokee Nation citizens for allotment was made without reference to the Kern-Clifton Roll.  When the Dawes Commission failed to complete the roll before the Commission's expiration in 1905, the Interior Department took over the process but the roll was still incomplete as the date set for dissolution of the Cherokee Nation government loomed in 1906. *Harjo*, 420 F. Supp. at 1126.  Accordingly, the Five Tribes Act was enacted to continue the tribal government indefinitely and otherwise address "the affairs of the tribes" in preparation for allotment. *Id.* at 1128-29.  The Five Tribes Act directed the enrollment of Cherokee freedmen on the Dawes Roll only in accordance with the Act's requirements as quoted, *supra* at page 70.

Because the compilation of the Dawes Roll was made independently of the compilation of the Kerns-Clifton roll, controversy ensued when, for example, individuals who were enrolled on the Kern-Clifton Roll and, at least initially, the Dawes Roll were later removed from the Dawes Roll after the Secretary of the Interior deemed those individuals to be ineligible for failure to show that their ancestors were actual bona-fide residents of the Cherokee Nation by February 11, 1867.  *Garfield*, 34 App. D.C. 70, is such a case.  In *Garfield*, "[t]he relators were enrolled [on the Dawes Roll] upon the understanding that their ancestor, Mary Rogers, returned to the Cherokee Nation within six months from August 11th,

1866" but a later "rehearing resulted in the finding that she did not return within that time, and, therefore, that relators were not entitled to enrolment." *Id.* at 76 (spelling in original). The relators challenged this finding and further argued that (1) their ancestor was not required to satisfy the residency requirement because it only applied to free colored persons and (2) the Secretary of the Interior lacked the authority to revise and correct the Dawes Roll after receiving partial lists of enrollees and approving them. *Id.* at 72, 75.

Importantly, in *Garfield* the relators consisted of a principal applicant (Mary Robbins), who had been the slave of a Cherokee citizen when the Civil War began, and her descendants, who were born after 1866 and therefore could not, themselves, satisfy the residency provision contained in Article 9. *Id.* at 74. As set forth in the facts stated by the opinion, the descendants' eligibility for inclusion on the Dawes Roll was, at first, accepted after the Dawes Commission:

> [F]ound upon the hearing had upon such applications that the principal applicant, Mary Robbins, <u>through whom the others claimed to be entitled to be enrolled</u>, was the slave of a Cherokee citizen at the commencement of the Rebellion, but returned to the Cherokee Nation within the time specified in the decree of the court of claims rendered on January 27, 1896, in the case of *Whitmire v. Cherokee Nation*, 31 Ct. Cl. 140, for the return of freedmen to said Nation.

*Id.* at 72-73 (emphasis added). The Acting Secretary of the Interior subsequently "approved a partial list of freedman members of the Cherokee Nation, which contained the names of Mary Robbins" and some of her descendants. *Id.* at 72. When a later investigation of another descendant's eligibility for the Dawes Roll revealed that Mary Robbins had not returned to the Cherokee Nation by February 11, 1867, the Acting Secretary directed that a consolidated rehearing and re-adjudication be held of all the relators who were descended from Mary Robbins. *Id.* at 73-74. The Dawes Commission conducted such a rehearing, after which it determined that none of the relators were entitled to enrollment. *Id.* at 74. The Acting Secretary then confirmed the Dawes Commission's decision and struck the relators' names from the Dawes Roll. *Id.*

On review, the *Garfield* court first addressed the question of whether Article 9's clauses stating "[a]nd are now residents therein, or who may return within six months, and their descendants" applied to Cherokee freedmen (versus "free colored persons" as stated in Article 9). *Id.* at 75-77. Based on the language in section 3 of the Five Tribes Act, which was enacted after the relators were enrolled on the Dawes Roll but before the Acting Secretary canceled their enrollment, the court held that it did. *Id.* at 76-77. Although the court viewed section 3 to be "a legislative interpretation of" Article 9 of the 1866 Treaty, the court's analysis appears to have been offered only in the context of determining whether the relators' ancestor needed to satisfy the residency requirement in Article 9 to be eligible to be identified as a Cherokee freedman on the Dawes Roll, which would then determine whether the relators were also eligible to be placed on the Dawes Roll as descendants of a Cherokee freedman. *Id.* at 76. The court never explicitly addressed whether the relators themselves had to meet the residency requirement to be placed on the Dawes Roll. The decision indicates, however, that during the agency-level adjudication of the relators' applications they were not required to independently satisfy the residency requirement in Article 9. *Id.* (stating that "[t]he relators were enrolled upon the understanding that their ancestor, Mary Rogers, returned to the Cherokee Nation within six months from August 11, 1866"). The court further held that the Secretary of the Interior's authority over the Dawes Rolls continued until terminated by statute, in which case he continued to have the power to correct the rolls until such termination. *Id.* at 79 ("We therefore hold that the Secretary's authority as to these enrolments was not exhausted when he acted upon the record first submitted to him, and that he had power to correct the error discovered.").

The relators sought an appeal at the Supreme Court, which resulted in the decision in *Lowe*, 223 U.S. 95. Here again, in reciting the factual background, the Supreme Court noted that the Secretary of the Interior had found that "relators were descendants of liberated slaves, but he also found that their ancestors had not returned to the Cherokee Nation within six months of the date of the treaty, August 11,

1866." 223 U.S. at 97. The Supreme Court took up the same two issues posed in *Garfield*, which were whether "the requirement of a return within the time designated applie[d] only to free colored persons" and whether the Secretary of the Interior retained the power to cancel the relators names from the Dawes Roll after previously having approved a partial list that included their names. *Id.* at 98.

Although the Supreme Court cited section 3 of the Five Tribes Act and commented about the relators lacking entitlement to be placed on the Dawes Roll,[43] it frankly is unclear whether the Supreme Court considered the lack of entitlement to be because the relators themselves failed to establish that they had been bona-fide residents of the Cherokee Nation by February 11, 1867 or because their ancestors failed in that regard, or both. Admittedly, the Supreme Court indicated that it considered the United States Court of Claims decree in the *Whitmire* litigation to exclude the relators "because they were not residents of the Cherokee Nation at the time of the promulgation of the [1866] treaty," *id.* at 104, and then went on to cite subsequent congressional legislation that required that enrollment on the Dawes Rolls be made in conformity with that decree, *id.* at 104-105. The Supreme Court's discussion on this point culminated with the quotation of section 3 of the Five Tribes Act, which the Supreme Court commented was an "even more particular" expression by Congress of the enrollment requirement, presumably referring to the fact that the act stated with greater clarity that the residency provision applied to both free colored persons and former slaves of Cherokee citizens. *Id.* at 105. The Supreme Court then analyzed whether the Secretary of the Interior retained authority to make changes to the Dawes Rolls after approving a list and held that the Secretary could revise and correct the rolls until his jurisdiction was terminated pursuant to the Five Tribes Act. *Id.* at 106-107. The Supreme Court then affirmed the decision in *Garfield*.

---

[43]     *Id.* at 105 (stating that "[r]elators nevertheless insist that notwithstanding they were not entitled to be placed upon the rolls, yet, having been placed there, they cannot be taken off by the Secretary of the Interior")

Even assuming that the decisions in *Garfield* and *Lowe* support the proposition advanced by the Cherokee Nation, which is that the Five Tribes Act limited eligibility for enrollment on the Dawes Roll to descendants of Cherokee Freedmen who were bona-fide residents of the Cherokee Nation by February 11, 1867, that limitation would have applied, by the terms of the act, only to applications for enrollment submitted after December 1, 1905 and until the Secretary of the Interior lost jurisdiction on March 4, 1907. As already explained, the plain language, purposes and legislative history of the Five Tribes Act do not evince a congressional intent to alter the rights under Article 9 of the 1866 Treaty or to amend or abrogate those rights. Instead, the Five Tribes Act appears to have been intended to wind down the Dawes Roll enrollment process by curtailing the filing of new applications and setting a deadline for final enrollment. The Dawes Roll needed to be completed to establish a snapshot in time of the Cherokee freedmen and their living descendants who were entitled to participate in the allotment process given that the United States was moving toward dissolution and statehood in what was anticipated, at the time, to be short order. There is nothing about the decisions cited by the Cherokee Nation that suggest that the enrollment provisions in the Five Tribes Act, including section 3, had a broader reach beyond the immediacy of finalizing enrollment. Moreover, the *Garfield* and *Lowe* decisions involved facts indicating that the Dawes Commission had, at least until some time before the Five Tribes Act was enacted, been approving the enrollment of descendants who were not residents of the Cherokee Nation on or before February 11, 1867.

### III.

The ultimate issues in this case are weighty and the competing interests and equities reflect the casualties of profound acts of injustice, indignity and demoralization committed during anguished times in our nation's history. And while both the Cherokee Freedmen and the Cherokee Nation are victims of that history in different, albeit intertwined, respects, it cannot be gainsaid that the Cherokee Freedmen bear no culpability for the course of historical acts and agreements that ultimately ushered them to this

Court and over which they commanded no voice, representation or power. The Court finds it confounding that the Cherokee Nation historically had no qualms about regarding freedmen as Cherokee "property" yet continues, even after 150 years, to balk when confronted with the legal imperative to treat them as Cherokee people. While the Cherokee Nation might persist in its design to perpetuate a moral injustice, this Court will not be complicit in the perpetuation of a legal injustice.

There appears to be no dispute that the Cherokee Freedmen are descendants of freedmen who were held as slaves by Cherokees and ultimately listed on the Dawes Freedmen Roll. Article 9 of the Treaty of 1866 entitles them to "all the rights of native Cherokees," 14 Stat. at 801, which means they have a right to citizenship so long as native Cherokees have that right. Nothing in the 1866 Treaty qualified that right by subjecting it to a condition antecedent that would terminate it, including the extinction of Indian Territory upon Oklahoma statehood. Although the Cherokee Nation Constitution defines citizenship, Article 9 of the 1866 Treaty guarantees that the Cherokee Freedmen shall have the right to it for as long as native Cherokees have that right. The history, negotiations, and practical construction of the 1866 Treaty suggest no other result. Consequently, the Cherokee Freedmen's right to citizenship in the Cherokee Nation is directly proportional to native Cherokees' right to citizenship, and the Five Tribes Act has no effect on that right. The Five Tribes Act did not abrogate, amend or otherwise alter Article 9's promise that descendants of freedmen shall have all the rights of native Cherokees.

The Cherokee Nation's sovereign right to determine its membership is no less now, as a result of this decision, than it was after the Nation executed the 1866 Treaty. The Cherokee Nation concedes that its power to determine tribal membership can be limited by treaty. Cherokee Nation's Mem. In Support of Mot. for Summ. J. 21, ECF No. 233. The Cherokee Nation can continue to define itself as it sees fit but must do so equally and evenhandedly with respect to native Cherokees and the descendants of

Cherokee freedmen. By interposition of Article 9 of the 1866 Treaty, neither has rights either superior or, importantly, inferior to the other. Their fates under the Cherokee Nation Constitution rise and fall equally and in tandem. In accordance with Article 9 of the 1866 Treaty, the Cherokee Freedmen have a present right to citizenship in the Cherokee Nation that is coextensive with the rights of native Cherokees.[44]

## CONCLUSION

For all the foregoing reasons, the Court will deny the Cherokee Nation and Principal Chief Baker's Motion for Partial Summary Judgment [ECF No. 233], and grant the Cherokee Freedmen's Cross-Motion for Partial Summary Judgment [ECF No. 235] as well as the Department of the Interior's Motion for Summary Judgment [ECF No. 234]. Because it was unnecessary for the Court to either review or rely on the expert report that was submitted as Exhibit 3 to the Department of the Interior's Motion for Summary Judgment [ECF No. 234], the Cherokee Nation and Principal Chief Baker's Motion to Strike Expert Report of Emily Greenwald [ECF No. 240] will be denied as moot. An appropriate order will accompany this opinion.

August 30th, 2017

Thomas F. Hogan
Senior United States District Judge

---

[44] The Court has considered the parties' other arguments and finds them without merit.